**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SAFECO INSURANCE COMPANY OF )
AMERICA and OHIO CASUALTY INSURANCE )
COMPANY, individually, and on behalf of a class )
consisting of members of the National Workers )
Compensation Reinsurance Pool, )
                                     )
                         Plaintiffs, )
vs. )
                                      )
AMERICAN INTERNATIONAL GROUP, INC., )
AIG CASUALTY COMPANY F/K/A )
BIRMINGHAM FIRE INSURANCE COMPANY )
OF PENNSYLVANIA, AIU INSURANCE )
COMPANY, AMERICAN HOME ASSURANCE )
COMPANY, AMERICAN INTERNATIONAL )
PACIFIC INSURANCE COMPANY F/K/A )
AMERICAN FIDELITY COMPANY, )
AMERICAN INTERNATIONAL SOUTH )
INSURANCE COMPANY F/K/A AMERICAN )
GLOBAL INSURANCE COMPANY, )
AMERICAN INTERNATIONAL SPECIALTY )
LINES INSURANCE COMPANY F/K/A )
ALASKA INSURANCE COMPANY, )
COMMERCE AND INDUSTRY INSURANCE )
COMPANY, INC., GRANITE STATE )
INSURANCE COMPANY, ILLINOIS )
NATIONAL INSURANCE COMPANY, )
INSURANCE COMPANY OF THE STATE OF )
PENNSYLVANIA, NATIONAL UNION FIRE )
INSURANCE COMPANY OF PITTSBURGH, )
NEW HAMPSHIRE INDEMNITY COMPANY, )
and NEW HAMPSHIRE INSURANCE )
COMPANY, )
                                      )
                         Defendants. )

Case No. 09CV2026

Judge Robert W. Gettleman

Magistrate Sidney I. Schenkier

**FIRST AMENDED**
**CLASS ACTION COMPLAINT**

      Safeco Insurance Company of America ("Safeco") and Ohio Casualty Insurance

Company ("Ohio Casualty") (collectively, "Plaintiffs"), individually, and on behalf of a class

consisting of members of the National Workers Compensation Reinsurance Pool ("NWCRP"),

an unincorporated association, and excluding the Defendants named here (Plaintiffs and the class

are collectively referred to as the "NWCRP Class"), for their First Amended Complaint against

American International Group, Inc. ("AIG") and AIG Casualty Company f/k/a Birmingham Fire

Insurance Company of Pennsylvania, AIU Insurance Company; American Home Assurance

Company, American International Pacific Insurance Company f/k/a American Fidelity

Company, American International South Insurance Company f/k/a American Global Insurance

Company, American International Specialty Lines Insurance Company f/k/a Alaska Insurance

Company, Commerce and Industry Insurance Company, Inc., Granite State Insurance Company,

Illinois National Insurance Company, Insurance Company of the State of Pennsylvania, National

Union Fire Insurance Company of Pittsburgh, New Hampshire Indemnity Company, and New

Hampshire Insurance Company (collectively, the "AIG Companies" and, when combined with

AIG, "Defendants"), allege as follows:

## I.    NATURE OF THE CASE

1.      This action arises out of Defendants' long-term fraudulent underreporting of

workers compensation premium and evasion of related financial obligations to Plaintiffs and the

class.  Plaintiffs bring this action individually and on behalf of all members of the NWCRP,

except the AIG Companies, in their capacity as representative class members of the NWCRP,

pursuant to Fed. R. Civ. P. 23(a) and (b)(3) ("Rule 23(a) and (b)(3)") and, in the alternative, Fed.

R. Civ. P. 23.2 ("Rule 23.2").

2.      The NWCRP was established in 1970 based on a concept that insurance

companies writing workers compensation insurance should be able to participate in an

arrangement that equitably apportions the premium, losses and expenses arising from the

residual, or assigned risk, workers compensation insurance market. In general terms, the residual market is comprised of employers who have been unable to get an insurer to voluntarily provide workers compensation coverage, and coverage is "assigned" to a specific insurer who must provide coverage under rates and terms specified by law. Generally, the residual market system, operating pursuant to a variety of state laws, regulations and contracts, aims at making workers compensation insurance available to all employers and, using reinsurance and related mechanisms, provides an equitable premium-based apportioning of the losses associated with residual market workers compensation policies.

3.     The National Council on Compensation Insurance, Inc. (the "NCCI" or "Administrator") is a Delaware non-stock corporation that serves as administrator to each of the companies participating in the NWCRP (the "Participating Companies" or a "Participating Company"). The NCCI is an agent for each of the Participating Companies, including the members of the NWCRP Class.

4.     On the basis of certified financial reports containing premium information provided by the Participating Companies, the NCCI, acting as Administrator and agent on behalf of the Participating Companies, contractually apportions residual market results among the Participating Companies based upon their voluntary workers compensation market share as derived from the premium they report. This system is predicated on insurance companies acting honorably and truthfully in their disclosure of annual workers compensation premium and other financial reporting.

5.     In a rejection of the fundamental aims of the NWCRP, Defendants schemed to cheat the NWCRP Class by falsely underreporting the workers compensation premium of the AIG Companies. As a result, over many of the years at issue, the NWCRP experienced billions

of dollars of losses that were allocated among the Participating Companies through this premium-based reinsurance. This case has been filed to redress Defendants' false reporting and the breach of legal duties and trust owed by Defendants to the NWCRP Class.

6. In 2005, in the midst of federal and state investigations and ensuing enforcement action taken against Defendants for false financial reporting, bid-rigging and other unlawful conduct, it was disclosed that Defendants had engaged in a series of longstanding false premium reporting practices with the purpose and effect of evading state insurance taxes and residual market obligations. The revelations from this investigation confirmed that AIG's senior management, including but not limited to Chairman and CEO Maurice R. Greenberg and senior executives Thomas R. Tizzio, Joseph C. Smetana and Richard L. Thomas (collectively, AIG's "Senior Managers"), directed or caused wholly-owned and controlled AIG affiliates, including the AIG Companies, to submit false and falsely certified financial statements and reports that deliberately underreported workers compensation premium information. Indeed, as further discussed below, these disclosures revealed that for decades Defendants had been intentionally issuing false statements and reports, which understated the true amount of the workers compensation premium written by the AIG Companies in order to decrease their proportionate share of the residual workers compensation market and thereby increase earnings and obtain other valuable benefits. This false reporting activity rendered past and current public and other financial reporting for Defendants inaccurate and misleading.

7. In a further development, the regulatory investigations disclosed that Defendants' false workers compensation premium reporting activities had been the subject of an internal investigation at AIG in 1991 and 1992. That internal investigation, which was led by Michael Joye, AIG's General Counsel and the most senior legal officer in the public company, resulted in

a formal, written report that acknowledged and detailed the company's unlawful conduct (the "Joye Memorandum"). In addition to describing in detail the false premium reporting practices, the Joye Memorandum determined that the false workers compensation premium reporting activities at issue reflected business practices that were, among other things, "permeated with illegality." A copy of the Joye Memorandum, as filed by the New York Attorney General in May 2005, is attached hereto as Exhibit A.

8.     Despite the admissions in the Joye Memorandum that Defendants' workers compensation reporting practices were unlawful and exposed the organization and responsible executives to civil liability in the hundreds of millions of dollars (as computed in 1992) as well as criminal prosecution for fraud, Defendants, along with their officers and outside advisors who were privy to the internal investigation, failed to put an end to the false workers compensation premium reporting, correct the false and falsely certified financial statements, or make appropriate restitution.

9.     To the further detriment of the NWCRP Class, Defendants failed to take proper and lawfully required action to preserve evidence of the false premium reporting misconduct or disclose the material contingent liability and adverse financial consequences for other insurers resulting from the false reporting schemes. Indeed, the circumstances reflect instead that Defendants embarked upon a cover-up of the false premium reporting conduct, including by failing to retain relevant records and by destroying evidence. The cover-up continues to the current day in the form of AIG's refusal to disclose to the victims of its fraud all relevant information about its false premium reporting practices – practices conducted under the direction of certain managers and officers of AIG, including AIG's Senior Managers, who were aware of

the schemes and failed to take proper action to end the false workers compensation premium reporting or to preserve relevant records.

10.     As uncovered in the internal and external investigations of AIG, certified annual financial reports and other materials containing falsified workers compensation premium figures were regularly issued by the AIG Companies for the purpose and with the effect of evading AIG's and the AIG Companies' equitable shares of financial responsibility for the NWCRP's allocated residual market losses. These false financial reporting practices were fraudulent and had the purpose and substantial effect of both depriving the members of the NWCRP Class of the funds that they were forced to pay in residual market assessments as a result of AIG's and the AIG Companies' evaded obligations, and requiring them to assume substantially greater financial responsibility in the form of reinsurance liability for residual market losses than if Defendants had truthfully reported their premium.

11.     In settlements between AIG and enforcement authorities in 2006, Defendants admitted and apologized for the acknowledged false premium reporting for the AIG Companies and professed to adopt appropriate financial reporting, governance and business codes of conduct. Defendants also agreed to deposit hundreds of millions of dollars into a settlement fund for victims of the false workers compensation premium reporting.

