**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | |
| Plaintiffs, | Case No. 07 CV 2898 |
| v. | Judge Robert W. Gettleman |
| ACE INA HOLDINGS, INC., et al., | Magistrate Judge Sidney I. Schenkier |
| Defendants. | |
| LIBERTY MUTUAL INSURANCE COMPANY, et al., | |
| Counter-Claimants, | |
| v. | |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | |
| Counter-Defendants. | |
| SAFECO INSURANCE COMPANY OF AMERICA, et al., | Case No. 09 CV 2026 |
| Plaintiffs, | Judge Robert W. Gettleman |
| v. | Magistrate Judge Sidney I. Schenkier |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | |
| Defendants. | |

**AIG'S COMMENTS AND OBJECTIONS TO DR. KADANE'S
<u>APPROVED SAMPLING PLAN FOR CERTAIN AIG DIVISIONS</u>**

Pursuant to the Court's July 28, 2010 and October 14, 2010 Orders, American International Group, Inc. et al. ("AIG") submits the following comments to Dr. Kadane's Sampling Plan for Certain AIG Divisions (the "Plan"), submitted by Dr. Kadane to the parties on Thursday, December 16, 2010.

## COMMENTS/OBJECTIONS

*AIG makes the following clarification to Paragraph 1 of the Plan*: Paragraph one of the Plan provides:

> The primary objective of the sampling plan is to achieve an unbiased and accurate estimate of the cumulative consequences arising from AIG's net underreporting by year of workers compensation ("WC") premium on policies issued in certain years and certain AIG Divisions (18, 54, 58, 59, 73, 82, and, for the period 1997-2002, Division 55, with data resident in AIG's CRS database—the "CRS Divisions"). In pursuit of that goal, the plan will obtain unbiased estimates of net underreporting by CRS Division and year. By "unbiased" what is meant is that methods of sample selection and methods used to extrapolate from the sample to the full population will not contribute bias to the final estimates.

AIG further clarifies that the fact that the Plan purports to be "unbiased"—in the sense that the method of sample selection and statistical extrapolation will not contribute bias to Liberty's and Class Plaintiffs' (together "Liberty") final estimates—does not mean that Liberty will achieve an unbiased and accurate estimate of AIG's reported premium. Whether Liberty's resulting estimates are unbiased will depend upon Liberty and its experts' methods of analysis. "Unbiased" sampling alone would not warrant the broad conclusion that Liberty has analyzed the resulting data in an "unbiased" manner.

*AIG makes the following objection to Paragraph 1 of the Plan*: AIG objects to the statement that the sampling plan is designed to ascertain an "accurate estimate of the cumulative consequences arising from AIG's net underreporting by year of workers compensation ("WC") premium on policies issued in certain years and certain AIG Divisions (18, 54, 58, 59, 73,

82 [)] . . . ." Liberty's proposed sampling design is fundamentally flawed because it focuses on AIG's "transferred" CRS data, rather than its "originating" division CRS data.

By way of background, AIG's CRS Data production to Liberty contains AIG's workers compensation premium data tied to its "transferred" and "originating" division. That is, AIG has produced CRS data to Liberty that shows the division where each premium originated (*i.e.*, the division where the premium was underwritten) and the division where that premium has been transferred, as applicable (*i.e.*, in an instance where an AIG division was dissolved and its business transferred to another division).

Liberty structured the Plan's sampling unit around AIG's transferred premium data. However, the Plan states that Liberty intends to estimate "the cumulative consequences arising from AIG's net underreporting by year of workers compensation ("WC") premium on policies issued in certain years and certain AIG Divisions." Liberty's plan focuses on divisions where premium was *issued* (originated), but Liberty has chosen to structure its sample around divisions where premium was *transferred*; as a result, Liberty's sampling unit is materially flawed. For example, the Plan contemplates sampling Division 73 during the period 1983–1989. Division 73 only came into existence in 1993—four years after the period that Liberty proposes sampling. AIG's CRS premium data contains only transferred Division 73 policy data between 1983 and 1989 (which largely originated in AIG Division 70). To further compound the problem, the policies issued in AIG Division 70 were transferred to several AIG Divisions (namely Divs. 57, 70, 73 and 93). Liberty's proposed sampling of Division 18 presents the same issue. Approximately 23 percent of the "transferred" Division 18 premium was actually issued in Divisions 56 and 61. The remaining 77 percent of the "transferred" Division 18 premium originated in Divisions 18 and 61. As a consequence, the universe being studied by Liberty has

2

not been clearly and correctly defined, and potential biases that could arise as a result have not been explored or considered.

*AIG makes the following objection to Paragraph 1 of the Plan*: Liberty's proposed sampling plan states that its objective is "to achieve an unbiased and accurate estimate of the cumulative consequences arising from AIG's net underreporting *by year* of workers compensation . . . premium." (Emphasis added.) Though Liberty will calculate yearly estimates based upon its sample of AIG's data, AIG believes these estimates will be imprecise because of Liberty's sampling design decisions.

