# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | )<br>)<br>) |
| Plaintiffs, | ) Case No. 07 CV 2898 |
| v. | )<br>) Judge Robert W. Gettleman |
| ACE INA HOLDINGS, INC., et al., | )<br>) |
| Defendants | ) Magistrate Judge Sidney I. Schenkier |
| LIBERTY MUTUAL INSURANCE COMPANY, et al., | )<br>)<br>) |
| Counter-Claimants, | ) |
| v. | ) |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | )<br>)<br>) |
| Counter-Defendants. | ) |
| SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY, individually, and on behalf of a class consisting of members of the National Workers Compensation Reinsurance Pool, | )<br>)<br>) Case No. 09 CV 2026<br>)<br>) Judge Robert W. Gettleman<br>) |
| Plaintiff, | ) Magistrate Judge Sidney I. Schenkier |
| v. | ) |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | )<br>)<br>) |
| Defendants. | ) |

**CLASS PLAINTIFFS' AND LIBERTY PARTIES RESPONSE TO AIG'S COMMENTS AND OBJECTIONS TO DR. KADANE'S DECEMBER 16, 2010 APPROVED SAMPLING PLAN FOR CERTAIN AIG DIVISIONS**

Ohio Casualty Insurance Company and Safeco Insurance Company of America (collectively, "Class Plaintiffs") and Liberty Mutual Insurance Company ("Liberty") respond to AIG's comments and objections to Dr. Kadane's Sampling Plan for Certain AIG Divisions, dated December 16, 2010 ("Dr. Kadane's Sampling Plan"), attached as Exhibit 1. We address AIG's objections and comments by restating AIG's positions serially, in the order originally presented, followed immediately by the Class Plaintiffs' and Liberty's response.

As an initial matter, the Class Plaintiffs and Liberty note that AIG previously raised each of these comments and objections with Dr. Kadane, who took them under advisement – along with the Class Plaintiffs' and Liberty's responses thereto – before Dr. Kadane submitted his Sampling Plan to the parties in approved form on December 16, 2010. Further, several of the provisions of Dr. Kadane's Sampling Plan to which AIG now objects (in particular, AIG's Objections/Comments Nos. 10, 11 and 12, below), are either identical, or substantially identical, to provisions (governing identical issues) that were incorporated *with AIG's agreement* in the Sampling Plan for AIG Divisions 55/51 and 50, approved by Dr. Kadane on July 28, 2010 and adopted by this Court on August 12, 2010. Ex. 9 hereto. AIG provides no explanation for these inconsistent positions.

### CLASS PLAINTIFFS' AND LIBERTY'S RESPONSES TO AIG'S COMMENTS/OBJECTIONS

**AIG COMMENT/OBJECTION NO. 1:**

*AIG makes the following clarification to Paragraph 1 of the Plan*: Paragraph one of the Plan provides:

> The primary objective of the sampling plan is to achieve an unbiased and accurate estimate of the cumulative consequences arising from AIG's net underreporting by year of workers compensation ("WC") premium on policies issued in certain years and certain AIG Divisions (18, 54, 58, 59, 73, 82, and, for the period 1997-2002, Division 55, with data resident in AIG's CRS

> database—the "CRS Divisions"). In pursuit of that goal, the plan will obtain unbiased estimates of net underreporting by CRS Division and year. By "unbiased" what is meant is that methods of sample selection and methods used to extrapolate from the sample to the full population will not contribute bias to the final estimates.

AIG further clarifies that the fact that the Plan purports to be "unbiased"—in the sense that the method of sample selection and statistical extrapolation will not contribute bias to Liberty's and Class Plaintiffs' (together "Liberty") final estimates—does not mean that Liberty will achieve an unbiased and accurate estimate of AIG's reported premium. Whether Liberty's resulting estimates are unbiased will depend upon Liberty and its experts' methods of analysis. "Unbiased" sampling alone would not warrant the broad conclusion that Liberty has analyzed the resulting data in an "unbiased" manner.

