IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ACE INA HOLDINGS, INC., *et al.*, <br><br> Defendants. | No.: 07 CV 2898 <br><br> Judge Robert W. Gettleman <br><br> Magistrate Judge Sidney I. Schenkier |
| SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY, individually, and on behalf of a class consisting of members of the National Workers Compensation Reinsurance Pool, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC., *et al.*, <br><br> Defendants. | No. 09 C 2026 |

**AIG'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND PRELIMINARY
<u>APPROVAL OF CLASS ACTION SETTLEMENT</u>**

Defendant American International Group, Inc. and its present and former subsidiaries and affiliates named as parties herein (collectively referred to as "AIG"), by their undersigned counsel, respectfully submit this Supplemental Memorandum in Support of Settlement Class Plaintiffs' and AIG's Joint Motion for Class Certification and Preliminary Approval of Class Action Settlement, D.E. # 330 (the "Motion").

## PRELIMINARY STATEMENT

AIG has joined the Settlement Class Plaintiffs in seeking preliminary approval of the proposed class settlement embodied in the parties' Settlement Agreement dated as of January 28, 2011, and discussed extensively in the Supplemental Memorandum filed today by Settlement Class Plaintiffs. AIG agrees with many of the reasons articulated by the Settlement Class Plaintiffs in their Supplemental Memorandum to support their conclusion that the proposed settlement is a fair and appropriate resolution of this litigation, particularly those relating to the detailed process of examination and negotiation that led to the proposed settlement and the adequacy of Settlement Class Plaintiffs and their counsel.[1] In keeping with the Court's directive to avoid duplicative submissions, AIG will not restate those reasons in this submission. AIG, instead, submits this Supplemental Memorandum to make several additional points that establish the reasonableness of the proposed settlement.

---

[1] As might be expected, given the two sides' differing perspectives, AIG disagrees with certain of the reasons Settlement Class Plaintiffs cite in support of the proposed settlement and, consequently, files this separate memorandum instead of joining Settlement Class Plaintiffs' memorandum in its entirety. These disagreements, however, merely serve to emphasize that the proposed settlement is a negotiated compromise of heavily disputed claims.

## DISCUSSION

The core of the proposed settlement is AIG's commitment to pay $450 million to the settlement class. That $450 million amount was not plucked out of thin air, nor was it merely the product of horse-trading with both sides simply meeting in the middle of their competing bids and asks. As detailed in the Settlement Class Plaintiffs' supplemental submission and accompanying exhibits, the $450 million settlement amount is the result of a months-long negotiation, during which both sides worked to find a principled basis to agree upon an amount that would fairly compensate the insurance companies impacted by the conduct alleged in the complaints filed here against AIG.

From AIG's perspective, the reasonableness of the settlement amount is evidenced by the fact that it faithfully reflects the results of a three-year regulatory examination of AIG's workers compensation premium reporting and calculation of any resulting impact upon AIG's residual market obligations. As described in detail in the supporting declaration of David Leslie, the Examiner in Charge appointed by the state insurance departments to conduct the AIG Multistate Examination, the Examination concluded that AIG underpaid its residual market obligations by approximately $175 million and that AIG should pay approximately $200 million in interest on top of that base amount fully to compensate the companies impacted by AIG's underpayment. The $450 settlement amount then includes an *additional* $75 million settlement premium above that $375 million sum.

Mr. Leslie's declaration described the methodology he used in conducting the AIG Multistate Examination. AIG believes that methodology was sound and acceded to its results. If there is any extent to which those results are inaccurate, however, AIG also believes that they overstate, rather than understate, the amount of harm actually suffered

2

by the settlement class. The accompanying expert declaration of David Appel (attached hereto as Exhibit A) explains AIG's view that Mr. Leslie made a number of assumptions and decisions, which AIG disagreed with but ultimately acceded to in the interest of reaching agreement, that significantly increased the amount of premium that was reallocated. Furthermore, as discussed below, there is no colorable argument that any reasonable settlement should include any treble damages or punitive damages above and beyond the actual harm suffered by the settlement class members. AIG, therefore, submits that the $450 million settlement amount – which is $75 million more than the amount of actual harm calculated by the Examiner in Charge – easily satisfies the reasonableness standard applicable on this motion for preliminary approval.

