## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) ) | Case No. 07 CV 2898 |
| Plaintiffs, | ) ) ) | Judge Robert W. Gettleman |
| v. | ) ) ) | Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

AMERICAN INTERNATIONAL
GROUP, INC., et al.,                          )          Case No. 07 CV 2898

                Plaintiffs,                   )          Judge Robert W. Gettleman

        v.                                    )          Magistrate Judge Sidney I. Schenkier

ACE INA HOLDINGS, INC., et al.,               )

                Defendants.                   )
_____

LIBERTY MUTUAL INSURANCE
COMPANY, et al.,                              )

                Counter-Claimants,            )

        v.                                    )

AMERICAN INTERNATIONAL
GROUP, INC., et al.,                          )

                Counter-Defendants.           )
_____

SAFECO INSURANCE COMPANY OF
AMERICA and OHIO CASUALTY                     )          Case No. 09 CV 2026
INSURANCE COMPANY, individually, and on       )
Behalf of a Class consisting of members of the )          Judge Robert W. Gettleman
National Workers Compensation Reinsurance     )
Pool,                                         )

                Plaintiffs,                   )

                                              )          Magistrate Judge Sidney I. Schenkier
        v.                                    )

AMERICAN INTERNATIONAL GROUP,                 )
INC., et al.,                                 )

                Defendants.                   )
_____

## ORIGINAL CLASS PLAINTIFFS' SUBMISSION OF CORRECTED
## DECLARATION OF SEAN MCSWEENEY

Safeco Insurance Company of America ("Safeco") and Ohio Casualty Insurance Company ("Ohio Casualty") (jointly, "Original Class Plaintiffs") hereby submit the attached corrected declaration of Sean McSweeney.

On June 14, 2011, Original Class Plaintiffs moved to supplement the record with several declarations, among them, Mr. McSweeney's. That motion was granted on June 16, 2011. Original Class Plaintiffs have discovered that the previously submitted declaration submitted for Mr. McSweeney contained a few typographical errors. There are no substantive differences between the originally filed McSweeney declaration and the corrected declaration, attached hereto as Exhibit A. Specifically, in Paragraph 7, the originally filed declaration stated that an earlier declaration by Thomas Jenkins was filed on June 3, 2010. The attached declaration uses the correct date of June 3, 2011. In addition, the attached declaration corrects a mistake in the case number in the case caption and some issues with formatting the document.

Dated: June 20, 2011

Respectfully submitted,

SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY,

By: s/ Matthew O. Sitzer
    Matthew O. Sitzer

One of Their Attorneys

1173451.2

Gary M. Elden
Gary M. Miller
Matthew O. Sitzer
Daniel M. Hinkle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700
gelden@grippoelden.com
gmiller@grippoelden.com
msitzer@grippoelden.com
dhinkle@grippoelden.com

Michael A. Walsh (admitted *pro hac vice*)
Allison D. Burroughs (admitted *pro hac vice*)
NUTTER, McCLENNEN & FISH, LLP
155 Seaport Boulevard
Boston, Massachusetts 02110
(617) 439-2775
mwalsh@nutter.com
aburroughs@nutter.com

1173451.2

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on June 20, 2011, I caused a true and correct copy of the foregoing **SUBMISSION OF CORRECTED DECLARATION OF SEAN MCSWEENEY** to be filed with the Clerk of the Court and served using the CM/ECF e-filing system upon all counsel of record.

s/ Matthew O. Sitzer
Matthew O. Sitzer

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | Case No. 07 CV 2898 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, et al., | ) ) ) ) | |
| Counter-Claimants, | ) ) | |
| v. | ) ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) ) | |
| Counter-Defendants. | ) ) | |
| SAFECO INSURANCE COMPANY OF AMERICA, et al., | ) ) ) | Case No. 09 CV 2026 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**CORRECTED DECLARATION OF SEAN MCSWEENEY**

1. I am a Senior Vice President and Deputy General Counsel of Liberty Mutual Group, Inc. ("Liberty"), and have held that position since May 2005. I have been continuously employed by Liberty since 1994 as an attorney in the company's Legal Department. In that capacity, I report directly to Christopher Mansfield, Liberty's General Counsel, and other senior company executives, including the company's Chief Executive Officer, Edmund Kelly.

