IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | |
| Plaintiffs, | ) | Case No. 07 CV 2898 |
| v. | ) ) | Judge Robert W. Gettleman Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| SAFECO INSURANCE COMPANY OF AMERICA, et al., | ) ) ) | Case No. 09 CV 2026 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman Magistrate Judge Sidney I. Schenkier |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | |
| Defendants. | ) | |

**DECLARATION OF PATRICK L. WHATLEY**

I, Patrick L. Whatley, state the following based on my personal knowledge, as well as on information and belief:

**I. BACKGROUND AND QUALIFICATIONS**

1. I am a Principal and President of Bickerstaff, Whatley, Ryan & Burkhalter, Inc., an actuarial consulting firm that I co-founded in 1995.

2. Prior to the founding of our firm, I was employed for approximately 22 years in the actuarial department of Employers Insurance of Texas ("Employers") where I held the position of Vice President, Actuary from 1984 to 1993 and other positions prior to that. The actuarial department at Employers was responsible for the quoting and calculating of all loss sensitive rating plans including retrospective rating, workers compensation

**OCP APPENDIX 00203**

dividend plans, and loss and composite rating calculations on third party lines. In addition, the premium audit department reported to me for a period of seven years.

3. My work at Employers included performing retrospective premium adjustments and policyholder dividend calculations on loss sensitive workers compensation policies. In the course of that work, and additionally while I managed the premium audit department, I necessarily reviewed countless underwriting / policy files on individual accounts in the performance of my duties.

4. As a consultant, I developed and implemented WC large deductible pricing algorithms and Large Risk Rating Option (LRRO) pricing parameters for clients in the mid 1990's.

5. I am a 1972 graduate of Texas A&M University, where I received a B.S. in Mathematics.

6. I am a Fellow of the Casualty Actuarial Society and a member of the American Academy of Actuaries.

7. My additional qualifications are laid out in full in the C.V. attached hereto as Exhibit 1.

## II. SUMMARY OF ENGAGEMENT AND ULTIMATE OPINION

8. I was initially retained for this matter by counsel for the Original Class Plaintiffs for the purpose of reviewing specific AIG Contract Files[1] and determining the workers compensation premium that AIG should have reported on those contracts to the NCCI and other workers compensation pool administrators. I performed this work under the guidance of Kevin M. Ryan, the expert retained by Original Class Plaintiffs for purposes of directing the entire review and analysis of AIG's sample Contract Files (the "Sample File Review").

9. I have also been asked to review, analyze, and assess the accuracy and reliability of the approach utilized by AIG and J. David Leslie ("Leslie") to generate the $2.1 billion underreporting estimate by reallocating AIG's reported premium data, by contract, based upon AIG's reported loss experience by line of business (the "Premium Reallocation Methodology"), which I understand was used to form the basis of the proposed $450 million settlement.

---

[1] "Contract File" refers to the specific types of documents for which AIG was required to search and produce associated with each policy written under each sampled AIG contract pursuant to the Court-approved Sampling Plan. (*See* Declaration of Kevin M. Ryan, submitted 4/28/11 ("Ryan Decl.") at ¶ 22.)

**OCP APPENDIX 00204**

10. In my opinion, based upon the files I have reviewed and the work performed by Joseph E. Seder ("Mr. Seder"), one of Original Class Plaintiffs' experts on damages (*see* Declaration of Joseph E. Seder, submitted 4/28/11 ("Seder Decl.")), Leslie's Premium Reallocation Methodology approach is inherently flawed and results in a materially inaccurate measurement of AIG's underreporting.

## III. ASSIGNMENT AND SCOPE OF WORK

11. As stated above, I have worked with and supported the work of Mr. Ryan as a member of the team of expert consultants responsible for the Sample File Review of AIG's Contract Files for AIG Divisions 50 and 55. In connection with that work, I became familiar with the contents of Contract Files that AIG has produced in response to the Sampling Plan for Divisions 50 and 55. I am also familiar with the methodology developed by Mr. Ryan for calculating the amount of "should have been reported" WC premium and resultant underreporting for each contract that was reviewed by his team. (*See* Ex. 2 to Ryan Decl.)

