# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., <u>et</u> <u>al</u>., | ) ) ) | |
| Plaintiffs, | ) | Case No. 07 CV 2898 |
| v. | ) ) | Judge Robert W. Gettleman |
| | | Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., <u>et</u> <u>al</u>., | ) ) | |
| Defendants. | ) ) | |
| | ) | |
| SAFECO INSURANCE COMPANY OF AMERICA, <u>et</u> <u>al</u>., | ) ) | Case No. 09 CV 2026 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| v. | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| AMERICAN INTERNATIONAL GROUP, INC., <u>et</u> <u>al</u>., | ) ) | |
| Defendants. | ) ) | |

**THIRD DECLARATION OF SCOTT E. HARRINGTON, PhD.**

## I.    INTRODUCTION, QUALIFICATIONS, AND BACKGROUND

1.    My name is Scott E. Harrington, PhD. I am the Alan B. Miller Professor of Health Care Management and Insurance and Risk Management at the Wharton School, University of Pennsylvania. I have previously issued two declarations in this action.[1] Those declarations set forth my qualifications to testify in this case.

---

[1] Declaration of Scott E. Harrington, PhD dated April 26, 2011 (supplemented on September 29, 2011) and Second Declaration of Scott E. Harrington, PhD dated October 3, 2011.

2.      I have been asked to provide this third declaration in response to the testimony of Dr. David Appel regarding my second declaration, which I prepared at the request of Butler Rubin Saltarelli & Boyd LLP, counsel for Liberty Mutual and calculated Liberty Mutual's damages resulting from AIG's workers compensation ("WC") premium underreporting to the Michigan Placement Facility ("Michigan Pool" or "Michigan") and the Texas Workers' Compensation Insurance Facility ("TWCIF," "Texas Pool," or "Texas").

3.      As set forth in my second declaration, Liberty Mutual paid higher assessments as a result of AIG's underpayments and was correspondingly damaged by the amounts of underpayment. I estimated the amount of total "underpayment" damages incurred by Liberty Mutual in Michigan and Texas as approximately $3.5 million, exclusive of pre-judgment interest, based upon Mathew Merlino's estimated AIG WC underreported premium of $2.1 billion.[2] I calculated pre-judgment interest on each category of damages based upon rates put forth by Settlement Class Plaintiffs and Merlino. Inclusive of prejudgment interest, the amounts of underpayment damages are negative $204,655 in Michigan and $11,030,885 in Texas, for a total of approximately $10.8 million.[3]

4.      Liberty Mutual was also damaged because it needed to hold assets in relatively safe securities to support estimated but risky liabilities for reserves for unpaid claims of the Michigan and Texas Pools due to AIG's underreporting. I estimated the amount of "reserve carry" damages including prejudgment interest incurred by Liberty Mutual for the Michigan and Texas Pools as approximately $1.6 million and the amount of "surplus

---

[2] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 2.
[3] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 2.

carry" damages including prejudgment interest incurred by Liberty Mutual as approximately $400,000.[4]

5.      Adding the above amounts, I estimated that the total damages suffered by Liberty Mutual from AIG's underreporting of premium in Michigan and Texas are approximately $12.8 million.[5]

6.      I also performed my calculations based on the $6.1 billion in WC underreporting calculated by Liberty Mutual's and the Original Class Plaintiffs' statistical experts. I estimated that the total damages suffered in Michigan and Texas by Liberty Mutual based upon AIG's estimated underreporting of $6.1 billion in WC premium are approximately $22.5 million.[6]

## II.      RESERVE CARRY AND SURPLUS CARRY DAMAGES

7.      In his third declaration, Dr. Appel rejects the concept of *any* reserve carry and surplus carry damages and argues that "Texas surplus carry damages are inappropriate even under the theory advanced by Dr. Harrington."[7]

8.      Dr. Appel reiterates and summarizes arguments from his second declaration against any reserve carry and surplus carry damages, stating:

> *First*, the existence of such damages is questionable based upon the relative insignificance of the alleged underreporting. The Lead Examiner already considered and ultimately rejected such damages—after quantifying the increase to Liberty Mutual's reserves due to underreporting in just tenths of a percent, the Lead Examiner properly recognized that such an increase would have an "insignificant" impact on operating ratios. [Citation to Dkt. #386, Second Supplemental Leslie Decl., June 3, 2011, at ¶ 51]. *Second*, fundamental economic principles argue against recognizing reserve and surplus carry damages. It is well established that the fair rate of return on an investment is dependent upon the riskiness of that investment. Because the Liberty Objectors did not write

---

[4] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 2.
[5] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 2.
[6] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 3.
[7] Third Declaration of David Appel PhD dated October 28, 2011, pp. 5-6, ¶17-19. Dr. Appel also raises a technical issue associated with the calculation of reserve carry damages (¶ 18 and footnote 7) that would be unlikely to affect the estimates materially if his point had merit. It also is not clear how this issue could in fact be addressed with the available data.

additional insurance and did not bear that additional risk, it cannot be reasonably argued that they are entitled to additional compensation for risk not borne.[8]

9.      Regarding Dr. Appel's first conjecture, insurance companies generally base their operating and financial decisions on the entirety of their estimated liabilities and the need to hold surplus to back those liabilities.  Dr. Appel does not opine otherwise.  The magnitudes of my estimates of reserve carry and surplus carry damages incurred by Liberty Mutual for AIG's underreporting of WC premium in Michigan and Texas speak for themselves.  I do not regard $2 million in estimated reserve carry and surplus carry damages as "insignificant."

10.      Regarding Dr. Appel's rejection of the concepts of reserve carry and surplus carry damages, Dr. Appel implies that holding additional reserves and surplus did not expose Liberty Mutual to additional risk because the associated funds were not used to back the sale of additional business.  His conclusion that Liberty Mutual was not exposed to risk is patently false.  Liberty Mutual bore substantial risk associated with the magnitude of future assessments, and that risk required a higher expected return than available on safe investments.

11.      Liberty Mutual bore additional risk associated with reserve liabilities for pool assessments.  The increase in risk does not depend on Liberty Mutual writing additional business – it results from the inherently risky nature of Pool liabilities (which, other things being equal, reduced Liberty Mutual's ability to write additional business).

12.      As I summarized in paragraph 10 of my second declaration (emphasis added):

> Liberty Mutual held such assets [safe assets] in amounts equal to the additional liabilities resulting from AIG's underreporting and an associated amount of "surplus" to serve **as a buffer against having to pay more in claims than anticipated by the liabilities**.  In addition to **the risk associated with those liabilities**, the investment of funds to back the additional reserves and surplus reduced Liberty Mutual's capacity to write business.  Earned returns were lower than what should have been expected given **the risk of the pool liabilities** and

---

[8] Third Declaration of David Appel, PhD dated October 28, 2011, pp. 5-6, ¶18.

Liberty Mutual's cost of capital. Liberty Mutual suffered damages in the amount of the difference between the **return commensurate with the risk involved** and the generally lower returns earned on safe assets."[9]

13. I explained further in paragraph 31 of my second declaration (emphasis added):

**An increase in an insurer's liabilities increases its risk** and reduces its surplus and capacity to write business. In order to maintain the same level of financial strength, the insurer will need to obtain additional capital, reduce the amount of business written, or both. Because AIG's underreporting increased reserve liabilities for Liberty Mutual, **AIG's underreporting increased Liberty Mutual's risk** and reduced funds that otherwise would have been available to increase surplus and support new business.[10]

Paragraph 32 continues (emphasis added):

If Liberty Mutual did not have to hold those safe assets to back the **higher, risky reserves required as a result of AIG's underreporting**, it could have used the funds to expand its business and generally earn higher returns. Instead, **Liberty Mutual was damaged by having to tie up funds to back risky reserve liabilities due to AIG's underreporting. Liberty Mutual bore the risk associated with those liabilities without the opportunity to earn an expected return commensurate with that risk**.[11]