12.     As part of a $1.6 billion settlement with New York and federal authorities, Defendants paid approximately $42 million to various states for its admitted and related tax evasion, seeking no release. Defendants also committed to pay $301 million dollars to those victimized by its longstanding practice of falsely reporting the workers compensation premiums received by the AIG Companies. Defendants have yet to make a full and complete restitution for

the financial injury caused to the NWCRP Class, and, accordingly, they remain liable to the NWCRP Class for their admitted false premium reporting conduct.

13.     Defendants' premium reporting fraud and cheating spans decades and involves thousands of pages of submissions and sworn filings of knowingly false and underreported workers compensation premium information provided to the NCCI, as agent for the NWCRP Class.  The NCCI, as Administrator for the Participating Companies, was responsible for allocating the proportional financial responsibility for NWCRP reinsurance liabilities to the NWCRP Class, and the AIG Companies, and for making residual market assessments to these entities.  Defendants intended for their false reports to be relied upon, and they were in fact relied upon by the NCCI, as agent for the NWCRP Class, which resulted in a disproportional amount of the NWCRP reinsurance liabilities being allocated to the NWCRP Class.

14.     Defendants' false premium reporting took a variety of forms, including, but not limited to, the following measures (collectively referred to as the "AIG False Workers Compensation Premium Reporting Schemes") by which Defendants knowingly and falsely reported the AIG Companies' applicable workers compensation premium to state tax authorities and the NCCI:

> A.     Defendants filed false responses to financial data calls, statistical reports, annual financial reports and other false reports with state authorities and the NCCI, which knowingly underreported the true and actual extent of workers compensation premium written by the AIG Companies by mischaracterizing workers compensation premium as non-workers compensation premium;
>
> B.     Defendants used a 50% pay-in program where half the maximum amount of workers compensation premium was collected at policy inception and the balance was booked as reinsurance assumed premium;
>
> C.     Defendants used an 18-month close-out program where workers compensation premium collected more than 18 months after inception of a policy was booked as general liability premium;

785038                                                                          7

     D.     Defendants falsely booked $25 million per quarter of workers compensation retroactive premium as reinsurance assumed premium; and,

     E.     Defendants utilized indemnity agreements with guaranteed cost policies which they used to collect reimbursements from policyholders in a manner intended to avoid reporting the proper amount of workers compensation premium.

15.     Defendants formulated and executed the AIG False Workers Compensation Premium Reporting Schemes under the direction and leadership of AIG's Senior Managers and other members of AIG's management team. AIG Chairman Greenberg bore direct responsibility for the supervision and oversight of AIG's day-to-day operations, including the AIG programs that were the source of many of the accounting machinations to which AIG has now admitted. Senior Managers Tizzio, Smetana, Thomas, and others were active in the conduct at issue, including the later cover-up and destruction of related evidence. These individuals acted deliberately in furtherance of Greenberg's infamous proclamation that he wanted to obtain every "unfair advantage" in the operation of the AIG businesses.

16.     The AIG False Workers Compensation Premium Reporting Schemes generated significant financial benefits for Defendants, including substantially increasing the profits reported by the AIG Companies and, ultimately, by AIG. In particular, for their role in improving the financial results reported by Defendants, the persons responsible for conducting the business operations of those companies received substantial additional compensation, bonuses and other rewards outside the normal course of AIG's business, from the award of interests in or compensation from C.V. Starr & Co. and/or Starr International Corp., third parties that were stockholders of, but were otherwise unrelated to, AIG.

17.     AIG's Senior Managers and others received periodic payments from C.V. Starr & Co. and/or Starr International Corp. This extra-corporate compensation scheme incentivized

those individuals to maximize the profitability of AIG, including by using the AIG False

Workers Compensation Premium Reporting Schemes to fraudulently underreport the AIG

Companies' workers compensation premium to the NCCI.

18.     While deceitfully purporting to be responsible industry participants, through

service on related NCCI and NWCRP Boards and committees, Defendants secretly took

advantage of the NWCRP Class, whose members both bore the financial hardships inherent in

the workers compensation residual market and paid a disproportionate share of that market's

losses.

19.     Through the hereinabove-alleged conduct, Defendants caused hundreds of

millions of dollars in direct damage to the NWCRP Class as well as the loss of the use of funds

and other consequential damages in excess of $1 billion.

20.     This action alleges violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), as well as claims for common law fraud, accounting, open, current

and mutual account, breach of contract, promissory estoppel and unjust enrichment.

## II.     PARTIES AND RELEVANT ENTITIES AND INDIVIDUALS

21.     Safeco is a Participating Company in the NWCRP and is incorporated under the

laws of the State of Washington, with its principal place of business in Washington.

22.     Ohio Casualty is a Participating Company in the NWCRP and is incorporated

under the laws of the State of Ohio, with its principal place of business in Ohio.

23.     The NWCRP, an unincorporated association, is a residual market reinsurance

mechanism through which its members, licensed workers compensation insurance companies,

reinsure certain workers compensation insurers who issue residual market insurance policies. All

of the insurance companies participating in the NWCRP, with the exception of the AIG

Companies, comprise the NWCRP Class. The NWCRP Class members are parties to certain agreements establishing a contractual reinsurance mechanism that provides reinsurance for a smaller number of members of the NWCRP Class, known as "servicing carriers," that issue and service residual market policies.

24.    Defendant AIG is a corporation incorporated under the laws of the State of Delaware with its principal place of business in New York, New York. AIG is a publicly-traded holding company, which, through its subsidiaries and affiliates, engages in a broad range of financial and insurance-related activities in the United States and abroad. AIG also serves as the largest underwriter of commercial and industrial insurance in the United States. AIG does not itself write or report upon its own workers compensation insurance, but directs and controls the activities of its affiliates and subsidiaries, including the AIG Companies.

25.    Defendant Granite State Insurance Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

26.    Defendant American Home Assurance Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

27.    Defendant Insurance Company of the State of Pennsylvania is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

28.    Defendant New Hampshire Indemnity Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

29.     Defendant Commerce and Industry Insurance Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

30.     Defendant AIU Insurance Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

31.     Defendant AIG Casualty Company (f/k/a Birmingham Fire Insurance Company of Pennsylvania) is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

32.     Defendant National Union Fire Insurance Company of Pittsburgh, Pa is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

33.     Defendant New Hampshire Insurance Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

34.     Defendant American International Pacific Insurance Company is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in New York, New York.

35.     Defendant Illinois National Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in New York, New York.

36.     Defendant American International South Insurance Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

37.    Defendant American International Specialty Lines Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in New York, New York.

38.    Each of the AIG Companies named as a Defendant herein is a subsidiary or affiliate of AIG that is or was at some relevant time a Participating Company in the NWCRP.

39.    Maurice R. Greenberg served as the Chairman and Chief Executive of AIG prior to his forced removal in 2006 following the state and federal investigations and enforcement actions brought against AIG and Greenberg personally that exposed the AIG False Workers Compensation Premium Reporting Schemes.  In that capacity, Greenberg was responsible, in part, for conducting the business operations not only of AIG, but also of the AIG Companies. Greenberg was also responsible, in whole or in part, for directing and controlling the business operations of C.V. Starr & Co., Inc. and Starr International Company, Inc.

40.    Thomas R. Tizzio served as the President of AIG for many years, including the years between 1991 and 1997, and subsequently served as Senior Vice Chairman. In those and other capacities, Tizzio was responsible, in part, for conducting the business operations not only of AIG, but also of the AIG Companies.  Tizzio retired from AIG in 2006, but remains an Honorary Director and advisor to AIG.

41.    Joseph C. Smetana is a former President and Chairman of AIG Risk Management. In those and other capacities, Smetana was responsible, in part, for conducting the business operations not only of AIG, but also of the AIG Companies.  Smetana was responsible for creating the AIG False Workers Compensation Premium Reporting Schemes.

42.    Richard L. Thomas managed AIG's Office of Workers Compensation prior to 1996 and subsequently served as a Senior Vice President and Chief Underwriting Officer. In

those and other capacities, Thomas was responsible, in part, for conducting the business operations not only of AIG, but also of the AIG Companies. Thomas is still employed by AIG as a senior executive.

43.     C.V. Starr & Co., Inc. ("CVSCO") is an investment holding company organized and existing under the laws of Delaware with a principal place of business in New York, New York. Although founded by Cornelius Van Der Starr, who also founded AIG, Defendants have never had any ownership interest in CVSCO at any time material to this First Amended Complaint. At all times material to this First Amended Complaint, CVSCO was a minority shareholder in AIG. From 1970 until 2005, CVSCO's business activities were conducted by individuals, who were officers and/or directors of AIG and/or the AIG Companies.

44.     Starr International Company, Inc. ("SICO") is a corporation organized and existing under the laws of Panama, with a principal place of business in Bermuda. Although founded by Cornelius Van Der Starr, who also founded AIG, Defendants have never had any ownership interest in SICO at any time material to this First Amended Complaint. At all times material to this First Amended Complaint, SICO was a minority shareholder in AIG. From 1970 until 2005, SICO's business activities were conducted by individuals who were officers and/or directors of AIG and/or the AIG Companies.