*AIG makes the following objection to Paragraphs 2 and 8 of the Plan*: The Plan contemplates a fixed standard of accuracy, and threatens to seek additional sampling if Liberty does not achieve that standard of accuracy.[1]

The Plan contemplates that Liberty's sampling results achieve a coefficient of variation ("CV")[2] that is no greater than 12.5%. However, Liberty has no basis for expecting that this standard of accuracy is achievable. Liberty has also not offered a standard for judging the precision of its estimates that would be appropriate both for higher and lower levels of underreporting. Liberty's standard of accuracy is incompletely defined because it does not

---

[1] *See* Plan at ¶ 2, p. 1 ("By 'accurate,' we mean that the standard error of the estimate of the cumulative consequences of underreporting WC premium in the CRS Divisions would be no larger than 12.5 percent of the estimate itself. The standard error of the estimate divided by the estimate itself is an estimate of the coefficient of variation. (Equivalently, the coefficient of variation associated with the estimate would not exceed 1/8.)"; *see also* Plan at ¶ 8, p. 2 ("Once the analyses are completed, we will provide an estimate of the cumulative consequences of underreporting in the divisions sampled accompanied by the standard error assigned to the estimate. As we discuss below, we hope that the standard error will not exceed one-eighth of the estimate. Should that outcome not materialize, we will consult with Dr. Kadane and AIG about whether additional sampling would be desirable and, if so, how it should occur.").

[2] The coefficient of variation is defined as the ratio of standard error of the estimate to the estimate itself.

3

account for the fact that this standard will vary depending upon the range of possible outcomes of underreporting estimates.

Further, Liberty's proposed standard of accuracy is problematic because several of the Plan's design decisions are likely to reduce the precision of Liberty's estimates. For example, the precision of the Plan will likely be reduced by several factors, including Liberty's (a) decision to specify equal sample sizes per stratum within each division (discussed in greater detail below), and (b) failure to describe an appropriate analysis plan for cases in Premium Group 2 that have low amounts of reported premium.

*AIG makes the following objection to Paragraph 3 of the Plan*: Liberty's secondary objective is that the sampling plan is designed to provide statistically significant evidence that the rate of underreporting in the sampled divisions is greater than zero.[3] Liberty's goal ignores the possible result where the estimated rate of alleged underreporting is greater than zero (due to human error) but is nonetheless very small. The Plan should state that achieving "statistical significance" is not the same as achieving "practical significance" or "substantive importance" (*i.e.*, that the amount of underreporting is consistent and substantial).

*AIG makes the following objection to Paragraph 8 of the Plan*: Liberty's Plan is inefficient for achieving an overall estimate because it has equal sample sizes per stratum within each division, which make the overall estimate less precise. In order to maximize the precision of the overall estimate, the sample should be allocated to a Division and year in proportion to the workers compensation premium amounts by Division and year. While it is possible that the rates of alleged underreporting could diverge systematically from the distribution of workers

---

[3] *See* Plan at ¶ 3, p. 1 ("A secondary objective of the sampling plan is to provide statistically significant evidence that the consequences (see note 1) are greater than zero. (As we will discuss, we believe that achieving the goal in paragraph would entail meeting this secondary goal.) Statistical significance is not necessarily the same as practical significance.").

compensation premium, such a result is not likely and it is even less likely that the amounts of underreporting would be equal across years and Divisions. As described above, Liberty's design decisions may contribute to obtaining a standard error that is larger than 12.5 percent; AIG does not agree that Liberty should be permitted to have a second bite at the apple and conduct further sampling if it does not obtain the outcome that it desires.

*AIG makes the following objection to Paragraph 42 of the Plan*: Liberty proposes to use workers compensation losses as the basis of its ratios because reported workers compensation premiums are unavailable. Liberty has not explained how it plans to create its ratios, nor what it plans to do if the correlation between the losses and the amounts of underreported premium are not highly correlated. In short, the analysis the Plan proposes is vague and incomplete.

*AIG makes the following objection to Paragraph 47 of the Plan:* AIG objects to the definition of a "Contract File" set forth in paragraph 47 of the Plan because it is overly broad and unduly burdensome. AIG further objects because the scope of sampling-related document production is controlled by the Court's order dated November 17, 2009. AIG submits that paragraph 47 should provide as follows: AIG will produce, after a reasonable search, the following documents, as each actually exists in AIG's files, for each selected contract: the (i) associated policy endorsements; (ii) underwriting files; (iii) accounting files; and (iv) electronically available (but not including microfiche stored) unit statistical cards (together a "Contract File")."

*AIG makes the following comment to Paragraph 48 of the Plan:* The Court should create the rule regarding the treatment of files that are produced with missing information or files that Liberty claims has insufficient information for adequate analysis.

5

*AIG makes the following objection to Section V (paragraphs 53-57) of the Plan:* Liberty's proposed methodologies for quantifying the consequences of AIG's alleged underreporting are premature and should not be included in the Plan, thus, AIG expressly reserves its rights to challenge the appropriateness or adequacy of any such methodology after the sampling has been conducted.

                                                AMERICAN INTERNATIONAL GROUP, INC., et al.,

                                                By:     /s/ Rebekah H. Parker
                                                           One of Their Attorneys

Stephen Novack
P. Andrew Fleming
Rebekah H. Parker
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900
Doc. #404513

Michael B. Carlinsky
Kevin S. Reed
Jennifer J. Barrett
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she served a copy of the foregoing **AIG's Comments And Objections To Dr. Kadane's Approved Sampling Plan For Certain AIG Divisions** by causing copies to be sent by U.S. District Court CM/ECF e-filing system on the 23rd day of December, 2010.

/s/ Rebekah H. Parker