**CLASS PLAINTIFFS AND LIBERTY'S RESPONSE:**

The Class Plaintiffs and Liberty believe that this "clarification" is unnecessary, as it was plainly implied by the final sentence in Paragraph 1. This issue was discussed by the parties with Dr. Kadane prior to his approval of the Sampling Plan, and Dr. Kadane chose not to incorporate AIG's "clarification." The final sentence in Paragraph 1, as worded, appeared to reflect the consensus view.

**AIG COMMENT/OBJECTION NO. 2:**

*AIG makes the following objection to Paragraph 1 of the Plan:* AIG objects to the statement that the sampling plan is designed to ascertain an "accurate estimate of the cumulative consequences arising from AIG's net underreporting by year of workers compensation ("WC") premium on policies issued in certain years and certain AIG Divisions (18, 54, 58, 59, 73, 82 []) ...." Liberty's proposed sampling design is fundamentally flawed because it focuses on AIG's "transferred" CRS data, rather than its "originating" division CRS data.

By way of background, AIG's CRS Data production to Liberty contains AIG's workers compensation premium data tied to its "transferred" and "originating" division. That is, AIG has produced CRS data to Liberty that shows the division where each premium originated *(i.e.,* the division where the premium was underwritten) and the division where that premium has been transferred, as applicable *(i.e.,* in an instance where an AIG division was dissolved and its business transferred to another division).

Liberty structured the Plan's sampling unit around AIG's transferred premium data. However, the Plan states that Liberty intends to estimate "the cumulative consequences arising from AIG's net underreporting by year of workers compensation ("WC") premium on policies issued in certain years and certain AIG Divisions." Liberty's plan focuses on divisions where

- 3 -

1065434.2

premium was *issued* (originated), but Liberty has chosen to structure its sample around divisions where premium was *transferred;* as a result, Liberty's sampling unit is materially flawed. For example, the Plan contemplates sampling Division 73 during the period 1983-1989. Division 73 only came into existence in 1993-four years after the period that Liberty proposes sampling. AIG's CRS premium data contains only transferred Division 73 policy data between 1983 and 1989 (which largely originated in AIG Division 70). To further compound the problem, the policies issued in AIG Division 70 were transferred to several AIG Divisions (namely Divs. 57, 70, 73 and 93). Liberty's proposed sampling of Division 18 presents the same issue. Approximately 23 percent of the "transferred" Division 18 premium was actually issued in Divisions 56 and 61. The remaining 77 percent of the "transferred" Division 18 premium originated in Divisions 18 and 61. As a consequence, the universe being studied by Liberty has not been clearly and correctly defined, and potential biases that could arise as a result have not been explored or considered.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

Dr. Kadane's Sampling Plan, as developed by Class Plaintiffs and Liberty, has always utilized "transferred" divisions. Class Plaintiffs and Liberty do not intend, for example, to extrapolate findings from sampled policies that were transferred from (say) Division 70 to Division 73 to those policies in Division 70 that were not transferred to Division 73. Thus, there is no conceptual disagreement on this issue, and Paragraph 1 should remain as worded in Dr, Kadane's Sampling Plan.

However, more importantly, Class Plaintiffs and Liberty have on *three* separate occasions (August 16, 2010, December 21, 2010, and December 30, 2010) asked AIG to explain how to treat confusing elements of AIG's electronic data pertinent to the "transferred" and "originating" issue. ***Each time*** – most recently in a January 4, 2011 email – AIG failed to provide complete answers. *See*, most recently, Ex. 2, 12/30/10 email Sitzer to Reed/Stanton, and Ex. 3, 1/4/11 email from Stanton to Sitzer. Without direct answers these questions, Class Plaintiffs and Liberty cannot compile or confirm the accuracy of draw population lists for (a) Divisions 18 and 73, (b) the "losses-only" sample, and (c) the Premium Group 2 sample, which

- 4 -

1065434.2

Dr. Kadane needs to randomly select the samples. *See* Ex. 1, Dr. Kadane's Sampling Plan at ¶¶ 12-17.