I. **THE $450 MILLION SETTLEMENT PAYMENT SUBSTANTIALLY EXCEEDS THE SETTLEMENT CLASS MEMBERS' ACTUAL DAMAGES**

As detailed in Settlement Class Plaintiffs' Supplemental Memorandum, the Examiner of the AIG Multistate Examination determined that the participating companies of the NWCRP and the NMWCRP suffered actual damages, plus interest, of $375 million. The proposed settlement requires AIG to pay a settlement premium of $75 million above that figure. Without even addressing whether that substantial premium is appropriate, there are strong arguments that the $375 million base figure underlying it is too high.

As set forth in the accompanying expert declaration of David Appel, Ph.D., of Milliman, who worked directly with David Leslie and his experts throughout the Examination, AIG and the Examiner disagreed on several significant aspects of the Examination methodology and its resulting premium reallocation. Among the more

3

significant areas of dispute that ultimately were resolved contrary to AIG's reasoned positions were:

- Whether to include $244 million in guaranteed cost premium on policies where there was no evidence that the coverage was loss sensitive in the total amount of premium subject to reallocation. The Examiner insisted that the reallocation include all guaranteed cost premium. AIG, however, identified $244 million in guaranteed cost premium that it believed should have been excluded from the reallocation process because it was not adjusted as the underlying policies developed losses. Nevertheless, AIG acquiesced to the Examiner's position and the regulatory reallocation included the additional guaranteed cost premium (*see* Appel Decl. ¶¶ 44-46);

- Whether to include $5.1 billion in captive insurance program premiums in the total amount of premium subject to reallocation. The Examiner included the direct insurance coverage premium component of AIG's captive insurance programs in the reallocation despite the fact that these premiums are fixed and not loss sensitive. AIG identified approximately $5.1 billion of non-loss sensitive captive insurance program premium, and proposed excluding this premium based upon an empirical analysis that demonstrated that AIG's direct insurance captive program premiums did not develop as its captive programs incurred losses. Nevertheless, the Examiner insisted on including the captive premium in the reallocation, and AIG acceded to the Examiner's view (*see id.* at ¶¶ 47-49); and

- Whether to include $656 million in premium coded as fixed expenses on retrospectively rated policies in the total amount of premium subject to reallocation. The Examiner included fixed premium components of retrospectively rated policies in the reallocation. AIG's analysis of its premium reporting system revealed $656 million in fixed premium expenses associated with reallocation relevant retrospectively rated policies, which did not vary with losses and which AIG believed should not be reallocated. Despite AIG's view, the Examiner included this premium in the reallocation (*see id.* at ¶¶ 50-52).

Had the Examiner adopted even some of AIG's disputed positions in the course of the Examination, the premium reallocation would have been significantly lower, as would the resulting residual market impact. (*See* Appel Decl. ¶¶ 54, 63) By way of example, the Examiner's fixed premium requests significantly impacted the ultimate

4

Examination premium reallocation figure. Because the total amount of premium subject to reallocation included approximately $6 billion in fixed premium, the Examiner concluded that AIG should reallocate $2.121 billion in workers compensation premium. (*See id.*) Without the fixed premium the reallocation figure would have been significantly lower – approximately $1.321 billion. (*Id*. at ¶ 63)

## II. AIG'S EXPOSURE TO TREBLE OR PUNITIVE DAMAGES IS IRRELEVANT AND INSIGNIFICANT

AIG anticipates that the Objectors may argue that the proposed settlement is not reasonable because it does not adequately account for AIG's exposure to treble or punitive damages. However, the NWCRP did, in fact, weigh that factor in its analysis. (*See* Dckt. No. 351-3, Ex. H (Leslie Decl.) ¶ 61.) A review of the facts, moreover, makes clear that, if anything, the parties over-weighted that factor in adding the $75 million premium to the base damages amount, as AIG does not face any meaningful exposure to any damages beyond compensatory damages and interest thereon.

With respect to treble damages, sought in connection with Settlement Class Plaintiffs' (and Liberty's) RICO claims against AIG, the Court should not and need not consider them in evaluating the adequacy of the proposed settlement. "[N]umerous courts have held that in determining a settlement value, the potential for treble damages should not be taken into account." *Carnegie v. Household Int'l, Inc*., 445 F.Supp.2d 1032, 1035 (N.D. Ill. 2006) (citing cases); *see also In re Community Bank of N. Va.*, 622 F.3d 275, 312 (3d. Cir. 2010) ("[W]e know of no authority that requires a district court to assess the fairness of a settlement in light of the potential for trebled damages."); *Rodriguez v. W. Publishing Corp*., 563 F.3d 948, 964 (9th Cir. 2009) ("It is our impression that courts generally determine fairness of an antitrust class action settlement

5

based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages."); *Suffolk Cty. v. Long Island Lighting*, 907 F.2d 1295, 1324 (2d Cir.1990) ("[I]t is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure."); *In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290(TFH), 99MS276(TFH), Civ. 99-0790(TFH), 2003 WL 22037741, at *3 n. 6 (D.D.C. June 16, 2003) ("Although the Direct Purchasers could potentially recover treble damages, the standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages."); *In re Am. Family Enters.*, 256 B.R. 377, 425 (D. N.J. 2000) ("[S]ingle damages, not treble or punitive damages, are the appropriate yardstick by which the fairness of a proposed class action settlement should be measured.").