2. My current duties as Deputy General Counsel include, among other things, serving as Liberty's chief litigation counsel. In that capacity, I am familiar with and have been involved in various aspects of the litigation with AIG over its underreporting since 2007. I have also been involved in certain attempts to settle the claims made against AIG.

3. I have reviewed the Supplemental Declarations filed by the Intervenors, their counsel and David Leslie on June 3, 2011 and I offer this declaration to clarify and correct some of the statements made in those Declarations.

4. As a preliminary matter, many of the matters disclosed by Intervenors relate to various positions taken by the NWCRP Board, AIG or Liberty in the negotiations over attempts to settle the claims made against AIG. Many of the matters disclosed are subject to confidentiality agreements that were entered into by the NWCRP Board, Liberty, AIG and the regulatory Examiner-in-Charge. The purpose of those confidentiality agreements was to promote the free disclosure of positions in an attempt to facilitate settlement. It is apparent from the Supplemental Declarations and the other submissions made by the Intervenors and AIG on June 3, 2011, that those parties have elected to wholly disregard the confidentiality agreements to which those communications are subject. Accordingly, I am supplementing the record so the Court has a complete and accurate account of the parties' positions on settlement of these cases.

5.     AIG has, at several points in time, attempted to settle the claims in the 07 Action. Initially, the negotiations over settlement were between AIG and the NWCRP Board. The Board was, from the initiation of the 07 Action until the dismissal in 2009 of the NWCRP claims, the lead litigant in that Action.

6.     After the Court granted AIG's Motion to Dismiss the 07 Action in August, 2009, Liberty informed the NWCRP Board in writing that, in light of the language of the Order dismissing the NWCRP Board's claims, it should withdraw from settlement negotiations with AIG and, in particular, that the Board lacked authority to settle on behalf of Liberty. A copy of Liberty's counsel's letters are attached as Exhibits B and C to the Declaration of Thomas W. Jenkins filed by Settling Class Plaintiffs on June 3, 2011.

7.     The NWCRP Board responded through counsel to Liberty's request that the NWCRP Board withdraw from settlement discussions on September 8, 2009, stating that it disagreed with Liberty's position and would continue to negotiate with AIG. A copy of the letter is attached as Exhibit D to the Declaration of Thomas W. Jenkins filed by Settling Class Plaintiffs on June 3, 2011.

8.     By the time of the Court's August 20, 2009 decision on the NWCRP's standing, Liberty had already filed its counterclaims against AIG in the 07 Action. The counterclaims mirror the original claims filed by the NWCRP in the 07 Action but also include claims by Liberty relating to AIG's underreporting of workers compensation premiums in non-Pool states such as Texas and other residual market mechanisms like special injury funds. In addition, Liberty's claims included damages arising from the unfair competitive advantage that AIG gained over Liberty from its underreporting.

3

9.      At the time Liberty advised the NWCRP it should withdraw from negotiations, Safeco and Ohio Casualty had also filed the class action. Because time was of the essence when that action was commenced (due to statute of limitations considerations), the class action was filed by the same law firm representing Liberty. However, shortly thereafter, Safeco and Ohio Casualty retained separate counsel. Those new lawyers filed appearances in August 2009.

10.     In order to facilitate Liberty's participation in negotiations with AIG, on November 4, 2009, Liberty, AIG and Mr. Leslie entered into an Agreement Regarding Conduct of Settlement Discussions. Pursuant to that Agreement, Liberty exchanged analyses of the case against AIG, views on the amount of AIG's actual underreporting, and the damages claimed by Liberty as a result of AIG's wrongdoing. Liberty's non-Pool state damages always played an important role in Liberty's analyses. Liberty's non-Pool damages were substantial. See e.g., Exhibit A, provided to Mr. Leslie on January 27, 2010, calculating Liberty's non-pool damages for Divisions 50/55, assuming $2.1 billion in underreporting, at $196 million. As the largest writer of workers compensation insurance, Liberty was the largest victim of AIG's underreporting in non-Pool states, including, for example, Texas, where AIG's underreporting caused tens of millions of dollars of damages to Liberty. Liberty is the only party that ever filed claims against AIG for such non-Pool states claims.