12. In connection with providing the opinions in this Declaration, I reviewed documents that outline the Premium Reallocation Methodology utilized by Leslie to generate the $2.1 billion underreporting estimate, and I am familiar with Leslie's approach. I also met with Mr. Seder to review and discuss the Premium Reallocation Methodology. I subsequently reviewed additional AIG Contract Files to determine the extent to which the Premium Reallocation Methodology conforms with or contradicts the underreporting calculations arrived at through Original Class Plaintiffs' sampling methodology.

## IV. SUMMARY OF OPINIONS

13. The Premium Reallocation Methodology does not and cannot accurately calculate AIG's underreporting of workers compensation premium for the following reasons:
    A. The premium data AIG provided to Leslie and his consultants, and that Leslie used in the Premium Reallocation Methodology, was inaccurate and incomplete.
    B. The loss data AIG provided to Leslie, and that Leslie used in the Premium Reallocation Methodology, was inaccurate and incomplete.

C. The Premium Reallocation Methodology improperly gives credit to AIG for $1.2 billion in nominal workers compensation premium *overreporting*.

D. The Premium Reallocation Methodology improperly excluded contracts for which the data AIG provided showed losses but no matching workers compensation premiums.

E. The Premium Reallocation Methodology improperly excluded premiums booked prior to 1985.

F. The Premium Reallocation Methodology improperly excluded Excess Premium, as assigned to PUC code[2] 088, from reallocation (for Division 55 only).

G. The Premium Reallocation Methodology improperly excluded contracts written in divisions other than Divisions 50 and 55.

H. The Premium Reallocation Methodology is inherently unreliable and inferior to a "bottom-up," sampling file review approach to determining and quantifying AIG's underreporting.

V. **DISCUSSION OF AND BASES FOR OPINIONS**

A. **The premium data that AIG provided to Leslie, and that Leslie used in the Premium Reallocation Methodology, was inaccurate and incomplete.**

14. One of the assumptions underlying the Premium Reallocation Methodology is that all premium in Divisions 50 and 55 was reported, though not necessarily to the correct line of business. If that assumption is wrong – that is, if AIG failed to book all of the premiums for those divisions, in the aggregate, in those divisions — then the Premium Reallocation Methodology will not yield an accurate result.

15. I have tested whether AIG reported all of the premium it should have booked in Divisions 50 and 55 by comparing the aggregate premium in AIG's electronic database (*see* Seder Decl., ¶ 4) for various contracts, including both monoline and multi-line contracts, with the premium found based on a review of the related Contract Files. I performed such a test on numerous contracts, and conclude, based on those tests, that AIG did not report in the database used by Leslie for his Premium Reallocation Methodology all of the

---

[2] A "PUC Code" is an internal code AIG reference number that identifies the type of business being insured or a specific component of premium. PUC 088 denominates excess of loss premium.

premium that AIG wrote in Divisions 50 and 55. As a result, the Premium Reallocation Methodology reallocates a smaller amount of premium than it should have.

16. Because AIG failed to book all of the premiums that it should have reported for Divisions 50 and 55, in the aggregate, in those divisions, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

B. **The loss data AIG provided to Leslie, and that Leslie used in the Premium Reallocation Methodology, was inaccurate and incomplete.**

17. The Premium Reallocation Methodology depends on the accuracy of two additional assumptions with respect to AIG's loss data. First, the Premium Reallocation Methodology assumes that losses have been reported to the correct line of business. Second, it assumes that all losses, in the aggregate, were reported and are reflected in AIG's electronic data. If either of these assumptions is false, then the Premium Reallocation Methodology will not yield accurate results.

18. I have tested whether AIG reported all of the losses it should have booked in Divisions 50 and 55 and whether those losses were reported to the correct line of business by comparing the losses in AIG's data for various contracts with the losses found based on a review of the related Contract Files. I performed such a test on numerous contracts, and conclude, based on those tests, that AIG did not always report losses to the correct line of business and did not report all of its losses, in the aggregate, on contracts that it wrote in Divisions 50 and 55.