14. In addition, footnote 19 of my second declaration, which addressed Dr. Appel's prior statement concerning the booking of Pool reserves on insurers' balance sheets, also stresses the risky nature of liabilities for future pool assessments. It states as follows (emphasis added):

Moreover, I disagree with Mr. Appel's opinion. **The obligations of carriers for future pool assessments for incurred claims represented risky, economic liabilities,** regardless of the specific details of individual carriers' reserving practices. When available, Pool reserves represent a reasonable basis for calculating reserve damages associated with those economic liabilities.[12]

---

[9] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, pp. 4-5, ¶10.
[10] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, p. 11, ¶31.
[11] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, p. 11, ¶32.
[12] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, p. 12, footnote 19.

15.     Thus, in contrast to my testimony, Dr. Appel fails to address the fundamental issue of whether WC insurance carriers were exposed to risk from higher estimated liabilities for future residual market assessments.

16.     Dr. Appel argues that "Texas surplus carry damages are inappropriate even under the theory advanced by Dr. Harrington."[13]  He argues that liabilities for deferred assessments for the Texas pool "would not be considered to be risky," apparently under the notion that resulting liability constituted an "account payable" or "expense reserve" that was fixed, unalterable, and independent of any past or future assessments.[14]  There is no reason to believe, however, that deferred assessments for the Texas Pool could not have been modified over time to reflect the actual amount of losses paid for Pool business, or that future deferred assessments could not be changed in view of loss experience for prior years.  Instead, Liberty Mutual and other carriers bore the risk that ultimate assessments could vary from the amounts initially established and deferred.   Dr. Appel cites no evidence to the contrary.

## III.   UNDERPAYMENT DAMAGES FOR MICHIGAN

17.     Dr. Appel made much of the fact that my estimate of underpayment damages for Michigan, *including prejudgment interest*, is negative (-$204,655).[15]  As seen in Exhibit 2 to my second declaration, Michigan estimated damages, without prejudgment interest (i.e., disregarding the timing of underpayment damages), are $221,812.[16]  The year to year timing of underpayments results in the negative value when prejudgment interest is included.[17]  As is clearly set forth in Exhibit 2, the negative amount for underpayment damages in Michigan including prejudgment interest was fully reflected in reductions to my total estimates of damages

---

[13] Third Declaration of David Appel, PhD dated October 28, 2011, p. 6, ¶19.
[14] Third Declaration of David Appel, PhD dated October 28, 2011, p. 6, ¶19.
[15] Third Declaration of David Appel, PhD dated October 28, 2011, pp. 3,5 and 7, ¶9, 15, and 21.
[16] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 2.
[17] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibit 4.

for Michigan and for Michigan and Texas combined. In other words, by including underpayment damages with interest in my calculations, I lowered Liberty Mutual's damages in Michigan.

## IV.   UNDERPAYMENT DAMAGES FOR TEXAS

18.   Dr. Appel concludes that my calculations of Texas damages are "unreliable," alleging that I was "forced to rely upon a patch-work of assumptions and Liberty's unverified internal data to fill the Texas documentation gaps."[18] He apparently presumes that those data gaps are related to the Texas Pool's experience in the mid-1990s and the run-off and sale to Swiss Reinsurance Company.[19] Contrary to this presumption, Texas pool data for the 1990s were generally complete, and the total annual Texas Pool assessments for 1985 through 1989 provided by Liberty Mutual's internal data were corroborated with external data (1990 Casualty Loss Reserve Seminar presentation).[20] Dr. Appel does not identify specific assumptions that he believes are unreliable or preferred alternatives. If anything, I believe that the methodology I employed is likely to underestimate Liberty Mutual's damages.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_Scott E. Harrington_
_____
Scott E. Harrington, PhD.

Dated: November 7, 2011

---

[18] Third Declaration of David Appel, PhD dated October 28, 2011, p. 5, ¶16.
[19] Third Declaration of David Appel, PhD dated October 28, 2011, p. 5, ¶16.
[20] Second Declaration of Scott E. Harrington, PhD dated October 3, 2011, Exhibits F.1-F.4 and 1990 Casualty Loss Reserve Seminar, Exhibit 2.