### III.    JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this matter under to 28 U.S.C. § 1332 because Safeco is a citizen of the State of Washington, Ohio Casualty is a citizen of Ohio, Defendants are citizens of Colorado, Delaware, Illinois, New York, and Pennsylvania, and the amount in controversy exceeds $75,000.00, exclusive of costs and interest. This Court also has jurisdiction under 28 U.S.C. § 1331 because it includes a federal question under 28 U.S.C.

§ 1964(a), the RICO statute's jurisdictional provision for civil actions. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

46.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper under 18 U.S.C. §§ 1965(a) and (b) because Defendants reside in this district, are found in this district, have an agent in this district, transact affairs in this district, or the ends of justice require that any parties residing in other districts be brought before this district court.

## IV.     CLASS ALLEGATIONS

47.     Plaintiffs bring this action individually and on behalf of all members of the NWCRP, an unincorporated association, other than the AIG Companies. Plaintiffs are representative members of the class of Participating Companies of the NWCRP, pursuant to Rules 23(a) and (b)(3) and, in the alternative, Rule 23.2.

48.     The NWCRP Class consists of all members of the NWCRP, with the exception of the AIG Companies. All members of this class were allocated an improperly greater share of the residual market losses due to Defendants' false and fraudulent reporting of workers compensation premiums.

### A.     RULE 23(a) and (b)(3)

49.     This action is properly brought, and may be maintained, as a class action pursuant to Rules 23(a) and 23(b)(3).

50.     There are over 500 NWCRP Class members, and thus, the class is so numerous that joinder of all class members would be impracticable.

51.     There are questions of law and fact common to the members of the NWCRP

Class, which common questions predominate over any questions that affect only individual class

members.  These questions include, but are not limited to, the following:

A.     Whether Defendants had a duty to submit accurate premium data
to the NCCI, as Administrator for the Participating Companies, so
that the reinsurance mechanism could equitably apportion the
premium, losses, and expenses of the residual market for workers
compensation insurance in NWCRP states;

B.     Whether Defendants defrauded and conspired to defraud the
NWCRP Class by using the mail and wires  (i) to regularly send
the NCCI, as agent for the NWCRP Class, false and falsely sworn
financials that underreported the true amount of workers
compensation written by the AIG Companies and other affiliates
and (ii) to regularly send the NCCI payments which underpaid the
AIG Companies' obligations (and correspondingly caused the
NWCRP Class members to overpay) for the amounts that were
really owed relating to residual market losses and liabilities;

C.     Whether Defendants obtained and conspired to obtain substantial
economic benefit in the form of money that was retained and/or
compensation earned as a result of the avoidance of the residual
market liabilities and assessments that were wrongfully caused to
be assumed or paid by other NWCRP Class members;

D.     Whether any report, annual statement or submission any Defendant
made to the NCCI was knowingly false or misleading in any
material respect;

E.     Whether the NWCRP Class' reliance on Defendants' statements
and promises to fairly and accurately report workers compensation
premium to the NCCI was reasonable, justifiable and/or
foreseeable; and

F.     Whether AIG violated 18 U.S.C. §§ 1962(c) and (d).

52.     Plaintiffs' claims are typical of those of the other NWCRP Class members in that

they arise from the damages suffered as a result of the same racketeering activities, breaches of

contract, misstatements and other misconduct of Defendants.  Plaintiffs and the other NWCRP

Class members share the same factual and legal theories against Defendants.

785038                                                  15

53.     A class action is the only appropriate method for the fair and efficient adjudication of this controversy for the following reasons, among others:

A.     The costs of individual actions here would be not be economically feasible for either the NWCRP Class or Defendants;

B.     Individual actions would unduly burden the judicial system; and

C.     Individual actions brought by the NWCRP Class members would create a risk of inconsistent results and would be unnecessarily duplicative of this litigation.

54.     Plaintiffs anticipate no significant or unusual difficulty in the management of this action because:

A.     AIG's racketeering activities constitute a common scheme perpetrated on all NWCRP Class members, all of which rely on the accuracy of the submissions made by Defendants to the NCCI;

B.     Evidence proving Defendants' false and fraudulent reporting of workers compensation premiums and the identities of the participants involved is ascertainable through discovery; and

C.     The identities of the NWCRP Class members are known or readily ascertainable.

**B.     RULE 23.2**

55.     In the alternative, this action is also properly brought, and may be maintained, as a class action pursuant to Rule 23.2. That Rule allows "[a]n action brought by or against the members of an unincorporated association" to be brought as a class "by naming certain members as representative parties." A Rule 23.2 class may be maintained if it appears that "the representative parties will fairly and adequately protect the interests of the association and its members."

56.     The NWCRP is an unincorporated association within the meaning of Rule 23.2. The NWCRP is a voluntary association of insurance companies having the common purpose of providing a means for workers compensation insurers to fulfill their obligations to the state

workers compensation residual market plans by reinsuring residual market policies. The NWCRP's purposes include facilitating the implementation and administration of Participating Company reinsurance by establishing uniform rules, policies, procedures and centralized administration for the reinsurance relationships. The NWCRP has a defined membership, which consists of the Participating Companies. The NWCRP is governed by the Articles of Agreement (the "Articles"), a contract to which the Participating Companies are parties. A copy of the most recent version of the Articles is attached hereto as Exhibit B. The NWCRP also has a definite structure, with a Board of Governors established by the Articles, as well as officers and a committee structure. Further, the NWCRP carries out regularly-scheduled organizational activities, including regular Board meetings, periodic committee meetings and annual meetings of the Participating Companies.

57. Plaintiffs will fairly and adequately represent the interests of the other members of the NWCRP Class. Plaintiffs have goals and interests that are common to those of the class members as reflected in their common membership in the NWCRP. Plaintiffs and the other NWCRP Class members stand in the same position against Defendants with respect to their claims under RICO and for common law fraud, accounting, open, mutual and current account, breach of contract, promissory estoppel and unjust enrichment arising out of Defendants' false and fraudulent reporting of workers compensation premiums. Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel who are competent in the prosecution of RICO and fraud claims and who intend to zealously protect and represent the interests of the NWCRP Class.

## V.  FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.  NWCRP's Role in the Residual Market for Workers Compensation Insurance

58.  The workers compensation insurance market in most states is composed of two distinct parts, the voluntary market and the assigned risk (or "residual") market.  The voluntary market is comprised of employers who are able to obtain insurance through the ordinary means of application through an agent or broker, without resorting to the residual market.  In contrast, the residual market consists of employers that are unable to procure workers compensation insurance through ordinary means in the voluntary market.  As a condition of being licensed to write workers compensation insurance in the voluntary market, most states require insurance companies to participate in the residual market

59.  The NWCRP was established to provide insurance companies an option for complying with the requirement that they participate in the residual market.  Since 1970, the NWCRP has facilitated the equitable sharing of residual market losses in over 40 states, as explained below.  The NWCRP mechanism provides for the apportionment of residual market premium and losses based on the amount of voluntary market workers compensation premium written and reported by the NWCRP Participating Companies to the NCCI.

60.  Each of the NWCRP Participating Companies is required to annually report to the NCCI its net direct written workers compensation premiums by year and by state, as specified in the NWCRP Articles of Agreement.  The Participating Companies' written submissions to the NCCI include net direct written workers compensation premium data as sworn in annual financial reports which are filed with insurance regulators in each state where an insurance company is licensed.  The NCCI relies upon the financial call reports, statistical reports and annual financial reports for each Participating Company for the purpose of verifying the accuracy of the premium and other financial information submitted to the NCCI.

61.     Based on these annual reports and sworn premium figures, the NCCI calculates each Participating Company's share of residual market losses and related expenses.  For each year, by state, the NCCI calculates a reinsurance participation ratio for each Participating Company based on the ratio of the total amount of workers compensation premiums that the specific Participating Company reported that it wrote in the voluntary market in a calendar year to the total amount of workers compensation premiums that all NWCRP Participating Companies reported they wrote in the voluntary market in that same calendar year.

62.     In its capacity as Administrator, the NCCI issues statements to the NWCRP Participating Companies showing the relevant Participating Company's allocated share of residual market premiums, losses, and expenses.  Each Participating Company then becomes liable for its share of the NWCRP operating losses, and is obligated to remit any cash balance owed to the NCCI.  The NCCI sends quarterly invoices to the NWCRP Participating Companies throughout the United States, including such companies in Illinois and in this District.

63.     By virtue of this confidential reporting and invoicing mechanism employed by the NCCI in connection with the NWCRP, individual Participating Companies are unable to independently verify the reliability of the reporting of other Participating Companies.   A Participating Company can only confirm the accuracy of the calculations performed by the NCCI with regard to its own, reported premium data.  Each Participating Company, including the NWCRP Class members and the AIG Companies, understands this characteristic of the NWCRP and, therefore, expects the other Participating Companies to rely on the accuracy of the reports that each of the other Participating Companies submits to the NCCI.  In turn, each Participating Company, including the NWCRP Class members, does in fact reasonably rely on the reports submitted to the NCCI by all other Participating Companies, including Defendants.