To be specific:

AIG did not answer Subpoint B under our first set of questions sent on December 30, 2010 addressing "transferred" and "originating" divisions. *See* Ex. 2 hereto. Subpoint B of this December 30 email asks AIG to: "please confirm that AIG cannot tie CRS losses records associated to a specific Transferred Division from its CRS premium counterpart." Contrary to what AIG had previously told Class Plaintiffs and Liberty in a September 3, 2010 letter— namely, that "CRS losses are associated with the original divisions, not the transferred divisions" – AIG, in its January 4, 2011 email, now flip-flops: "AIG's CRS loss data does not contain a fixed originating division field." Ex. 3. Thus, as AIG now states, "the division associated with future losses on a given policy *will change*…" *Id.* (Emphasis added.) Put simply, between September 3, 2010 and January 4, 2011, AIG has (1) changed its instructions about how to treat its own data, but (2) continues to fail to provide complete instructions.

If AIG's answer to the question in Subpoint B is "No," then how does AIG track the progression of incurred losses for a given policy/effective year over time? Put another way, AIG continues to delay answering how the Class Plaintiffs and Liberty should tie premium to their associated losses if they were to adopt AIG's instruction that the sample should be based on "originating" division.

A simple example of this problem would be a hypothetical policy/effective year combination that originated in Division 70, but was later transferred to Division 73. How can Class Plaintiffs and Liberty ensure that the losses for this example will not be limited by AIG to

just those losses that occurred while the policy existed in Division 70, but also include the losses when the policy was transferred to Division 73?

Based on its response to our second set of questions in the December 30, 2010 email regarding the selection of loss policy variables to be used, AIG apparently agrees with the Class Plaintiffs' and Liberty's methodology, repeating the same formula for losses calculations that the Class Plaintiffs and Liberty previously have used. Ex. 3, 1/4/11 email from Stanton to Sitzer. However, AIG fails to fully answer the question by providing any examples of its calculations, so that the parties can reconcile apparently different results from the same formula.

In its response to the Class Plaintiffs' and Liberty's Other Divisions' pilot sample analysis, AIG states:

1. "AIG cannot understand how Liberty arrived at its Total Reported WC Losses (per AIG Electronic Data) for this account. According to the CRS database, total workers' compensation losses for both policies amount to $457,472, not $755,056." (*See* AIG's 11/9/10 pilot sample response.)

2. "AIG cannot understand how Liberty arrived at its Total Reported WC Losses (per the AIG Electronic Data) for this account. According to the CRS database, total workers' compensation losses for Policies 8283394, 8283395, and 8283396 amount to $331,041, not $1,012,450." *Id.*

In order to provide Dr. Kadane the draw populations he needs without additional delay, Class Plaintiffs and Liberty respectfully ask the Court to order AIG to provide sufficiently detailed calculations to explain how it arrived at the loss amounts for the CRS Pilot Sample policies where AIG found loss discrepancies, so that a mutually agreed upon methodology can be established.

**AIG COMMENT/OBJECTION NO. 3:**

*AIG makes the following objection to Paragraph 1 of the Plan:* Liberty's proposed sampling plan states that its objective is "to achieve an unbiased and accurate estimate of the cumulative consequences arising from AIG's net underreporting *by year* of workers compensation ... premium." (Emphasis added.) Though Liberty will calculate yearly estimates

- 6 -

based upon its sample of AIG's data, AIG believes these estimates will be imprecise because of Liberty's sampling design decisions.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

This objection was discussed at length during the parties' meetings with Dr. Kadane before he approved the Sampling Plan. The Class Plaintiffs and Liberty seek an accurate estimate of the *cumulative* consequences of AIG's underreporting, underreporting that may have taken place in different divisions in different years. The standard of accuracy would be tied to the "coefficient of variation" of the results. Class Plaintiffs and Liberty did not set specific goals for the coefficient of variation on a yearly basis. The fact that "AIG believes" that yearly estimates will be "imprecise" does not mean that they will be, and is in any case irrelevant to Paragraph 1 of the Sampling Plan.