In any event, Settlement Class Plaintiffs' (and Liberty's) RICO claims have little chance of succeeding. Settlement Class Plaintiffs allege that AIG conducted an association-in-fact enterprise consisting of its subsidiaries and two other companies, C.V. Starr & Co., Inc. ("CVSCO") and Starr International Company, Inc. ("SICO" and, together with CVSCO, the "Starr Entities"). (Dckt. No. 316 (Compl.) ¶ 98.) An association-in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 129 S. Ct. 2237, 2243 (2009). In other words, Settlement Class Plaintiffs must prove an ongoing relationship or coordination among the AIG subsidiaries and the Starr Entities such that they functioned as a "continuing unit."

The only connection between the AIG subsidiaries and the Starr Entities alleged in Settlement Class Plaintiffs' Complaint is that executives at the AIG subsidiaries were

motivated to engage in the alleged premium underreporting scheme by compensation that was paid to them through the Starr Entities and outside the ordinary course of business. (Comp. ¶¶ 20-21, 121.) Yet, after over a year and a half of discovery, which included the production of millions of pages of documents and dozens of depositions, Liberty has found no evidence linking the Starr Entities and the AIG Subsidiaries in any kind of conspiracy or "continuing unit", nor any evidence that AIG used the Starr Entities to pay senior executives in order to incentivize them to participate in the alleged underreporting scheme. Without any evidence to support the alleged association-in-fact enterprise, the RICO claim fails.

With respect to punitive damages, sought in connection with various tort claims asserted by Settlement Class Plaintiffs (and Liberty), these too are appropriately excluded from the Court's fairness analysis. *See, e.g., Mangone v. First USA Bank*, 206 F.R.D. 222, 229-230 (S.D. Ill. 2001) ("Punitive damages are generally not appropriate in measuring the fairness of a proposed class action settlement."); *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 70 (D.Mass. 1997) ("the fact that [the defendant] is not 'sufficiently punished' is not itself a reason for finding the settlement unfair"); *In re Am. Family Enters*., 256 B.R. at 425.

Moreover, there is no reasonable likelihood that a jury would award significant punitive damages above and beyond the $100 million in regulatory fines and penalties that AIG already has agreed to pay to the 50 states and the District of Columbia. Punitive damages "are aimed at deterrence and retribution," and their imposition is limited by considerations of constitutional due process. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *see also Lenard v. Argento*, 699 F.2d 874, 890 (7th Cir. 1983)

7

(courts must ensure that the punitive damages imposed "[do] not go beyond deterrence and become a windfall"). An award of punitive damages "must bear a reasonable relationship to compensatory damages," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996), and, while the Supreme Court has not adopted a simple mathematical formula for punitive damages, it has strongly suggested that ratio greater than 1:1 for punitive damages to compensatory damages would be constitutionally infirm where, as here, compensatory damages are substantial and a party has suffered only economic injuries, *see State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio [than 9:1], perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."). The amounts that a defendant has already paid—in the form of losses, remedial costs, fines, and settlements—must be considered when calculating the ratio between compensatory damages and any punitive award necessary to deter future conduct. *See, e.g., In re Exxon Valdez*, 270 F.3d 1215, 1244 (9th Cir. 2001) (recognizing that the need for a deterrent punitive damage award was reduced where the defendant had paid hundreds of millions of dollars in the form of fines, settlements with government entities, and other expenses); *In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liability Litig.*, 526 F. Supp. 887, 900 (N.D. Cal. 1981), *vacated on other grounds by* 693 F.2d 847 (9th Cir. 1982) ("Common sense dictates that a defendant should not be subjected to multiple civil punishment for a single act or unified course of conduct which causes injury to multiple plaintiffs.").