11.     At a meeting with Mr. Leslie and his team on November 19, 2009 which I attended with outside counsel and representatives of the NWCRP Board, Mr. Leslie told us that our settlement demands had to assume $2.1 billion in underreporting by AIG, explaining that he and AIG had already agreed to this number for purposes of the Multi-State Examination. Mr. Leslie stated that AIG would not revisit the $2.1 billion number for purposes of settling with the private litigants. He also told us that AIG was only interested in a global settlement that

would put an end to both his regulatory examination of AIG as well as the private litigation brought by the industry against it.

12.     On November 25, 2009, Mr. Leslie wrote an email to me and Liberty's outside counsel offering his views on the value of the industry's claims against AIG. A copy of Mr. Leslie's email is attached as Exhibit B. Mr. Leslie estimated the NWCRP's damage from AIG's underreporting to be $621 million. I was surprised that Mr. Leslie was offering his own analysis of the value of the industry's claims and was concerned that his role in the negotiations between Liberty and AIG was going to be something more than that of a facilitator. I responded to the email saying that we needed to talk since we "never understood that the states and the EIC would be this heavily engaged in the carriers['] damage calculation." A copy of my email to Mr. Leslie is attached as Exhibit C.

13.     In the first week of December 2009, I had several phone conversations with Mr. Leslie. He related his view that Liberty was making unreasonable settlement demands that he believed AIG would never accept. I commented on and questioned his role and involvement in our efforts to resolve the case. He advised that he and his clients were interested in a principled global resolution. I asked whether he knew if there was a limit on what AIG could pay to achieve a global settlement. Mr. Leslie said there was indeed such a limit and indicated that he knew what the limit was but would not disclose the amount. I then stated that it sounded as though there was a finite amount that AIG had available to pay the carriers and the regulators and we were competing for the same dollars. Mr. Leslie replied that he was aware of what AIG had set aside to pay for all claims and that his clients, the regulators, would always be in line ahead of the industry when it came to collecting from the limited fund AIG had available to achieve a global settlement.

5

14. As I stated above, there was a disagreement between Liberty and the NWCRP Board over authority to negotiate with AIG. Liberty continued to believe the Board lacked authority to settle. In order to avoid a public dispute over the Board's authority, effective January 20, 2010, Liberty and the NWCRP Board entered into an agreement delegating to Liberty the lead in negotiating with AIG under certain stated conditions.

15. In the following months, Liberty (with the blessing of the NWCRP Board) made two settlement demands on AIG. In each case, Liberty demanded that AIG pay the industry and Liberty separate specified amounts for the industry's claims and Liberty's non-Pool claims. AIG rejected each of those demands.

16. In late March 2010, I was told by the NWCRP Board's counsel that the consensus of those on the Board other than Liberty was that the private litigation needed to settle, that the other Pool Board members were suffering from "litigation fatigue," and that the NWCRP Board was prepared to settle the Pool claims for far less than what the NWCRP Board had previously demanded in settlement for the Pool-related claims.

17. In April, 2010, Robert Benmosche, AIG's CEO, called Edmund Kelly, Liberty's CEO, and expressed a willingness to come to Boston in the hopes of working out a resolution of the pending litigation. Messrs. Kelly and Benmosche met on Saturday, May 8th specifically to discuss resolution of the litigation and they reached an "agreement" to settle the case that morning. A true and correct copy of an email memorializing the material terms is attached hereto as Exhibit D. As stated in the email, Messrs. Kelly and Benmosche agreed that AIG would pay $500 million to settle the NWCRP claims asserted in the class action and $100 million to settle Liberty's non-Pool claims. In light of the fact that Liberty did not have authority from either the NWCRP Board or class counsel to effect such a settlement, Mr. Kelly made it

clear in his note to Mr. Benmosche that he would "start[] the process of getting buy-in to our agreement."

18.  Upon learning of the Kelly/Benmosche agreement, I contacted my counterpart at AIG, Michael Leahy, on May 11, 2010.  Mr. Leahy acknowledged the discussions between Messrs. Kelly and Benmosche and stated that AIG intended to source some of the monies to be paid for the $600 million settlement from the Alleged Underreporting Defendants (the "AURs") sued by AIG in the 07 Action.

19.  Chris Mansfield and I met with AIG's General Counsel, Thomas Russo and Kenneth Harkins of AIG on June 10, 2010.  Messrs. Russo and Harkins informed us that, while AIG was not seeking to have Liberty contribute to the proposed settlement, AIG would be pursuing, amongst others, ACE, Hartford, and Travelers for contributions.  Mr. Russo sought our assistance in facilitating those recoveries.  We declined.