19. Because AIG did not report losses to the correct line of business and did not report all of its losses, in the aggregate, on contracts that it wrote in Divisions 50 and 55, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

C. **The Premium Reallocation Methodology improperly gives credit to AIG for $1.2 billion in workers compensation *overreporting*.**

20. I have reviewed Mr. Seder's Declaration, wherein he states that the approximately $2.1 billion in underreporting found by Leslie is actually a net number composed of two sub-parts. The Premium Reallocation Methodology estimates approximately $3.4 billion in

OCP APPENDIX 00207

gross, nominal underreporting and approximately $1.2 billion in gross, nominal *overreporting*. The Premium Reallocation Methodology concludes that AIG underreported in total $2.1 billion by subtracting $1.2 billion in nominal *overreporting* from $3.4 billion in nominal underreporting. (*See* Seder Decl. at ¶¶ 29-30.)

21. My review of underlying Contract Files included testing certain contracts for which the Premium Reallocation Methodology estimated nominal workers compensation *overreporting* (and thus, reallocation of premium *away* from the workers compensation line), but where AIG did not *overreport*, but actually underreported, workers compensation premiums for those contracts.

22. Accordingly, in my opinion, the only way to accurately determine whether AIG actually *overreported* any workers compensation premium is to look at AIG's Contract Files to determine whether the accounting records demonstrate that AIG mistakenly reported more workers compensation premium than it actually collected from the insured. I have seen no evidence that Leslie performed this exercise; nor do I believe such an exercise would identify $1.2 billion in overreporting. Because it is clear that AIG underreported workers compensation premiums with respect to certain contracts that the Premium Reallocation Methodology identifies as reflecting nominal overreporting, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

D. **The Premium Reallocation Methodology improperly excluded contracts for which the data AIG provided showed losses but no matching workers compensation premiums.**

23. The Premium Reallocation Methodology excludes contracts for which the electronic data AIG provided showed losses but no matching premiums for any line of business (the "Losses-Only" contracts). Because AIG reported no premium on these contracts, no premium could be reallocated to workers compensation, even though AIG received workers compensation premium in connection with these contracts.

24. To test whether AIG should have reported workers compensation premium for the Losses-Only contracts, I compared the workers compensation premium for certain of these contracts as reflected in the AIG database for Division 55 – which was in every

case $0 – with premiums calculated from the Sample File Review for those same contracts. In addition, as a result of a recent contention from AIG that premium for these contracts was booked in Division 85, I compared the workers compensation premium for certain of these contracts as reflected in the AIG database for Division 85 with the premiums calculated from the Contract File review for those same contracts. I performed such tests on numerous contacts, and conclude, based on those tests, that AIG underreported workers compensation premium on the Losses-Only contracts.

25. Because AIG underreported workers compensation premium on Losses-Only contracts, which were excluded from analysis under the Premium Reallocation Methodology, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

E. **The Premium Reallocation Methodology improperly excluded premiums booked prior to 1985.**

26. The Premium Reallocation Methodology excludes all premiums booked before 1985.

27. To test whether AIG underreported workers compensation premiums booked before 1985, I compared premiums booked before 1985 for certain contracts, as reflected in AIG's data, with the premiums calculated from the Sample File Review for those same contracts. I reviewed numerous pre 1985 contracts and observed many instances where AIG underreported workers compensation premium prior to 1985.

28. Because AIG underreported workers compensation premium that should have been booked before 1985, a population that was excluded from analysis under the Premium Reallocation Methodology, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

F. **The Premium Reallocation Methodology improperly excludes Excess Premium assigned to PUC code 088 (Division 55 only).**

29. The Premium Reallocation Methodology excludes all excess premium (PUC code 088) for Division 55.

30. To test whether AIG underreported excess workers compensation premiums, I compared premiums reported in AIG's data for certain contracts with premiums calculated from the

OCP APPENDIX 00209

Sample File Review for those same contracts. I performed such a test on numerous contracts, and conclude, based on those tests, that AIG underreported workers compensation excess premium.