64. As a result of the AIG False Workers Compensation Premium Reporting Schemes, the NWCRP Class members paid more in assessments to the NWCRP than they would have but for Defendants' false and fraudulent underreporting, while the AIG Companies paid less than they would have but for Defendants' false and fraudulent underreporting. Each member of the NWCRP Class and the AIG Companies has an account with the NCCI arising from the reinsurance mechanism. These accounts are open to future adjustments as a result of changes in premium, losses, and expenses incurred over time. These accounts are current as a result of the fact that adjustments have been made to these accounts within the last 12 months. These accounts are mutual as a result of the fact that adjustments to the account can be favorable or unfavorable to the NWCRP Class and/or the AIG Companies and credit and debit balances are offset against one another.

**B.     AIG's False and Fraudulent Reporting of Workers Compensation Premiums**

65. For several decades, the AIG Companies, as operated by AIG, AIG's Senior Managers and others, directed and participated in schemes to mischaracterize, falsely report and falsely book the AIG Companies' workers compensation premiums as other premiums in order to reduce expenses, inflate profits and enrich themselves.

66. According to a lawsuit filed by AIG against its two most senior officers, Greenberg, Tizzio and others knew and approved of the false reporting schemes and failed to take corrective action in the form of payment of additional taxes and assessments despite the discovery by AIG's General Counsel, Michael Joye, of the AIG False Workers Compensation Premium Reporting Schemes and his unequivocal identification of their illegality.

67. The AIG False Workers Compensation Premium Reporting Schemes were designed to and had the effect of allowing the AIG Companies to reduce expenses by evading their full and fair share of residual market assessments. As a result of Defendants' knowing

underreporting of the AIG Companies' workers compensation premiums, the NWCRP Class received quarterly invoices from the Administrator that apportioned reinsurance obligations based on these false premium reports, effectively repeating those false statements to the NWCRP Class, and thus imposing upon the NWCRP Class disproportionately higher shares of liability for the ultimate losses arising from the workers compensation residual market than would have been imposed but for the AIG Companies' false reports. The financial injury to the NWCRP Class, based on Defendants' own admissions, runs into the hundreds of millions of dollars excluding interest and other relevant sanctions, including disgorgement and exemplary damages.

68.     Over the course of the AIG False Workers Compensation Premium Reporting Schemes, Defendants were advised that the false reporting practices were illegal and should be halted, that corrective action needed to be taken, and that restitution had to be made to victims. Defendants ignored this advice, continued the false reporting of premiums, continued to falsify sworn financials, and continued to intentionally benefit from the financial gains created by the false reporting.

69.     In June 1989, a compliance and underwriting administration officer for the AIG Risk Management division of AIG met with the head of AIG Risk Management, to recommend that certain of the AIG False Workers Compensation Premium Reporting Schemes be immediately stopped. His superior responded that:

> none of his presentation was news to him; and that he had made a similar presentation (using stronger language) to his superiors some time ago. The policy decision in those higher councils had been to continue the illicit practices, pending discovery and implementation of another effective scheme to avoid some substantial part of the taxes and Assigned Risk assessments on our Worker's Compensation business. Therefore [he was] prohibited from directing [AIG's] operation staffs to adopt the recommendation above.

70.     In 1991 and 1992, AIG General Counsel Joye led an internal investigation of the company's workers compensation business practices. As a result of this investigation, Defendants determined that their conduct with respect to booking and reporting workers compensation premiums "involve[d] various intentional violations of State and Federal law." Defendants further determined that their workers compensation business was "permeated with illegality."

71.     Interviews conducted during AIG's internal investigation revealed further admissions that Defendants engaged in widespread and long running false premium reporting practices with full knowledge and direction from management, including the AIG Senior Managers.  One employee stated that AIG Chairman Greenberg "knows the whole program" and "wants it this way."  Another employee stated, "[y]ou should be aware that [Greenberg] knows about this and has approved it."  Yet another employee stated that the false reporting schemes had been reported to senior management for Defendants, and that the Chairman and CEO of AIG did not want to change things to "make it legal - he wants to continue as is."

72.     The Joye Memorandum describes a litany of illegal and fraudulent acts performed by Defendants:

> The major elements of illegality include false reporting of [workers compensation] premiums as [general liability] premiums, exceeding maximum legal [workers compensation] premiums, avoiding residual market and other [workers compensation]-related assessments and expenses, avoiding premium taxes, overcharging clients for residual market assessments and premium taxes, [and] booking fictitious premiums and assets . . . .

73.     As detailed in the Joye Memorandum, Defendants engaged in various business practices that individually and collectively were designed to, and in fact had the effect of, evading state premium taxes and residual market assessments and accomplishing other unlawful purposes.

785038                                          22

74.     Defendants utilized what was termed the "18-Month Closeout Program" to falsely report workers compensation premiums as general liability premiums. Under the "18 Month Closeout Program" the AIG Companies purported to terminate workers compensation policies at the first adjustment point 18 months after policy inception. The AIG Companies then calculated the refund of workers compensation premium due to the insured and recorded the refund on their books as having been paid to the insured. At the same time, Defendants recorded on company books an amount equal to the workers compensation refund that was paid to them as a "Stop-Gap Liability Policy" premium, which premium was reported as general liability premium charged to policyholders. Defendants determined in 1992 that "[t]hese [were] book entries only; no actual cash was paid." Further, additional premiums generated at later adjustment points by the purportedly cancelled workers compensation policy under this program were also booked and falsely reported by the AIG Companies as general liability premiums.

75.     Defendants also used a "50% pay-in program" where half the maximum amount of workers compensation premium was collected at policy inception and the balance was booked as reinsurance assumed premium and as an asset. Defendants later admitted that "[t]hese constitute[d] fictitious premiums and assets on the books of AIG as there [were] no reinsurance contracts and these [were] not reinsurance premiums."

76.     Defendants also booked $25 million per quarter of expected workers compensation premium as reinsurance assumed premium. Defendants admitted that a "practice [had] been instituted of taking down $25 million each quarter of the expected [workers compensation] retroactive premiums and recording it as premium income on an accrual basis." "This premium [was] booked as reinsurance assumed premiums instead of [workers compensation] premiums" in violation of state statutes and regulations which require premiums

to be reported by line of business, and with the purpose and effect of cheating the NWCRP Class.

77.     Management of Defendants was repeatedly advised by multiple executive level personnel that the misreporting of workers compensation premium as reinsurance assumed premium was fraudulent and had to be corrected.  A number of reports to this effect were written and destroyed, not retained, or never revealed by Defendants in order to conceal the true nature and extent of the fraud.

78.     Defendants filed false responses to financial data calls, false statistical reports and falsely sworn financial reports with states and the NCCI, as Administrator for the Participating Companies, that knowingly and intentionally omitted the true and actual extent of workers compensation premium written by the AIG Companies.

79.     Defendants utilized indemnity agreements with guaranteed cost policies which they used to collect reimbursements from policyholders in a manner intended to avoid reporting the proper amount of workers compensation premium.

80.     Defendants used the AIG False Workers Compensation Premium Reporting Schemes to report a much lower volume of workers compensation premiums than the AIG Companies actually wrote.  Defendants also knew and intended that the AIG Companies' false statements of workers compensation premium would be used as the basis to calculate all of the NWCRP quarterly statements issued by NCCI as Administrator for the Participating Companies. Because apportionment of the losses from the residual market policies reinsured by the NWCRP Class is based on reported workers compensation premium volume, the AIG Companies' underreported workers compensation premium had the effect of substantially reducing the AIG Companies' share of financial responsibility, assessments and expenses owing under reinsurance

obligations with the NWCRP Class, while also increasing the share of liabilities, assessments and expenses paid by all the other NWCRP Class members.

81.     As of January 1992, Defendants determined that the amount of the AIG Companies' workers compensation premium that went unreported was in the range of $300-$400 million annually and yielded "an unlawful benefit in the range of $60-$80 million or more annually."

82.     Defendants admitted that the evaded assessments were "of necessity, paid as additional assessments by the other insurance companies subject to the [Workers Compensation] residual market assessments," including, in particular, the NWCRP Class members.

83.     Defendants also concluded that the company practice of booking retrospective workers compensation premiums as reinsurance assumed premiums also "avoid[ed] the payment of State premium taxes, residual market assessments and other fees and assessments that apply to written direct [workers compensation] premiums but don't apply to reinsurance premiums." Defendants knew and acknowledged in 1992 that "the annual unlawful benefit to AIG" from this form of false financial reporting alone was in the "range of $15-$20 million."