**AIG COMMENT/OBJECTION NO. 4:**

*AIG makes the following objection to Paragraphs 2 and 8 of the Plan:* The Plan contemplates a fixed standard of accuracy, and threatens to seek additional sampling if Liberty does not achieve that standard of accuracy.[1]

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

This objection also was raised and discussed at length during the parties' discussions with Dr. Kadane before he approved the Sampling Plan. Moreover, Dr. Kadane's Sampling Plan does not reflect a "threat[]" that Class Plaintiffs and Liberty intend to seek additional sampling. Rather, the plan lays out in advance, as Dr. Kadane instructed that it should, what Class Plaintiffs

---

[1] *See* Plan at ¶ 2, p. 1 ("By 'accurate,' we mean that the standard error of the estimate of the cumulative consequences of underreporting WC premium in the CRS Divisions would be no larger than 12.5 percent of the estimate itself. The standard error of the estimate divided by the estimate itself is an estimate of the coefficient of variation. (Equivalently, the coefficient of variation associated with the estimate would not exceed 1/8.)"; *see also* Plan at ¶ 8, p. 2 ("Once the analyses are completed, we will provide an estimate of the cumulative consequences of underreporting in the divisions sampled accompanied by the standard error assigned to the estimate. As we discuss below, we hope that the standard error will not exceed one-eighth of the estimate. Should that outcome not materialize, we will consult with Dr. Kadane and AIG about whether additional sampling would be desirable and, if so, how it should occur.").

1065434.2

and Liberty propose to do if the standard error was not met. As AIG itself cites, Dr. Kadane's Sampling Plan states that Class Plaintiffs and Liberty will "consult with Dr. Kadane and AIG about whether additional sampling would be desirable and, if so, how it should occur." (*See*, Ex. 1, Dr. Kadane's December 16, 2010 Sampling Plan at ¶ 8.)

**AIG COMMENT/OBJECTION NO. 5:**

The Plan contemplates that Liberty's sampling results achieve a coefficient of variation ("CV")[2] that is no greater than 12.5%. However, Liberty has no basis for expecting that this standard of accuracy is achievable. Liberty has also not offered a standard for judging the precision of its estimates that would be appropriate both for higher and lower levels of underreporting. Liberty's standard of accuracy is incompletely defined because it does not account for the fact that this standard will vary depending upon the range of possible outcomes of underreporting estimates.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

AIG's statement ignores the fact that Class Plaintiffs and Liberty offered empirical evidence based on their CRS Pilot Sample results that supported their belief that they would not only meet the 12.5% standard, but could exceed it. *See* Ex. 1, ¶ ¶ 30-34 of Dr. Kadane's Sampling Plan, setting forth Class Plaintiffs' and Liberty's basis for expecting the desired level of accuracy.

Moreover, the accuracy standard is not "incompletely defined." Class Plaintiffs and Liberty have always intended 12.5 % to be the accuracy standard regardless of the levels of underreporting. Indeed, the Class Plaintiffs and Liberty remind AIG that under a hypothetical example offered by AIG during the parties' prior discussions with Dr. Kadane the probability of meeting the standard at a given sample size would be the same regardless of the amount of underreporting. *See* Ex. 4 at Table 2. Class Plaintiffs and Liberty offer this example not because

---

[2] The coefficient of variation is defined as the ratio of standard error of the estimate to the estimate itself.

1065434.2

they agree with AIG's assumptions, but rather to note that AIG has *itself* suggested conditions under which accuracy estimates would not differ depending on the amounts of underreporting.