Even if AIG had engaged in reprehensible conduct that theoretically could warrant punitive damages, the $450 million settlement reflects the maximum conceivable amount of punitive damages that could be awarded under the circumstances here. As

8

discussed above, the base level of compensatory damages here is, at most, $174 million. Under the rationale of *State Farm*, it is inconceivable that a penalty greater than $174 million would be constitutional here. *State Farm*, 538 U.S. at 425. AIG has already been fined $100 million for the conduct that forms the basis of Class Plaintiffs' claims, leaving $74 million until the 1:1 ratio is reached. *See, e.g., Exxon Valdez*, 270 F.3d at 1244. Since the $450 million settlement amount includes a $75 million premium above the maximum compensatory damages and accrued interest, the settlement here reflects an amount equal to any possible punitive damages that Class Plaintiffs might realistically hope to obtain. This Court thus would be well within its discretion to approve the $450 million settlement even if Objectors raise the possibility of obtaining a greater punitive damages award following trial. *See, e.g., Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (finding that speculative possibility of punitive damages was insufficient to conclude district court abused its discretion in approving settlement); *Ross v. Trex Co., Inc.*, 2009 WL 2365865, at *5 (N.D. Cal. July 30, 2009) ("punitive damages are not necessarily material to the value of a settlement"); *cf. In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) ("[T]he court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial.").

### III. THE SETTLEMENT AMOUNT AND/OR THE PLAN OF ALLOCATION ARE NOT TAINTED BY CONFLICTS

The Objectors have strenuously argued that the settlement amount and/or the plan of allocation should be rejected because they ascribe no value to AIG's underreporting claims against several of the Settlement Class Plaintiffs. They assert that this somehow

9

confers a skewed benefit on a handful of class members that taints the entire settlement. But this argument fails in light of the clear evidence that the settlement amount, and its allocation among all class members, is a purely neutral compensation structure under which each class member receives no more nor less than their pro rata share of the settlement amount based upon their share of the workers compensation market in each affected state and year.

AIG was not obligated to insist upon a reduction of the amounts allocated to those companies against which it has alleged underreporting claims, and it elected not to do so in order to get this settlement across the finish line. Similarly, the Settlement Class Plaintiffs, who are not asserting any underreporting claims against any party other than AIG, were not obligated to insist upon reduced allocations for alleged underreporters, and they were perfectly justified in accepting a deal that treated all class members equally and fairly.

The Objectors' sudden profession of faith in AIG's underreporting claims against Travelers, The Hartford, and others is odd, to say the least, given the Objectors' failure to prosecute those claims themselves on behalf of the purported class. One would think that if the Objectors honestly believed those claims had value, the Objectors would have aggressively pursued them long before now. They did not pursue them, however, and not only does that fact call into question the Objectors' sincerity in championing them now, it also undercuts the Objectors' claim that class members are somehow hurt by the fact that the plan of allocation does not account for those claims. The simple and undeniable fact is that nobody *ever* has prosecuted AIG's underreporting claims on behalf of the purported class. The members of that class, therefore, have never had any legitimate

expectation of receiving any benefit from those claims, nor can they now be claimed to be hurt by AIG's decision to settle those claims.

As to the basis for AIG's decision, AIG respectfully submits that should be irrelevant to the Court's assessment of the fairness of the settlement amount for the reasons discussed immediately above. With that being said, AIG continues to believe that its underreporting claims have merit and value but has made a business judgment to forego any such future value in order to achieve a global settlement at this time. Litigation is inherently speculative, and it likely would be years until AIG's underreporting claims could be resolved judicially. The underreporting defendants (along with Liberty and the Settlement Class Plaintiffs) have made quite clear that they believe AIG's claims to be subject to significant challenge, and their ongoing litigation is certain to be expensive and burdensome upon AIG. As such, it is entirely within AIG's reasonable judgment to give up such claims in exchange for the resulting global peace that the proposed settlement is intended to provide.

## **CONCLUSION**

For the foregoing reasons, AIG respectfully requests that the Court grant the Joint Motion for Class Certification and Preliminary Approval of Class Action Settlement.

                                                Respectfully submitted,

                                                PLAINTIFFS AMERICAN INTERNATIONAL GROUP, INC., et al.,

                                                By:   /s/ Rebekah H. Parker
                                                          One of Their Attorneys

Stephen Novack
P. Andrew Fleming
Rebekah Parker
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900

Michael B. Carlinsky
Kevin S. Reed
Jennifer J. Barrett
Quinn Emanuel Urquhart
  & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing **AIG's Supplemental Submission In Support Of Motion For Class Certification And Preliminary Approval Of Class Action Settlement** was served upon all counsel of record in this action pursuant to the written consent of the parties under Fed. R. Civ. P. 5(b)(2)(E) via the U.S. District Court CM/ECF e-filing system on February 25, 2011.

/s/ Rebekah H. Parker