20.  When I received a copy of Mr. Russo's letter of July 29, 2010, I concluded that AIG must have been unsuccessful in obtaining contributions from ACE, Hartford, Travelers for their underreporting to help fund the settlement and instead elected to, as Mr. Russo's letter suggests, discount AIG's settlement offer.  Further, AIG's newest settlement strategy, proposing a single undifferentiated sum, was designed to pit Liberty's non-Pool claims against the claims of the class.  For that reason, I wrote to Leslie on August 9, 2010 expressing Liberty's concerns about their latest "offer" and stating that Liberty would not support any settlement that did not fairly resolve Liberty's non-Pool claims.

21.  I attended a meeting with AIG and the NWCRP Board on August 26, 2010.  During the meeting, AIG attempted to convince everyone that the $450 million offered in the July 29, 2010 letter was a fair and reasonable settlement.  Mr. Russo further stressed that the

$450 million was the maximum the Treasury Department would allow AIG to pay. During the meeting, AIG suggested that, if Safeco and Ohio Casualty would not agree to accept the $450 million offer, the NWCRP Board should arrange for someone else (unspecified) to intervene in this lawsuit to do so.

22.     I attended a NWCRP Board meeting held on September 15, 2010. Prior to the meeting, on September 1, 2010, Liberty's outside counsel, James Rubin received a voice message from the NWCRP Board's counsel, Thomas Jenkins. Mr. Jenkins stated that the NWCRP Board was moving forward unilaterally to negotiate non-monetary terms with AIG and was considering having an intervenor replace Safeco and Ohio Casualty in the class litigation. As a result, it was clear that if Liberty resisted the proposed settlement from AIG it would find itself at odds with the NWCRP Board.

23.     Prior to the scheduled September 15, 2010 Board meeting I had requested that the Board invite class counsel to the meeting so that the views of the class with respect to AIG's offer could be represented and heard by us. The Board agreed. Accordingly, class counsel, Gary Elden and Michael Walsh, made a presentation to the Board concerning the progress made in the litigation and their perspectives, as class counsel, on the possible settlement of the class claims upon the terms that AIG had proposed. As stated in the Supplemental Declarations of Messrs. Letak, Malphurs, Bloss, Treacy, Jacobs, Schroeder, and Schlessinger, after Mr. Elden and Mr. Walsh left the September 15 meeting, I addressed the Pool Board before it went into executive session on the topic of AIG's July 29, 2010 settlement offer of $450 million.

24.     I began my remarks by stating that I was present and speaking solely on behalf of Liberty Mutual as a party to the 07 Action and that I could not and was not speaking on behalf of Safeco or Ohio Casualty or the class that those companies were seeking to represent in the 09

Action. I also stated that, with respect to settlement of the class' case against AIG, there was separation between Liberty Mutual and the class, and that class counsel had their own views, as already expressed, as to whether and in what amount to settle the case. At no time during my presentation did I say that the $450 million settlement offer made by AIG on July 29, 2010 was reasonable, or "within a range of reasonableness." Nor did I indicate that Liberty was prepared to accept the settlement offer made by AIG in return for a release of all of its claims against AIG. I did not say that the class would support such a deal, nor did I say or imply that Liberty's support for the deal would ensure class counsels' support, or that I or Liberty could "guarantee", "deliver", or "take care of" class counsels' support for any such settlement.

25.     I did state that AIG's offer required the release of all claims against AIG in the 09 and 07 Actions, yet failed to take into account, separately, Liberty's substantial non-pool claims, and that AIG would have to offer more money for Liberty to support the proposed settlement. I described the distinction between pool and Liberty's non-pool claims. I also said that if Liberty received adequate compensation for its non-pool claims Liberty would support a settlement of the class claims for $450 million. That statement was not based on my opinion as to the reasonableness or adequacy of the $450 million settlement offer. It instead was a reflection of my concern, which I clearly voiced to the Board and its counsel at that meeting, that any dispute between the Pool Board and Liberty over the settlement proposed by AIG that resulted from the Board's "litigation fatigue" would end up delaying the ultimate resolution of the case, potentially expanding the scope of the litigation, and ultimately would benefit AIG and not the victims of its wrongdoing. I urged the Pool Board to work with Liberty on a joint settlement strategy so that such a dispute between Liberty and the Board could be avoided.