31. Because AIG underreported workers compensation excess premium, which was excluded from analysis under the Premium Reallocation Methodology, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

G. **The Premium Reallocation Methodology improperly excluded contracts written in divisions other than Divisions 50 and 55.**

32. The Premium Reallocation Methodology excludes all premiums in divisions other than Divisions 50 and 55 ("Other Divisions").

33. In preparation for a thorough review of the premium reporting in AIG's Other Divisions, a Pilot Sample of policies was drawn and reviewed. The Divisions sampled were 2, 18, 27, 54, 58, 59 and 82. The Original Class Plaintiffs conducted a file review of the Pilot Sample policies, provided their findings to AIG, and AIG provided a response to those findings. I have reviewed the findings of the Original Class Plaintiffs and the AIG response in connection with this Declaration.

34. The Contract Files provided by AIG to the Original Class Plaintiffs were found to be lacking in many respects.[3] Consequently, the actual reportable WC premium for approximately one-half of the policies in the Pilot Sample could not be determined.

35. At a minimum, however, the Pilot Sample revealed that large, loss sensitive rating plans containing WC coverage were written in AIG's Other Divisions. For these, Original Class Plaintiffs calculated underreporting in connection with a number of the Other Division Pilot Sample policies, using the same methodology applied to determine the premium that AIG should have reported on the contracts sampled from Division 55.

36. Because the Other Division Pilot Sample indicated that AIG underreported workers compensation premium in these Other Divisions, which were excluded from analysis under the Premium Reallocation Methodology, the Premium Reallocation Methodology does not and cannot yield an accurate estimate of AIG's underreporting.

---

[3] Letter dated November 1, 2010 from Matthew O. Sitzer of Grippo & Elden LLC to Dr. Joseph B. Kadane and all Sampling parties.

H.  **The Premium Reallocation Methodology is inherently unreliable and inferior to a "bottom up," Sampling File Review approach for determining and quantifying AIG's underreporting.**

37. Based upon my review of the sampled Contract Files, particularly those in Division 55, I found the majority to be very large risks from a diverse spectrum of industries. I also found that even though the primary vehicle used to write these risks was either an Indemnity Agreement or a Facultative Reinsurance Agreement, these instruments were often tailored to meet the needs and/or exposures of the particular risk. It is my opinion, therefore, that a "bottom up," Sampling File Review approach is a superior method to determine and quantify AIG's underreporting.

38. Two other types of issues I have encountered in reviewing AIG's Contract Files – guaranteed cost contracts and linked contracts – illustrate the unreliability of the Premium Reallocation Methodology.

39. The Premium Reallocation Methodology assumes that the by-line breakdown of premiums should follow the by-line breakdown of losses on each individual contract. That assumption does not hold true, however, for guaranteed cost business.

40. I tested to see whether AIG underreported workers compensation premium on guaranteed cost business by reviewing certain guaranteed cost contracts and comparing the premiums AIG booked for those contracts, as reflected in AIG's electronic data, with the premiums calculated from the Sampling File Review for those same contracts. I performed such a test on numerous contracts, and conclude, based on those tests, that AIG underreported workers compensation premiums on guaranteed cost contracts.

41. Because Leslie included guaranteed cost contracts in the Premium Reallocation Methodology, however, I also compared the amount of underreporting calculated using a Sampling File Review approach for certain guaranteed cost contracts with the amount of underreporting estimated by the Premium Reallocation Methodology. Based on my review, the true amount of underreporting on certain guaranteed cost contracts, as calculated from my contract-level file review, exceeded the amount of underreporting that resulted from an application of the Premium Reallocation Methodology.