84.     Defendants further admitted that the false premium reporting conduct was in violation of law and created civil liability to the NWCRP Class members who were injured thereby.  As the Joye Memorandum stated:

> A jury could find that the above conduct constitutes various kinds of State and Federal civil and criminal violations, including common law fraud, mail fraud, Securities Act violations, RICO violations, State statutory and regulatory violations, State tax fraud and breach of contract.  In addition, this conduct would be a violation of the proposed new Federal insurance fraud statute if it becomes law in early 1992 as expected.  The RICO statute, in addition to stringent criminal penalties, provides a treble damages civil action to private plaintiffs. ***Potential plaintiffs who could take advantage of this and other causes of action are the other***

> *insurance companies who have to pick up AIG's share of*
> *residual market assessments and other assessments*, the States
> who lose premium tax payments to which they are legally entitled
> and AIG's insureds who pay for residual market assessments and
> premium taxes that AIG does not report or pay. Also possible are
> class actions by such plaintiffs seeking bad faith and punitive
> damages. If successful, such class actions would result in
> astronomical damages awards against AIG. (Emphasis added).

85. Over the course of the false reporting schemes, Defendants knew that "the level of management involvement and culpability, the amount of money involved and the widespread nature of the illegal activities are such that [AIG is subject to federal criminal prosecution and] a Federal conviction would expose AIG to fines and penalties in the hundreds of millions of dollars and would cause the loss of jobs and careers of numerous long-time employees of AIG. The situation is so serious that it could threaten the continued existence of senior management in its current form."

86. Defendants disregarded counsel's recommendation that specific "corrective actions" be taken to reduce exposure to criminal and civil prosecution. In particular, Defendants rejected the express direction of the company's top legal officer that steps should immediately be taken to end the illegal conduct, discharge the employees involved, pay restitution to the states, residual market participants and other victims, and adopt appropriate compliance measures. Other reports addressing the fraudulent nature of the company's premium reporting and business practices were similarly ignored.

87. Despite the clear and intentional injury caused by the admitted false reporting conduct, Defendants took no disciplinary action against any of the responsible executives that had been identified.

88. After being advised that Defendants were not going to follow his recommendations, Joye resigned as AIG's General Counsel. In his letter of resignation, which

his predecessor later told him would be destroyed by the company, Joye stated that he could not remain as AIG's top legal officer since the corrective actions that he had recommended would not be implemented.

89.     Over all years at issue, and as noted by the New York Attorney General in its enforcement action, the AIG Companies, at the direction of AIG, continued to include false financial data in certified filings and reports.

90.     Defendants further failed to adopt measures to end the premium reporting fraud, took no steps to properly record the known and internally reported misconduct as a material contingent liability, and otherwise concealed civil and regulatory exposure created by the AIG False Workers Compensation Premium Reporting Schemes.

91.     Defendants continued the false premium reporting conduct for decades, and for many years following the 1991 - 1992 internal investigation.

92.     From at least as early as the 1991-1992 time period through the present, Defendants engaged in a course of conduct that constitutes an effort to avoid detection of their known and admitted wrongdoing in connection with workers compensation premium reporting.

93.     Following repeated internal objections and notice of the AIG False Workers Compensation Premium Reporting Schemes, Defendants failed to take action to preserve records and other evidence of the company's misconduct. By allowing relevant information concerning the AIG False Workers Compensation Premium Reporting Schemes to be destroyed or lost, Defendants, as well as their responsible company officers and employees, acted contrary to legal and corporate requirements pertaining to the preservation of information involving matters giving rise to material liability and risk of enforcement investigations.

94.     Defendants' ongoing illegal conduct and the AIG False Workers Compensation Premium Reporting Schemes would have remained hidden and undetected but for the fact that Defendants became the subject of a number of enforcement investigations by the New York Attorney General ("NYAG"), the New York Superintendent of Insurance ("NYDOI"), the Securities Exchange Commission ("SEC") and the United States Department of Justice ("DOJ").

95.     In the course of government investigations into bid-rigging, false financial disclosures and other fraudulent conduct by Defendants, AIG's internal investigation of the AIG False Workers Compensation Premium Reporting Schemes came to the attention of government investigators.  The AIG False Workers Compensation Premium Reporting Schemes thus became the subject of regulatory enforcement as well as threatened criminal prosecution.

96.     The external investigations culminated in February 2006 with multiple settlements resolving pending and threatened actions between Defendants and the NYAG, NYDOI, SEC and DOJ.  Defendants agreed to pay at least $1.6 billion in fines and restitution, adopt various business reforms, and accept an appointed corporate monitor to supervise their business conduct and public financial reporting.

97.     As part of the 2006 settlements, Defendants paid a fine of $100 million to the State of New York for its unlawful insurance business practices. They also agreed to pay, without any conditions or release, approximately $42 million to states where Defendants had evaded premium taxes through aspects of the AIG False Workers Compensation Premium Reporting Schemes.  Defendants also agreed to pay $301 million into a fund that was supposed to address claims by victims for limited aspects of the AIG False Workers Compensation Premium Reporting Schemes.  However, the full extent of Defendants' admitted wrongdoing has been concealed by Defendants and remains to be fully exposed.

98.     The 2006 settlements did not offer direct or full restitution to the NWCRP Class members that were injured by the AIG False Workers Compensation Premium Reporting Schemes.

99.     Based on Defendants' admissions and reasonable estimates of the benefits gained as a result of the AIG False Workers Compensation Premium Reporting Schemes, the total harm caused by Defendants' actions exceeds $1 billion.

100.    At all relevant times, Defendants had a duty to refrain from issuing knowingly false statements and falsely certified financial reports concerning their  workers compensation premium information.

101.    The NWCRP Class reasonably relied on the accuracy of the AIG Companies' sworn workers compensation premium reports, which, upon use by the NCCI, as Administrator for the Participating Companies, caused the AIG Companies to incur artificially low residual market assessments for decades.  As a result of the knowingly false premium reporting, Defendants evaded hundreds of millions of dollars in liabilities, assessments and cash remittances that the NWCRP Class was improperly left to bear.  Defendants enjoyed the unfair competitive advantage of fraudulently suppressed residual market obligations and liabilities, and thus a lower cost structure, for decades, which in turn allowed Defendants to increase market share, maintain a higher surplus and greater capacity, obtain other "unfair advantages," and inflict other direct financial injury to the NWCRP Class.

102.    Defendants' false and illegal reporting conduct continues to cause financial harm to the NWCRP Class and will continue to do so into the future because workers compensation insurance claims remain open to loss development as claims by injured workers mature and evolve until workers reach retirement or die.

### C.     Fraudulent Concealment and Ongoing Impact

103.     Defendants have admitted that the residual market assessments that were evaded "results in an unlawful benefit to AIG in the range of $60-$80 million or more annually" for one practice and $15-$20 million annually for another similar false reporting practice. Based on these and other admitted wrongful benefits, Defendants concealed the false premium reporting conduct for as long as possible and the AIG Companies have, to date, never filed true and accurate financial reports with state tax authorities or the NCCI.

104.     The AIG Companies recently attempted to submit to various state insurance regulators "amended" statements of workers compensation premium for some of the years in question. The current efforts to substitute new false statements of premium for the years in question are acts in furtherance of Defendants' fraudulent schemes and evidence of their original fraud and ongoing wrongdoing.

105.     Defendants failed to preserve documents and other materials that would reveal the true extent of their unlawful business practices, all as part of an effort to avoid accountability for their false and fraudulent actions.

106.     The AIG False Workers Compensation Premium Reporting Schemes were publicly revealed for the first time in the spring of 2005. The AIG Companies had submitted false and fraudulent premium information to state insurance regulators and to the NCCI, year after year on forms that require disclosure of current premium data as well as premium data for the previous decade by year, state and line of business.

107.     Defendants' fraudulent conduct is ongoing. While Defendants have admitted that premium on insurance policies issued by the AIG Companies between 1985 and 1996 was improperly booked and reported, the magnitude of the underreporting to which Defendants have admitted in 1985 indicates that Defendants' fraudulent underreporting of premium began prior to

1985.  Many of the insurance policies that are the subject of Defendants' fraudulent underreporting remain open to further loss development and thus the premium figures presently used by the NCCI for apportioning the premium, losses and expenses of the residual market remain inaccurate.  The AIG False Workers Compensation Premium Reporting Schemes are still causing the AIG Companies to underreport premium in 2009, and will continue to do so for the foreseeable future.

108.    Defendants' false premium reporting schemes are still having an ongoing financial impact on the NWCRP Class for several reasons.  Defendants' fraudulent business practices occurred in the AIG Companies' loss-sensitive business, which is a type of insurance where the price, or the premium, fluctuates over the course of decades based on the claims experience of the insured.  Furthermore, the NWCRP Class members each have open and continuing liabilities to the reinsured servicing carriers, and the other NWCRP Class members, for every policy year.  As a result of the AIG False Workers Compensation Premium Reporting Schemes, the assessments made by the NCCI, on behalf of the NWCRP, to the AIG Companies in 2009 have been understated and will continue to be understated for the foreseeable future.