**AIG OBJECTION/COMMENT NO. 6:**

Further, Liberty's proposed standard of accuracy is problematic because several of the Plan's design decisions are likely to reduce the precision of Liberty's estimates. For example, the precision of the Plan will likely be reduced by several factors, including Liberty's (a) decision to specify equal sample sizes per stratum within each division (discussed in greater detail below), and (b) failure to describe an appropriate analysis plan for cases in Premium Group 2 that have low amounts of reported premium.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

Class Plaintiffs and Liberty do not believe that Dr. Kadane's Sampling Plan's design decisions are "likely" to reduce precision, and we have previously provided Dr. Kadane with support for this belief in our proposed plan by referring to actual CRS Pilot Sample results – which Dr. Kadane included in his (final) Sampling Plan. *See* Ex. 1 at ¶ ¶ 22 and 23 of Dr. Kadane's Sampling Plan, addressing AIG's point "(a)" in AIG's Objection/Comment No. 6, above, and Paragraphs 15 and 16 of Dr. Kadane's Sampling Plan which describe the analysis plan for Premium Group 2, addressing AIG's point "(b)," above.

**AIG OBJECTION/COMMENT NO. 7:**

*AIG makes the following objection to Paragraph 3 of the Plan:* Liberty's secondary objective is that the sampling plan is designed to provide statistically significant evidence that the rate of underreporting in the sampled divisions is greater than zero.[3] Liberty's goal ignores the possible result where the estimated rate of alleged underreporting is greater than zero (due to human error) but is nonetheless very small. The Plan should state that achieving "statistical significance" is not the same as achieving "practical significance" or "substantive importance" (*i.e.,* that the amount of underreporting is consistent and substantial).

---

[3] *See* Plan at ¶ 3, p. 1 ("A secondary objective of the sampling plan is to provide statistically significant evidence that the consequences (see note 1) are greater than zero. (As we will discuss, we believe that achieving the goal in paragraph would entail meeting this secondary goal.) Statistical significance is not necessarily the same as practical significance.").

- 9 -

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

Once again, this concern with respect to describing statistical or practical significance was raised by AIG and addressed by Class Plaintiffs and Liberty in meetings with Dr. Kadane prior to his approval of the plan. Class Plaintiffs and Liberty did not "ignore" the possibility that a statistically significant result might be small, but noted that, once a numerical underreporting estimate is at hand, it will "speak for itself" and not require some prior definition of "substantive importance." Somewhat inconsistent with the objection it makes above regarding Class Plaintiffs' and Liberty's sampling, in recent discussions AIG has had with Dr. Kadane and certain Alleged Underreporters about *AIG's* proposed affirmative sampling plans directed at those parties, AIG *itself* made the point that even a small percentage of underreporting could have considerable practical significance.

**AIG COMMENT/OBJECTION NO. 8:**

*AIG makes the following objection to Paragraph 8 of the Plan:* Liberty's Plan is inefficient for achieving an overall estimate because it has equal sample sizes per stratum within each division, which make the overall estimate less precise. In order to maximize the precision of the overall estimate, the sample should be allocated to a Division and year in proportion to the workers compensation premium amounts by Division and year. While it is possible that the rates of alleged underreporting could diverge systematically from the distribution of workers compensation premium, such a result is not likely and it is even less likely that the amounts of underreporting would be equal across years and Divisions. As described above, Liberty's design decisions may contribute to obtaining a standard error that is larger than 12.5 percent; AIG does not agree that Liberty should be permitted to have a second bite at the apple and conduct further sampling if it does not obtain the outcome that it desires.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

AIG's objection here – which, again, was raised by AIG (and rebutted by Class Plaintiffs and Liberty) prior to Dr. Kadane's approval of the Sampling Plan – simply ignores evidence established by Class Plaintiffs' and Liberty's CRS Pilot Sample. Class Plaintiffs and Liberty presented data to AIG noting, for instance, that the correlation between policy-family

underreporting amounts and total WC premium amounts for the Pilot Sample Divisions was negative, suggesting that WC underreporting per policy-family was higher in the smaller divisions (as measured by total reported WC premium) than in larger ones. As an example, underreported WC premium per policy-family was 3.1 times as large as a proportion of reported WC premium in small Division 54 as in large Division 82 (138% vs. 44%). Thus, even though Division 82 had 4.1 times the total reported premium of Division 54, it is not at all clear that the consequences arising from underreporting WC premium were appreciably larger in the larger division than in the smaller one. It is because of outcomes like this that Class Plaintiffs and Liberty proposed a sampling plan that made no strong prior assumptions about when and where underreporting occurred and, if so, to what extent. In other words, AIG's statement that an underreporting pattern justifying Class Plaintiffs' and Liberty's approach is "not likely" is not only unsupported by evidence, but is contrary to available evidence observed in connection with our Pilot Sample.