26.     A day or two after my presentation to the NWCRP Board, I was contacted by William Hannay of Schiff Hardin, outside litigation counsel to the NWCRP. Mr. Hannay indicated that some Pool Board members were concerned by the disparate positions taken by Liberty and class counsel on the subject of settlement, with class counsel advising the Board to wait until sampling was completed and me telling the Board that Liberty would go along with $450 million for the class provided AIG compensated Liberty for its non-pool claims. Mr. Hannay asked me whether class counsel could be "counted on" to support a global settlement. I told him that Liberty would certainly advise class counsel of its views, but that class lawyers had their own independent, ethical duties to the class with respect to any settlement, and that they would have to be satisfied through their own due diligence that such a settlement would be fair and reasonable.

The undersigned hereby declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of his knowledge, information and belief.

Dated: June 20, 2011

_____
Sean McSweeney

For Settlement Purposes Only (FRE 408)

Privileged Confidential
Attorney Work Product
Attorney-Client Communication

# Revised Damage Calculation Summary

**(In Millions of Dollars)**

### Applying Cash-Flow Methodology
(Interest at 7.5% Compounded)

|  |  | Damage to NWCRP<br>Participating<br>Companies / Class | Damage to Liberty |
|---|---|---|---|

### EIC Agreed Upon Damage Elements

**Legacy Period (1985-1996) D50/D55**

|  |  |  | Damage to NWCRP | | Damage to Liberty |
|---|---|---|---|---|---|
| Premium Reallocation (Per AIG methodology) | (1) |  | $ 2,061.9 | $ | 2,061.9 |
| Core Damages (NWCRP States ONLY) | * | $ | 167.8 | $ | 36.6 |
| Interest Amount (NWCRP States ONLY) |  | $ | 242.7 | $ | 54.6 |
| **Subtotal: Legacy D50/D55** |  | $ | 410.5 | $ | 91.2 |
| **Cost of Overstated Reserves (Legacy<br>Period / Divisions 50 & 55 Only)** | (2) * | $ | 506.4 | $ | 105.0 |
| **Sub-Total Damage (per EIC)** |  | $ | 916.9 | $ | 196.2 |

Tentative Preliminary Draft
January 27, 2010

Joint Prosecution/Defense Privilege Work Product Material -- Distribution Strictly Limited
Subject to terms of November 4, 2009 Agreement Regarding Settlement Discussions

**EXHIBIT A**

For Settlement Purposes Only (FRE 408)

Privileged Confidential
Attorney Work Product
Attorney-Client Communication

## Revised Damage Calculation Summary

(In Millions of Dollars)

### Applying Cash-Flow Methodology
(Interest at 7.5% Compounded)

|  |  | Damage to NWCRP Participating Companies / Class | Damage to Liberty |
|---|---|---|---|
| **Additional Elements of Damage to Liberty/NWCRP Class** |  |  |  |
| **Core Damage (NWCRP States ONLY)** | (3) * $ | 97.2 | $ 20.4 |
| **Interest Amount (NWCRP States ONLY)** | $ | 172.1 | $ 36.2 |
| **Estimated Cost of Overstated Reserves (Legacy Period / Top 10 Other Divisions)** | (4) * $ | 211.3 | $ 42.2 |
| **Estimated Cost of Overstated Reserves (Pre-Legacy Period / ALL Divisions)** | (5) | TBD | TBD |
| **Other Considerations** Attorneys' Fees (through 11/09) | $ | 14.0 | $ 7.3 |
| **Sub-Total Additional Damage (to Liberty/NWCRP Class)** | $ | 494.6 | $ 106.1 |

Joint Prosecution/Defense Privilege Work Product Material -- Distribution Strictly Limited
Subject to terms of November 4, 2009 Agreement Regarding Settlement Discussions

For Settlement Purposes Only (FRE 408)