42. With regard to the treatment of linked contracts, the Premium Reallocation Methodology handles each contract separately and independently, reallocating the premium assigned to

**OCP APPENDIX 00211**

each contract based on the losses assigned to that contract. Thus, it fails to recognize and account for contracts that AIG admits should be linked together. By contrast, in the bottom-up file review, AIG identified potential linked contracts to certain sampled contracts. The Contract Files were reviewed and a determination made whether to link the contracts together for review. Based on my review, the true amount of AIG's underreporting on linked contracts, as calculated from my contract-level file review, exceeded the amount of underreporting that resulted from an application of the Premium Reallocation Methodology.

43. The Premium Reallocation Methodology's failure to properly capture the underreporting from guaranteed cost contracts and linkages is yet another reason it is unreliable and inaccurate.

## VI. CONCLUSION

44. As explained in detail above, because of the inherent flaws in Leslie's Premium Reallocation Methodology, it yields a materially inaccurate estimate of AIG's underreporting.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*[signature: Patrick L. Whatley]*

Patrick L. Whatley

Dated: April 26, 2011

OCP APPENDIX 00212

# EXHIBIT 1

**OCP APPENDIX 00213**

PATRICK L. WHATLEY, F.C.A.S., M.A.A.A.

1701 N. Collins, Suite 226A
Richardson, Texas 75080

PROFESSIONAL AND ACADEMIC QUALIFICATIONS:

- Fellow of the Casualty Actuarial Society, 1982
- Member of the American Academy of Actuaries, 1982
- B. S. Mathematics, Texas A&M University, 1972

EMPLOYMENT HISTORY:

- Employers Insurance of Texas, 1972 - 1993. Vice President, Actuary, 1984 - 1991.
  Senior Vice President, Actuary, 1991 - 1993.

- Self employed consultant, 1994 - June, 1995.

- Bickerstaff, Whatley, Ryan & Burkhalter, Inc., June, 1995 - present.

HIGHLIGHTS OF PAST ACTIVITIES and CONSULTING ASSIGNMENTS INCLUDE:

* Provided actuarial support, including rate exhibit preparation and expert testimony at rate hearings, for the Insurance Council of Texas, an industry trade organization, 1979 - 2002.

* Provided expert testimony before the Texas Legislature on insurance related matters, 1979-1987.

* Provided expert testimony before the U.S. Senate Labor and Human Resources Committee on the United States Longshoremen and Harborworkers Compensation Act, September, 1980.

* Member of the National Council on Compensation Insurance Actuarial Committee, 1989-90.

* Member of the Texas Automobile Insurance Plan Actuarial Committee, 1990-91.

* Rate filing preparation / assistance for clients in numerous jurisdictions and lines of business.

* Loss Reserve analysis for Insurance Carriers and Self Insured entities.

**OCP APPENDIX 00214**

Mr. Whatley, Principal and President of Bickerstaff, Whatley, Ryan & Burkhalter, became an independent actuarial consultant in December, 1993, after approximately 22 years as a company actuary. He began his career as a Property/Casualty actuary in 1972 and is a Fellow of the Casualty Actuarial Society and a Member of the American Academy of Actuaries.

For the approximate 22 years before becoming a consultant, Pat was employed in the actuarial department of Employers Insurance of Texas, a major commercial insurer in the Southwest. From 1984-1993 he held the position of Vice President, Actuary, at the Dallas-based carrier. His experience at Employers included extensive pricing and loss reserve work in the commercial casualty area, particularly in workers compensation and commercial automobile.

During his career, Mr. Whatley has developed extensive expertise in various types of individual risk rating plans, including retrospective rating, experience rating, loss rating, dividend plans, and deductible pricing. He was also the data quality officer at Employers and is intimately familiar with statistical plans and the data they capture. He held several management positions at Employers and is familiar with the operations of a number of different departments in a commercial casualty insurer including data processing, premium audit, and individual risk rating.

As a consultant, Mr. Whatley continued to focus his practice in the workers compensation area. Clients include Workers' Compensation State Funds, entities self-insured for workers' compensation both public and private, insurance companies, and managing general agents handling workers' compensation business.

**OCP APPENDIX 00215**