## VI.    CLAIMS

### COUNT ONE
### VIOLATION OF 18 U.S.C. § 1962(c),
### Racketeer Influenced And Corrupt Organizations
### (Against AIG)

109.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

110.    This action is brought under Title 18 U.S.C. § 1964(c) for violations of Title 18 U.S.C. § 1962(c) as described more fully below.  In sum, AIG, acting through the individuals who conducted its business operations, including the Senior Managers, created and conducted an

enterprise that, over decades, repeatedly and continuously engaged in a pattern of racketeering activity by causing the AIG Companies and those responsible for providing financial information to NCCI on their behalf and those with knowledge of the AIG False Workers Compensation Premium Reporting Schemes (i) to send NCCI  false financial statements that underreported the true amount of workers compensation written by the AIG Companies, (ii) to send NCCI  checks or other payment forms which underpaid the AIG Companies' obligations owed relating to residual market losses and assessments, thus increasing the amounts paid by the NWCRP Class and thereby defrauding the members of the NWCRP Class, and (iii) to conceal the AIG False Workers Compensation Premium Reporting Schemes from the authorities, from the NCCI, from the NWCRP Class, and from the public, including but not limited to financial analysts who covered AIG.

111.    In perpetrating this series of frauds against the NWCRP Class members, AIG, acting through the individuals who conducted its business operations, including the Senior Managers, violated, *inter alia*, the federal mail fraud statute well over 100 separate and distinct times.  Because AIG operated an enterprise through a pattern of racketeering activity to the injury of the NWCRP Class, Plaintiffs seek federal remedies, including treble damages and litigation costs, available under RICO, along with compensatory and punitive damages from AIG.

### Association-In-Fact Enterprise

112.    At all times material to this First Amended Complaint, CVSCO, SICO and the AIG Companies constituted an association-in-fact "enterprise" as the term is defined in Title 18 U.S.C. §§ 1961(4) and 1962(c).

113.    At all times material to this First Amended Complaint, AIG was a "person" within the meaning of Title 18 U.S.C. §§1961(3) and 1962(c).  At all times material to this First

Amended Complaint, AIG, acting through the individuals who conducted its business operations, including but not limited to the Senior Managers, directed, controlled and participated in the operation and management of the enterprise. As set forth herein, each of the named participants in the operation and management of the enterprise had a distinct role in committing the frauds and each received proceeds or benefits from the frauds.

114. The association-in-fact enterprise operated to corrupt the AIG Companies and use those separate corporate forms to defraud the NWCRP Class of monies relating to residual market losses and allocated financial assessments and liabilities payable by the AIG Companies and other affiliates to the NCCI, as Administrator for the Participating Companies.

115. AIG, acting through the individuals who conducted its business operations, including but not limited to the Senior Managers, participated in the conduct and operation of the association-in-fact enterprise by means including devising the nature and mechanics of the false reporting, booking and characterization of workers compensation premium scheme, including the conscious decision to abuse AIG corporate subsidiary forms (including the AIG Companies and others) in order to insulate AIG and the Senior Managers from regulatory enforcement and other liability, widely disperse the wrongful and unlawful conduct, make the fraudulent scheme harder to detect and better conceal the nature and extent of the lies and wrongdoing while serving to cheat and deprive the NWCRP Class of money.

116. Through the association-in-fact enterprise, AIG, acting through those of its officers, employees and agents who exercised influence and control over the business operations of CVSCO and SICO, including the Senior Managers, caused CVSCO and SICO to transfer valuable assets owned by those companies to the managers, employees and other agents of the AIG Companies who conceived of or implemented the AIG False Workers Compensation

Premium Reporting Schemes, and to the managers, employees and other agents of the AIG Companies who had knowledge of the AIG False Workers Compensation Premium Reporting Schemes and who therefore were in a position to disclose those schemes to the authorities, to the NCCI, to the NWCRP Class, and to the public. These asset transfers were transacted without any corresponding transfer of consideration to CVSCO and SICO, to reward managers, employees and other agents of the AIG Companies for contributing to the 20% annual growth of profitability that AIG had established as its objective, without regard to whether such increased profitability was achieved by unlawful means, including by racketeering activity. Because the assets transferred by CVSCO and SICO to managers, employees and other agents of the AIG Companies were extremely valuable, the recipients of these transfers were strongly incentivized to contribute materially to high levels of profitability growth (as reported publicly by AIG) even if (i) unlawful means, such as racketeering activity, were required to make such contributions, and (ii) concealment of the use of such unlawful means was required to continue to make such contributions. Furthermore, because AIG was a publicly owned company, but CVSCO and SICO were not, by rewarding officers, employees and other agents of Defendants for contributing to AIG's publicly reported profitability growth by means of asset transfers from CVSCO and SICO, instead of from AIG directly, AIG was able to avoid the public disclosures that would have been required if these asset transfers had been effected directly by AIG or by the AIG Companies. AIG thereby also avoided the regulatory and public scrutiny that would have accompanied such disclosures had the extent and value of these asset transfers to the officers, employees and other agents of Defendants who conceived of, implemented and/or had knowledge of the AIG False Workers Compensation Premium Reporting Schemes become known to the authorities and the public.

117.    The purpose of the association-in-fact enterprise was thus (i) to corrupt those managers, employees and other agents of the AIG Companies who conceived, implemented, participated in or otherwise had knowledge of the AIG False Workers Compensation Premium Reporting Schemes through the undisclosed payment of excessive incentive compensation, thereby enabling the AIG Companies, acting at the direction of AIG and through the individuals who conducted their business operations, to implement those schemes over decades, notwithstanding the fraudulent and criminal nature of the AIG False Workers Compensation Premium Reporting Schemes, and notwithstanding that by doing so those individuals exposed themselves personally to civil liability, to criminal prosecution and to other sanctions; and (ii) thereby to maximize the as-reported profitability of AIG over an extended period of time.

118.    During the approximate period from 1970 to 2005, AIG thus violated Title 18 U.S.C. § 1962(c) by conducting or participating in, directly or indirectly, the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity that was designed to and did result in the fraudulent and wrongful conversion of money from the NWCRP Class for the improper and illegal use and benefit of AIG.

119.    The pattern of racketeering activity consisted of separate and distinct violations of the federal mail fraud statute, Title 18 U.S.C. § 1341. The schemes culminated in the submission of false premium figures to the NCCI, as Administrator for the Participating Companies, which served to improperly reduce the amount of residual market losses and liabilities to be allocated to and paid by the AIG Companies and other affiliates involved in the workers compensation insurance business.

120.    The schemes to defraud the NWCRP Class relied upon the use of the mail. On numerous occasions, over the 1970 to 2005 period, the AIG Companies, knowingly and with the

intent to defraud the NWCRP Class, sent false financial statements – which underreported workers compensation premium – and checks or other payment forms – which underpaid the AIG Companies' proper share of residual market losses and assessments – through the mail in furtherance of the AIG False Workers Compensation Premium Reporting Schemes and overall scheme to defraud. As defined below, each use of the mail to send falsified premium figures and checks or other payment forms constituted separate and independent violations of the mail fraud statute.

121.    The hereinabove-alleged racketeering activity was frequent and ongoing during the 1970-2005 period.

122.    Each successive mail fraud was related to the AIG False Workers Compensation Premium Reporting Schemes and the overall scheme to defraud Plaintiffs and the NWCRP Class members. These acts, as further detailed below, constitute a "pattern of racketeering activity" within the meaning of Title 18 U.S.C. §§ 1961(1) and 1961(5). The activities of the enterprise affected interstate commerce. For example, the funds that were obtained by fraud from Plaintiffs and the NWCRP Class involve workers compensation insurance companies engaged in a national market. In addition, Plaintiffs and the other NWCRP Class members do business in a national insurance marketplace and the injury and damages sustained due to the fraud have affected their ability to compete in that marketplace.

123.    As a direct and proximate result of the hereinabove-alleged racketeering activity and violations of Title 18 U.S.C. § 1962(c), the NWCRP Class members have been injured in their business and property.

**Pattern Of Racketeering**

124.    AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their

business operations, including the Senior Managers, conducted and participated in the conduct of the affairs of the enterprise through multiple predicate acts of mail fraud in violation of Title 18 U.S.C. § 1341. AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their business operations, including the Senior Managers, also aided and abetted violations by others of these laws, within the meaning of Title 18 U.S.C. § 2.

125.    The unlawful conduct of AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their business operations, including the Senior Managers, included use of the mails to deliver and disseminate false responses to financial data calls, false statistical reports, false financial statements and other reports, agreements, correspondence, policy materials, premium reports and notices, payments of residual market obligations, reports to insurance regulators, and other payments by clients and insurers for the purpose of an unlawful scheme to obtain money by false misrepresentations in violation of the mail fraud statute.