Lastly, as Class Plaintiffs and Liberty repeatedly made clear prior to Dr. Kadane's approval of the Sampling Plan, further sampling if accuracy measures are not met – whatever the showing of underreporting is – is not a "second bite at the apple" that would give Class Plaintiffs' and Liberty another chance to reach an estimate more to their liking. On the contrary, any such further sampling, were it to occur, could just as likely reduce the estimate of underreporting as increase it.

**AIG OBJECTION COMMENT NO. 9:**

*AIG makes the following objection to Paragraph 42 of the Plan:* Liberty proposes to use workers compensation losses as the basis of its ratios because reported workers compensation premiums are unavailable. Liberty has not explained how it plans to create its ratios, nor what it plans to do if the correlation between the losses and the amounts of underreported premium are not highly correlated. In short, the analysis the Plan proposes is vague and incomplete.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

This objection is without merit. Paragraph 42 of Dr. Kadane's Sampling Plan explicitly describes how to calculate ratios in this circumstance. *See* Ex. 1 at ¶ 42. Further, Class Plaintiffs and Liberty see no need to specify additional methodologies "if the correlation between the losses and the amounts of underreported premium are not highly correlated [sic]." The estimates will be unbiased regardless of the signs or the magnitudes of these correlations.

**AIG OBJECTION/COMMENT NO. 10:**

*AIG makes the following objection to Paragraph 47 of the Plan:* AIG objects to the definition of a "Contract File" set forth in paragraph 47 of the Plan because it is overly broad and unduly burdensome. AIG further objects because the scope of sampling-related document production is controlled by the Court's order dated November 17, 2009. AIG submits that paragraph 47 should provide as follows: AIG will produce, after a reasonable search, the following documents, as each actually exists in AIG's files, for each selected contract: the (i) associated policy endorsements; (ii) underwriting files; (iii) accounting files; and (iv) electronically available (but not including microfiche stored) unit statistical cards (together a "Contract File")."

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

Class Plaintiffs and Liberty strongly disagree with AIG's "objection" to Paragraph 47 of Dr. Kadane's Sampling Plan, in which AIG seeks to substantially reduce – and, we submit, render incomprehensively vague – its production obligation with respect to the sampled files by belatedly seeking to change the definition of what documents constitute a "Contract File" from the way that term has been consistently defined over the entirety of the sampling process (indeed, since March 2010), including in the previously approved Sampling Plan for AIG Divisions 55/51 and 50. Ex. 9 hereto.

Class Plaintiffs' Liberty's and AIG's positions on this issue are thoroughly discussed in the parties' correspondence, attached hereto at Exs. 5-8. Briefly summarized, AIG is seeking to belatedly impose a different definition of "Contract File" than the definition that all parties had

agreed to, and which had been *previously approved by both Dr. Kadane and this Court,* in connection with the Sampling Plan for AIG Divisions 55/51 and 50 (approved by Dr. Kadane on July 28, 2010 and adopted by this Court on August 12, 2010). Indeed, the "Contract File" definition to which AIG now objects (*see* Paras. 47 of Dr. Kadane's Sampling Plan) was taken nearly *verbatim* from the previously approved Sampling Plan for AIG Divisions 55/51 and 50. Ex. 9, 7/28/10 Dr. Kadane's Final Sampling Plan for AIG Divisions 55/51 and 50; *see also* Ex. 5, 12/15/10 letter at ¶ ¶ 1-4.