Privileged Confidential
Attorney Work Product
Attorney-Client Communication

## Revised Damage Calculation Summary

### (In Millions of Dollars)

#### Applying Cash-Flow Methodology
(Interest at 7.5% Compounded)

|  |  | Damage to NWCRP Participating Companies / Class | Damage to Liberty |  |
|---|---|---|---|---|
| **Additional Elements of Damage to Liberty** |  |  |  |  |
| Core Damages (Other State Residual Market Funds) | (6) * | N/A | $ | 6.3 |
| Interest Amount (Other State Residual Market Funds) |  | N/A | $ | 33.7 |
| Core Damages (Guaranty Fund/Spec'l Injury Fund/Etc.) | (7) * | N/A | $ | 6.5 |
| Interest Amount (Guaranty Fund/Spec'l Injury Fund/Etc.) |  | N/A | $ | 21.8 |
| **Other Considerations** |  |  |  |  |
| Lost Profits (including interest) | (8) | N/A | $ | 50.0 |
| **Sub-Total Additional Damage (to Liberty)** |  | N/A | $ | 118.3 |

Tentative Preliminary Draft
January 27, 2010

Joint Prosecution/Defense Privilege Work Product Material -- Distribution Strictly Limited
Subject to terms of November 4, 2009 Agreement Regarding Settlement Discussions

For Settlement Purposes Only (FRE 408)

Privileged Confidential
Attorney Work Product
Attorney-Client Communication

# Revised Damage Calculation Summary
### (In Millions of Dollars)

### Applying Cash-Flow Methodology
(Interest at 7.5% Compounded)

|  | Damage to NWCRP Participating Companies / Class | | Damage to Liberty | |
|---|---|---|---|---|
| **Summary of All Damage Elements** | | | | |
| Sub-Total Damage (per EIC) | $ | 916.9 | $ | 196.2 |
| Sub-Total Additional Damage (to Liberty/NWCRP Class) | $ | 494.6 | $ | 106.1 |
| Sub-Total Additional Damage (to Liberty) | | N/A | $ | 118.3 |
| **Total Damage** | $ | 1,411.5 | $ | 420.6 |
| Total Damage (including interest at single [9] damage level and trebling of items denoted with an asterisk for violation of RICO and/or MA Sec. 93A) | | 3,376.8 | | 854.5 |
| Disgorgement of AIG's Profit (applying AIG's avg. reported GAAP return on equity to the value of reserves / accruals / assessments avoided by AIG in Divisions 50/55, for the Legacy Period ONLY) | $ | 3,291.1 | $ | 687.0 |

Tentative Preliminary Draft
January 27, 2010

Joint Prosecution/Defense Privilege Work Product Material -- Distribution Strictly Limited
Subject to terms of November 4, 2009 Agreement Regarding Settlement Discussions

For Settlement Purposes Only (FRE 408)

Privileged Confidential
Attorney Work Product
Attorney-Client Communication

# Revised Damage Calculation Summary

### (In Millions of Dollars)

#### Applying Cash-Flow Methodology
##### (Interest at 7.5% Compounded)

| Damage to NWCRP Participating Companies / Class | Damage to Liberty |
|---|---|

Notes:

(1)  Variance from Milliman model due to potential minor modeling differences, which can be resolved upon receipt of additional information/input from AIG/Milliman.

(2)  These damages are intended to address the incorrect allocation of reserves, principally loss and loss expenses, and the corresponding impact on policyholder surplus (over time). The reserves are calculated using actual discounted reserves as reported by NCCI for the years 1999-2009.

(3)  "Core Damage (NWCRP States ONLY)" is calculated based on reallocation of approximately $182.6M of premium for Divisions 50/55 in the Pre-Legacy Period, as well as $860.1M of premium for AIG's Top 10 Other Divisions in the Legacy Period and $58.2M of premium for those other divisions in the Pre-Legacy Period. AIG's Top 10 Other Divisions were selected by WC premium volume only, using AIG-WC 335575-692. Those divisions are 58, 82, 2, 85, 13, 54, 14, 18, 45, and 77.

(4)  Reserve damage contributions for the legacy period/other divisions category are estimated based on the ratio of core damages in that segment to the ratio of core damages calculated for the legacy period/D50 & 55 segment.

(5)  There is likely also a material injury incurred from the cost of overstated reserves (both for Divisions 50 and 55, as well as the other divisions) in the pre-legacy period, but cash-flow data has only been made available back to 1980 -- some of which is only in hard copy and difficult to read -- so we have not attempted to estimate those damages to date.

(6)  "Other State Residual Market Funds" includes Michigan, New Mexico, Massachusetts (for the Legacy Period only), and Texas. Data is available for Texas for the period 1980-1994, when we understand that operation of the Pool was transferred to Swiss Re. Core damages in Texas are calculated using AIG's average nationwide market share and an estimated 21% market share for the Liberty Group.