126.    The materials transmitted by mail, including false and fraudulent premium reports submitted to insurance regulators and to the NCCI, as Administrator and agent for the Participating Companies, contained knowing and intentional misrepresentations and omissions that were intended to deceive Plaintiffs and the other NWCRP Class members.  These misrepresentations and omissions included:

      A.    False certifications concerning the true and correct amount of workers compensation premiums generated by the AIG Companies on a state-by-state and year-by-year basis;

      B.    Fraudulent and undisclosed agreements used to further the overall fraud and schemes to falsely report, mischaracterize and understate workers compensation premiums;

C.    Underreporting of the true nature and volume of workers compensation premiums and business in annual and other reports;

D.    Falsely booking fictitious premiums and assets;

E.    Falsely reporting and booking workers compensation premiums as general liability, reinsurance assumed premium and other forms of premium;

F.    Falsely reporting in annual, unit statistical and other reports to insurance regulators and the NCCI, among others, the amount of workers compensation premiums on a state-by-state and year-by-year basis;

G.    Falsely certifying and claiming to have correctly and accurately reported all workers compensation premiums on a state-by-state and year-by-year basis; and,

H.    Knowingly submitting payment for inaccurately low assessments by the NCCI, as Administrator and agent for the Participating Companies.

127.    Plaintiffs and the other NWCRP Class members have been injured in their business or property by overt acts of mail fraud of AIG and by its conduct in directing, aiding, and abetting others to commit such unlawful acts.

**Predicate Racketeering Acts**

128.    Beginning in or about 1970 and continuing for decades, AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their business operations, including the Senior Managers, managed and conducted the affairs of that enterprise through a pattern of racketeering activity, by committing or aiding and abetting the commission of hundreds of predicate acts of racketeering activity, being violations of Title 18 U.S.C. § 1341, as set forth herein.

129.    The pattern of racketeering activity consisted of the following specific and exemplar acts, among others:

**Racketeering Act One: Mailing of Fraudulent Annual Report of Workers Compensation Premium to NCCI:** On or about February 28, 1974, American Home Assurance Company, Commerce and Industry Insurance Company, Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company, New Hampshire Insurance Company, Granite State Insurance Company, American Fidelity Company, Illinois National Insurance Company, Inland National Insurance Co., and New Hampshire Indemnity Co., for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the National Association of Insurance Commissioners (the "NAIC"). On information and belief, both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 1973, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Two: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about March 29, 1979, American Home Assurance Company, Commerce and Industry Insurance Company, Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company, and the New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. On information and belief, both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 1978, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Three: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about February 29, 1984, American Home/National Union Companies, and the New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. On information and belief, both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 1983, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Four: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI, as Administrator for the NWCRP:** On or about March 8, 1989, the American Home/National Union Companies, and on February 23, 1989, the New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 1988, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Five: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about February 28, 1994, National Union Fire Insurance Company of Pittsburgh, and the American Home/National Union Companies, and on or about February 16, 1994, the New Hampshire Insurance Companies and American International Specialty Lines Insurance Company, for the purpose of executing and attempting to execute the AIG False Workers

Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One.  This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC.  Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 1993, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Six: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:**  On or about February 24, 1999, the American Home/National Union/New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One.  This Report was accompanied by portions of these companies' statutory Annual Statements, which were accompanied by, contemporaneously or shortly thereafter, portions of their statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC.  Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 1998, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Seven: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:**  On information and belief, on or about March 2004, AIG, National Insurance company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, Commerce and Industry Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, American Home Assurance Company, Insurance Company of the State of Pennsylvania, AIU Insurance Company, and New Hampshire Insurance Company, for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in

response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 2003, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Eight: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On information and belief, on or about March 2006, Illinois National Insurance Company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, Commerce and Industry Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Insurance Company of the State of Pennsylvania, AIU Insurance Company, and New Hampshire Insurance Company, for the purpose of executing and attempting to execute the AIG False Workers Compensation Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state-by-state basis for the year 2005, all in violation of Title 18 U.S.C. §§ 1341 and 2.

130. Each of the specified and other racketeering acts of AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their business operations, including the Senior Mangers, was related, had the same or similar purpose of executing the scheme and unlawful conduct alleged herein, involved the same or similar participants and method of commission, had similar results, and directly impacted similar victims, including the NWCRP Class.

131.    To effectuate the illegal scheme, AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their business operations, including the Senior Managers, used or caused the use of mails in interstate commerce to deliver insurance agreements, NWCRP quarterly invoices calculated on the basis of and incorporating the AIG Companies' false statements of workers compensation premium, residual market assessment payments, workers compensation premium and financial reports and other materials comprising or related to the AIG False Workers Compensation Premium Reporting Schemes. AIG, acting through the association-in-fact enterprise consisting of CVSCO, SICO and the AIG Companies and in collaboration with the individuals who conducted their business operations, including the Senior Managers, has also received agreements, communications, correspondence, assessments and payments from the mails or commercial interstate carriers relating to the reinsurance mechanism as administered by the NCCI on behalf of the NWCRP Class.

132.    AIG has engaged in a pattern of racketeering activity as defined at Title 18 U.S.C. § 1961(5) by committing at least two acts of racketeering as set out in this First Amended Complaint within the past 10 years.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against AIG, and that the Court grant the following relief:

a)      Compensatory damages in an amount to be determined at trial;

b)      Treble the amount of compensatory damages;

c)      Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d)      Such other and further relief as the Court deems just and equitable.

**COUNT TWO**
**Violation of 18 U.S.C. § 1962(d),**
**Racketeer Influenced and Corrupt Organizations**
**(Against AIG)**

133.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

134.     As set forth herein, AIG agreed and conspired with various persons, including CVSCO and SICO, to violate 18 U.S.C. § 1962(c) by directly and indirectly conducting and participating in the conduct of the affairs of the hereinabove-alleged association-in-fact enterprise through a pattern of racketeering activity.

135.     AIG agreed and conspired to commit at least two of the predicate acts of mail fraud in furthering the common purpose of the enterprise to commit multiple and ongoing frauds against the NWCRP Class through the AIG False Workers Compensation Premium Reporting Schemes.

136.     This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

137.     As a direct and proximate result of the racketeering activities of the resulting violations of 18 U.S.C. § 1962(c), the NWCRP Class has been injured in their business and property.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against AIG, and that the Court grant the following relief:

a)     Compensatory damages in an amount to be determined at trial;

b)     Treble the amount of compensatory damages;

c)     Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d) Such other and further relief as the Court may deem just and equitable.

## COUNT THREE
## COMMON LAW FRAUD
### (Against All Defendants)

138. Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

139. Beginning in or around 1970 and continuing thereafter, Defendants made numerous false and misleading statements about the AIG Companies' workers compensation insurance premiums and business. Specifically, Defendants knowingly and repeatedly, year after year, submitted false and inaccurate responses to financial calls, false statistical reports, and false annual statements for the AIG Companies and thereby knowingly submitted false and inaccurate premium data to the NCCI, as Administrator and agent for the Participating Companies.

140. The AIG Companies' false and inaccurate reports, annual statements and submissions to the NCCI were material, in that accurate disclosure of the volume of their workers compensation insurance premium was and is essential to the equitable allocation of the premium, losses, and expenses of the residual market reinsurance mechanism administered by the NCCI on behalf of Plaintiffs and the other NWCRP Class members.

141. Defendants made the foregoing false statements about the AIG Companies' workers compensation premiums with knowledge that the statements were false.

142. Defendants made their false and misleading statements with the intent that the NCCI, Plaintiffs and the other NWCRP Class members rely on their statements for such matters as the equitable apportionment of the operating results of the residual market for workers compensation insurance.

143.   In reliance on Defendants' false reports and representations, the NCCI, as the Administrator and agent for the Participating Companies, issued quarterly invoices to the AIG Companies and assessed sums against the AIG Companies that did not accurately represent, but understated, their true and proper share of residual market reinsurance obligations.  Further, in reliance on the same false reports and representations by Defendants, the NCCI, as Administrator and agent for the Participating Companies, issued quarterly invoices to Plaintiffs and the other NWCRP Class members that overstated their respective shares of residual market reinsurance obligations.

144.   As a direct and proximate result of their reliance on the false reports and misrepresentations made by Defendants, Plaintiffs and the other NWCRP Class members have suffered substantial financial harm in an amount to be proven at trial.

**WHEREFORE,** Plaintiffs requests judgment in their favor, individually and on behalf of the NWCRP Class, and against Defendants, and that the Court grant the following relief:

a)   Award actual damages in an amount to be determined at trial;

b)   Award punitive damages in an amount to be determined at trial;

c)   Award prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees;

d)   Impose a constructive trust upon (i) all gains, from whatever source derived, realized by Defendants as the result of amounts retained by any or all of them as a consequence of the  AIG False Workers Compensation Premium Reporting Schemes; and (ii) any other benefit realized by Defendants as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and

e)   Grant such other and further relief as the Court may deem just and equitable.

## COUNT FOUR
## ACCOUNTING
### (Against All Defendants)

145.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

146.     Plaintiffs and the other NWCRP Class members have no adequate remedy at law for the false premium underreporting by the AIG Companies.

147.     Plaintiffs and the other NWCRP Class members have a compelling need for discovery to understand the scope and the consequences of the premium underreporting by the AIG Companies.

148.     The accounts between the AIG Companies, on the one hand, and Plaintiffs and the other NWCRP Class members, on the other hand, are extremely complex due to the number of years and number of states in which workers compensation premium was written.

149.     The Participating Companies, including Plaintiffs, the other NWCRP Class members and the AIG Companies, each occupy a position of trust with respect to one another in connection with the mutual obligation to accurately report workers compensation premium to the NCCI.