Perhaps even more disturbingly, in recent discussions with Dr. Kadane and subsequent correspondence (*see* Ex. 5, 12/15/10 letter, and Ex. 8, 12/22/10 letter), AIG has suggested that it may not have searched for and produced all Contract File documents for Divisions 55/51 and 50 by the October 4, 2010 deadline set in the Court's August 31, 2010 Order, and, in any event, it is "reserv(ing) the right" to search for and produce later additional Contract File materials "not found in the files but which may be relevant to determining whether the premium associated with the file was properly reported…." Ex. 8, 12/22/10 letter.

AIG's failure to have searched for and produced such responsive material would be a plain violation of the Court's August 31, 2010 production Order, which memorialized the Court's directive that AIG was to fully complete its "production of contract files under the approved sampling plan" by October 4, 2010. August 31, 2010 Order at ¶ 2. (Indeed, AIG clearly represented on October 4, 2010 that it had performed a "diligent search" and that its sampling production was "complete.") Notwithstanding such a violation, Class Plaintiffs and Liberty offered that, if AIG "believes it is too burdensome to do any more searches than it already has for the sampled Contract Files . . ." then they would need a "firm commitment" from AIG that "the files produced within the 60-day (sampling) production period will be all that AIG

will attempt to use at trial with respect to each sampled file." Ex. 7, 12/21/10 letter. AIG flatly refused to provide such a commitment, and now essentially seeks the ability to selectively search for and produce additional responsive documents for certain Division 55/51 and 50 Contract Files long after it was ordered to complete its production. Ex. 8, 12/22/10 letter. Permitting AIG to belatedly and selectively produce such material would be highly prejudicial and unfair to Class Plaintiffs and Liberty.

Given the importance of this issue to the sampling/discovery process, we respectfully request that the Court issue a separate ruling at the January 13, 2011 Sampling Plan approval hearing addressing this issue. Specifically, Class Plaintiffs and Liberty request that the Court (a) re-affirm that AIG's sampling production obligation was to search for and produce the documents defined as "Contract File" in ¶ 30 of its previously approved Sampling Plan for AIG Division 55/51 and 50 by October 4, 2010; and (b) approve the definition of "Contract File" and associated sampling production obligation included in Dr. Kadane's December 16, 2010 Sampling Plan at ¶ 47.

Lastly, to the extent that AIG claims it was too burdensome to do any more searches than it previously performed in connection with its production of the sampled files for Divisions 55/51 and 50 (which it represented was "complete" on October 4, 2010), we respectfully request that the Court order that AIG shall not be permitted to use any later produced documents falling under the definition of "Contract File" at trial to rebut the Class Plaintiffs' and Liberty's conclusions on a particular sampled file. We request that this prohibition also apply prospectively to AIG's forthcoming sampling production for the Divisions outlined in Dr. Kadane's December 16, 2010 Sampling Plan.

- 14 -

**AIG COMMENT/OBJECTION NO. 11:**

*AIG makes the following comment to Paragraph 48 of the Plan:* The Court should create the rule regarding the treatment of files that are produced with missing information or files that Liberty claims has insufficient information for adequate analysis.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

Similar to its treatment of if the "Contract File" issue, AIG now seeks to undo (or render vague) the sampling procedural provisions and obligations regarding how to treat "missing or insufficient files" which all parties had *agreed to* and which were *previously approved* by both Dr. Kadane and the Court in connection with the Sampling Plan for AIG Divisions 55/51 and 50. Indeed, Paragraphs 48 and 50 of Dr. Kadane's December 16, 2010 Sampling Plan – which establish up-front procedures for dealing with missing or insufficient files – were also taken *verbatim* from the Sampling Plan for AIG Divisions 55/15 and 50, previously approved by both Dr. Kadane and this Court. *Compare* ¶¶ 30-32 (at pp. 10-11) of Dr. Kadane's (and the Court's) approved Sampling Plan for AIG's Divisions 55/51 and 50 (Ex. 9 hereto), to ¶¶ 48 and 50 of Dr. Kadane's December 16, 2010 Sampling Plan (Ex. 1 hereto).