(7)  Guaranty Fund and Special Injury Fund damage includes injury arising out of fund participation in the following jursidictions: Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Louisiana, Maryland, Michigan, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, and Virginia.

(8)  Liberty also intends to pursue damages not included in this calculation related to the narrowed margins and lost business caused by AIG's underreporting.

(9)  Interest has not been trebled, although there is authority for such an approach. The value associated with the disgorgement of AIG's profit has also been left at its single damage level, though trebling could be granted on this amount, pursuant to MA Sec. 93A, as well as interest. Finally, fees have not been trebled.

Tentative Preliminary Draft
January 27, 2010

Joint Prosecution/Defense Privilege Work Product Material -- Distribution Strictly Limited
Subject to terms of November 4, 2009 Agreement Regarding Settlement Discussions

**From:** Leslie, J. David <dleslie@rackemann.com>
**To:** jrubin@butlerrubin.com <jrubin@butlerrubin.com>
**Cc:** McSweeney, Sean
**Sent:** Wed Nov 25 11:38:53 2009
**Subject:** AIG -- NWCRP/Liberty Mutual -- Residual Market Issues

Jim,

Further to our conversation of Monday afternoon, we have looked, on a high level basis, at the November 5 Liberty Mutual preliminary damages number and made a number of adjustments based on our discussion of last Thursday. The objective was to compare the Liberty preliminary damages figure to what I had earlier believed to be a settlement range to which the NWCRP Board would give serious

consideration. Stripping the guaranty fund/second injury fund/other assessment damages out leaves estimated damages of $897.6 million. We then deducted an estimated amount for the increase in AIG's share of reserves going forward, AIG's share of damages as a prior pool participant (assuming AIG had a 5% market share), and the effect of increased voluntary market premium, due to the reallocation of premium, on RML rates. (We cannot tell if Liberty's numbers include non-NCCI managed pools, so we gave that no consideration.) Assuming a 6.8% interest rate, shifting the timing of damages from Liberty's calculation (6 months into the policy year, approximately 21 years ago on average) to the average date of Milliman's cash flow damages (11 years ago), conducting a similar analysis for the pre-Legacy Period and moving those damages back to 17 years ago, and then using Liberty's pre-Legacy Period estimate (which we have used but do not believe is appropriate), the end result is estimated damages of $621 million. The starting date for calculating damages is, by far, the most important factor. If one were to use a lower pre-Legacy Period estimate, which we believe is appropriate, a lower interest rate or if AIG has a larger market share than 5%, the number would be pushed lower. Of course we are not privy to Liberty's actual calculations, so we may be missing a critical element of its logic.

This analysis implies, as I said on Monday, that the earlier assumed "settlement range" and Liberty's preliminary figure are generally consistent with one another.

Dave

*J. David Leslie*
*Rackemann, Sawyer & Brewster, PC*
*160 Federal Street*
*Boston, MA  02110*
*(617) 951-1131*
*(617) 542-7437 (FAX)*
*dleslie@rackemann.com*

*******************************************************************

*This e-mail and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you receive this e-mail in error please immediately notify me at (617) 951-1131 and permanently delete the original copy and any copy of any e-mail, and any printout thereof.*

**EXHIBIT B**

**From:** McSweeney, Sean [mailto:Sean.McSweeney@LibertyMutual.com]
**Sent:** Wednesday, November 25, 2009 4:17 PM
**To:** Leslie, J. David; 'jrubin@butlerrubin.com'
**Subject:** Re: AIG -- NWCRP/Liberty Mutual -- Residual Market Issues

Dave - We need to discuss this after the holiday. Liberty, and the pool,  never understood that the states and the EIC would be this heavily engaged in the carriers damage calculation.

Have a nice Holiday. I will call you Monday morning.

**EXHIBIT C**

**From:** Kelly, Edmund
**Sent:** Saturday, May 08, 2010 10:09 AM
**To:** Betty2.bell@aig.com
**Subject:** This am's Meeting

Bob,

Thanks for breakfast. I enjoyed the conversation.

I've started the process of getting buy-in to our agreement:

    $100MM on Liberty's direct claim,
     500MM on the Pool claim.

Let's talk Mon or Tues.

Ted

EXHIBIT D