150.     Plaintiffs and the other NWCRP Class members have been defrauded by Defendants and need the equitable remedy of an accounting to understand the scope and the consequences of the fraudulent underreporting by the AIG Companies.

151.     The NYAG's enforcement action revealed that Defendants have failed to preserve evidence of their false reporting and other wrongdoing.  Plaintiffs and the other NWCRP Class members seek an equitable remedy in the form of an accounting to understand the circumstances and consequences of the destruction of evidence by Defendants from the time that their unlawful conduct began to the present.

152.    To enable Plaintiffs and the other NWCRP Class members to obtain full and fair restitution and to force Defendants to identify and disgorge all of the wrongfully obtained benefits of the AIG False Workers Compensation Premium Reporting Schemes, an accounting must be made on an enterprise-wide basis for the full economic benefit obtained by Defendants as a result of the false premium reporting schemes.

153.    Plaintiffs and the other NWCRP Class members have demanded an accounting from Defendants, and Defendants have refused to provide an accounting.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against Defendants, and that the Court grant the following relief:

a)    Require Defendants to submit to an immediate accounting;

b)    Impose a constructive trust upon (i) all gains, from whatever source derived, realized by Defendants as the result of amounts retained by any or all of them as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and (ii) any other benefit realized by Defendants as a consequence of the AIG False Workers Compensation Premium Reporting Schemes;

c)    Award Plaintiffs the costs of bringing suit, including reasonable attorneys' fees; and

d)    Grant such other and further relief as the Court may deem just and equitable.

## COUNT FIVE
## ACTION ON AN OPEN, CURRENT AND MUTUAL ACCOUNT
### (Against the AIG Companies)

154.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

155.    Each of the Participating Companies in the NWCRP, including Plaintiffs, the other NWCRP Class members and the AIG Companies, has a highly complex account arising

from the reinsurance mechanism administered by the NCCI on behalf of the Participating Companies.

156.    These accounts are open to current and future adjustments as a result of changes in premium, losses, costs and expenses.

157.    These accounts are current as a result of the fact that adjustments have been made to each of these accounts within the last 12 months.

158.    These accounts are mutual as a result of the fact that adjustments to each of these accounts can be favorable or unfavorable to Plaintiffs, to the other NWCRP Class members or to the AIG Companies.

159.    As a direct and proximate result of the AIG Companies' failure to accurately report workers compensation premiums to the NCCI, the open, current and mutual account between each of the AIG Companies and Plaintiffs and the other NWCRP Class members has been improperly computed in an amount to be proven at trial.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against the AIG Companies, and that the Court grant the following relief:

a)    Require the AIG Companies to submit to an immediate accounting;

b)    Award restitution for damages caused to the NWCRP Class members in an amount to be determined at trial;

c)    Award prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees;

d)    Impose a constructive trust upon (i) all gains, from whatever source derived, realized by the AIG Companies as the result of amounts retained by any or all of them as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and (ii) any other benefit realized by the AIG Companies as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and

e)    Grant such other and further relief as the Court may deem just and equitable.

## COUNT SIX
## BREACH OF CONTRACT
### (Against the AIG Companies)

160.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

161.    Plaintiffs, the other NWCRP Class members and the AIG Companies have at all times material to this action been parties to the Articles of Agreement.

162.    Under the Articles of Agreement, the AIG Companies have a duty to submit accurate premium data to the NCCI, as Administrator and agent for the Participating Companies, so that the quota share reinsurance mechanism may equitably apportion the premium, losses, and expenses of the residual market for workers compensation insurance in NWCRP states.

163.    The AIG Companies repeatedly breached their contractual obligations by submitting false and inaccurate premium data to the NCCI.

164.    Plaintiff and other NWCRP Class Members have performed any and all conditions precedent or other dependent conditions to AIG's obligations.

165.    As a direct and proximate result of the AIG Companies' breaches of contract, Plaintiffs and the other NWCRP Class members have incurred substantial damages in specific amounts to be proven at trial.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against the AIG Companies, and that the Court grant the following relief:

a)    Impose a constructive trust upon (i) all gains, from whatever source derived, realized by the AIG Companies as the result of their contractual breaches, and (ii) any other benefit realized by the AIG Companies as a consequence of their contractual breaches and

785038                                                    50

b)     Award Plaintiffs' actual damages in an amount to be determined at trial;

c)     Award prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d)     Award such other and further relief as the Court may deem just and equitable.

### COUNT SEVEN
### PROMISSORY ESTOPPEL
### (Against the AIG Companies)

166.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

167.    The AIG Companies made clear and unambiguous promises to Plaintiffs and the other NWCRP Class members to fairly and accurately report their workers compensation premium to the NCCI, as Administrator and agent for the Participating Companies.

168.    The AIG Companies made annual reports to the NCCI regarding the AIG Companies' workers compensation premium by state and by year.

169.    Plaintiffs and the other NWCRP Class members relied on the AIG Companies' promises to fairly and accurately report their workers compensation premium to the NCCI, as Administrator and agent for the Participating Companies, and their reports to the NCCI.

170.    Reliance by Plaintiffs and the other NWCRP Class members on the promises of the AIG Companies to fairly and accurately report their workers compensation premium to NCCI and their reports to the NCCI was reasonable and foreseeable to the AIG Companies.

171.    In reliance upon the false promises of the AIG Companies, the residual market assessments of Plaintiffs and the other NWCRP Class members were inflated by the AIG Companies' false reporting of workers compensation premium.  Plaintiffs and the other NWCRP

Class members, through their common agent, the NCCI, acted in reliance upon such false promises.

172.    As a direct and proximate result of the AIG Companies' promise to fairly and accurately report their workers compensation premium to NCCI and sworn reports to the NCCI upon which Plaintiffs and the other NWCRP Class members reasonably relied, Plaintiffs and the other NWCRP Class members suffered substantial financial harm in an amount to be proven a trial.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against the AIG Companies, and that the Court grant the following relief:

a)    Impose a constructive trust upon (i) all gains, from whatever source derived, realized by the AIG Companies as the result of amounts retained by any or all of them as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and (ii) any other benefit realized by the AIG Companies as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and

b)    Require the disgorgement of all unlawfully gained profits from deceptive, fraudulent and unjust practices in an amount to be determined at trial;

c)    Order restitution for damages caused to Plaintiffs and the other NWCRP Class members in an amount to be determined at trial;

d)    Award prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

e)    Grant such other and further relief as the Court may deem just and equitable.

**COUNT EIGHT**
**UNJUST ENRICHMENT**
**(Against AIG)**

173.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein.

174. Because of the AIG False Workers Compensation Premium Reporting Schemes, AIG's reserves were understated for decades, making additional capital available to AIG to invest that would not have been available but for the AIG False Workers Compensation Premium Reporting Schemes. The availability of this additional capital enabled AIG to realize and report substantial gains due to the investment of this capital.

175. AIG has unjustly retained these substantial benefits that accrued to it from the AIG False Workers Compensation Premium Reporting Schemes.

176. The retention of these benefits by AIG arising from the AIG Companies' underreporting of workers compensation premium violates the fundamental principles of justice, equity and good conscience.

177. The amount by which AIG has thereby been unjustly enriched will be proven at trial.

**WHEREFORE,** Plaintiffs request judgment in their favor, individually and on behalf of the NWCRP Class, and against AIG, and that the Court grant the following relief:

a) Impose a constructive trust upon (i) all gains, from whatever source derived, realized by AIG as the result of amounts retained by it or by any of the AIG Companies as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and (ii) any other benefit realized by AIG as a consequence of the AIG False Workers Compensation Premium Reporting Schemes; and

b) Require the disgorgement of all unlawfully gained profits or other compensation from deceptive, fraudulent and unjust practices in an amount to be determined at trial;

c) Order restitution for damages caused to the NWCRP Class members in an amount to be determined at trial;

d) Award prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

785038

53

e) Grant such other and further relief as the Court may deem just and equitable.

## VII. JURY DEMAND

Plaintiffs hereby demand trial by jury as to all appropriate claims pursuant to Rules 38 and 39 of the Federal Rules of Civil Procedure.

Respectfully submitted,

SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY, individually, and on behalf of a class consisting of members of the National Workers Compensation Reinsurance Pool

_____/s/ Gary M. Elden_____
One of Their Attorneys

Gary M. Elden (ARDC# 00728322)
Gary M. Miller (ARDC# 06229867)
Matthew O. Sitzer (ARDC# 06210083)
Daniel M. Hinkle (ARDC# 6283092)
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 704-7700

Michael A. Walsh (admitted *pro hac vice*)
Allison D. Burroughs (admitted *pro hac vice*)
NUTTER McCLENNEN & FISH, LLP
155 Seaport Boulevard
Boston, MA 02110
Telephone: (617) 439-2000

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that he served a copy of the foregoing First

Amended Class Action Complaint by causing copies thereof to be sent by U.S. District Court

CM/ECF e-filing system on the 28th day of August, 2009.


/s/ Matthew O. Sitzer
Mastthew O. Sitzer

785038