Like the Contract File definition, the provisions establishing a procedure for handling missing or insufficient files (*i.e.*, ¶¶ 30-32 of the Division 55/51 and 50 Sampling Plan) were the subject of a great deal of discussion, negotiation, and, ultimately, agreement, prior to the approval of the Plan. These *same* provisions are just as applicable to govern the identical issues in Dr. Kadane's December 16, 2010 Sampling Plan relating to files for AIG's other Divisions. Indeed, if these procedures and obligations are not the same as those we are now using to govern the Division 55/51 and 50 Sampling Plan, we will be faced with a confusing and unworkable situation where we have one set of procedures and obligations that apply to one Sampling Plan and a different set governing another. Class Plaintiffs and Liberty believe that the procedures set

forth in these previously approved paragraphs should be approved again for use in Dr. Kadane's December 16, Sampling Plan.

**AIG OBJECTION/COMMENT NO. 12:**

*AIG makes the following objection to Section V (paragraphs 53-57) of the Plan:* Liberty's proposed methodologies for quantifying the consequences of AIG's alleged underreporting are premature and should not be included in the Plan, thus, AIG expressly reserves its rights to challenge the appropriateness or adequacy of any such methodology after the sampling has been conducted.

**CLASS PLAINTIFFS' AND LIBERTY'S RESPONSE:**

Class Plaintiffs and Liberty note that it was Dr. Kadane who, in connection with the previously approved Sampling Plan for AIG Divisions 55/51 and 50, explicitly asked the parties to include a discussion in the plan of proposed methodologies for quantifying the consequences of AIG's alleged underreporting. These Paragraphs (52-57) in Dr. Kadane's December 16, 2010 Sampling Plan are identical to paragraphs included in the previously approved Division 55/51 and 50 Sampling Plan. *Compare* Section V., ¶¶ 68-71, of Dr. Kadane's (and the Court's) approved Sampling Plan for AIG's Divisions 55/51 and 50 (Ex. 9 hereto), to ¶¶ 52-57 of Dr. Kadane's December 16, 2010 Sampling Plan (Ex. 1 hereto). Thus, AIG's objection is without merit.

- 17 -

| | |
|---|---|
| Dated: January 6, 2011 | Respectfully submitted, |
| Safeco Insurance Company Of America And Ohio Casualty Insurance Company | Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, Employers Insurance Company of Wausau, Wausau Business Insurance Company, Wausau General Insurance Company and Wausau Underwriters Insurance Company |
| By: s/ Matthew O. Sitzer<br>   One of Their Attorneys | By: s/ Jason S. Dubner<br>   One of Their Attorneys |
| Gary M. Elden<br>Matthew O. Sitzer<br>GRIPPO & ELDEN LLC<br>111 South Wacker Drive<br>Chicago, IL  60606<br>(312) 704-7700<br><br>Michael A. Walsh<br>Allison D. Burroughs<br>NUTTER, McCLENNEN & FISH, LLP<br>155 Seaport Boulevard<br>Boston, Massachusetts  02110<br>Telephone:  (617) 439-2775 | James I. Rubin<br>James A. Morsch<br>Jason S. Dubner<br>Mark A. Schwartz<br>Amy B. Kelley<br>**BUTLER RUBIN SALTARELLI & BOYD LLP**<br>70 West Madison Street, Suite 1800<br>Chicago, Illinois  60602<br>Telephone:  (312) 444-9660 |

1065434.2

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on January 6, 2011, I caused a true and correct copy of the foregoing **CLASS PLAINTIFFS' AND LIBERTY PARTIES RESPONSE TO AIG'S COMMENTS AND OBJECTIONS TO DR. KADANE'S DECEMBER 16, 2010 APPROVED SAMPLING PLAN FOR CERTAIN AIG DIVISIONS** to be filed with the Clerk of the Court and served using the CM/ECF e-filing system upon all counsel of record.

s/ Matthew O. Sitzer
Matthew O. Sitzer

1065434.2