# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | Case No. 07 CV 2898 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, et al., | ) ) ) | |
| Counter-Claimants, | ) ) | |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) | |
| Counter-Defendants. | ) ) ) | |
| _____ | ) | |
| SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY, individually, and on Behalf of a Class consisting of members of the National Workers Compensation Reinsurance Pool, | ) ) ) ) ) ) ) | Case No. 09 CV 2026  Judge Robert W. Gettleman  Magistrate Judge Sidney I. Schenkier |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

## ORIGINAL CLASS PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR REIMBURSEMENT OF ATTORNEYS' FEES, COSTS AND EXPENSES

**TABLE OF CONTENTS**

PAGE

INTRODUCTION AND SUMMARY OF REPLY ................................................................ 1

ARGUMENT ........................................................................................................................ 5

I.      THERE WOULD HAVE BEEN NO SETTLEMENT WITHOUT
ORIGINAL CLASS PLAINTIFFS' LITIGATING THE CLASS
ACTION. ................................................................................................... 5

          A.     Leslie's speculation regarding the litigation or AIG's
motivations are irrelevant. ................................................................. 5

          B.     Original Class Plaintiffs' litigation efforts were
instrumental in causing the $450 million offer. ................................. 6

          C.     Leslie and Settlement Class Plaintiffs concede AIG paid
more than Leslie's methodology says AIG owed in order
to settle claims that were preserved, brought and litigated
by Original Class Plaintiffs. .............................................................. 7

II.     SETTLEMENT CLASS PLAINTIFFS' PROPOSED MAY 8,
2010 CUT-OFF FOR FEES IS UNREASONABLE AND
UNJUSTIFIED. ........................................................................................ 8

III.    ORIGINAL CLASS PLAINTIFFS DID NOT OVERSTAFF THE
CASE, NOR DID THEY INCUR UNREASONABLE FEES
AND EXPENSES LITIGATING IT. ......................................................... 9

          A.     There is no justification for limiting Original Class
Plaintiffs' reimbursement to the work done by only one
law firm. .......................................................................................... 10

          B.     Reimbursement is appropriate for time spent on the
sampling project. ............................................................................. 12

IV.    THE AMOUNTS AWARDED TO ORIGINAL CLASS
PLAINTIFFS SHOULD NOT BE OFFSET BY GOLDBERG
KOHN'S FEES. ....................................................................................... 14

CONCLUSION .................................................................................................................. 15

1233651

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Been v. O.K. Indus., Inc.*,
   No. 02-285, 2011 WL 4478766 (E.D. Ok. Aug. 16, 2011) ...................................................... 6

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ..................................................................................................................... 6

*Cintas Corp. v. Perry*,
   517 F.3d 459 (7th Cir. 2008) ...................................................................................................... 10

*Gottlieb v. Barry*,
   43 F.3d 474 (10th Cir. 1994) ........................................................................................................ 2

*In re Agent Orange Prod. Liab. Litig.*,
   818 F.2d 226 (2d Cir. 1987) ....................................................................................................... 15

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) ...................................................................................................... 10

*Klackzak v. Consol. Med. Trans. Inc.*,
   96 C 6502, 2005 WL 1564911 (N.D. Ill. May 26, 2005) ............................................................ 6

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ...................................................................................................... 14

*RK Co. v. See*,
   622 F.3d 846 (7th Cir. 2010) ...................................................................................................... 10

*Spark v. MBNA Corp.*,
   289 F. Supp. 2d 510 (D. Del. 2003) ............................................................................................ 2

*U.S. v. Benson*,
   941 F.2d 598 (7th Cir. 1991) ........................................................................................................ 5

*U.S. v. Benson*,
   957 F.2d 301 (7th Cir. 2002) ........................................................................................................ 6

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ...................................................................................................... 2

**Other Authorities**

Alba Conte and Herbert Newberg,
   NEWBERG ON CLASS ACTIONS (4th ed. 2002) .............................................................................. 7

## INTRODUCTION AND SUMMARY OF REPLY

In their first brief in this case, Settlement Class Plaintiffs acknowledged that Original Class Plaintiffs had done "*a fine job of prosecuting this lawsuit*" and were "*fully qualified to battle through verdict, judgment and appeal*." Ex. T at 3.[1] Settlement Class Plaintiffs did not raise a single allegation or complaint that Original Class Plaintiffs prosecuted the Class Action for their own "self-interest," rather than for the benefit of the entire Class. To the contrary, Settlement Class Plaintiffs said they "*recognized and appreciated*" Original Class Plaintiffs' litigation efforts and would support a motion for reimbursement of their litigation fees and expenses. *Id.* at 5; Dkt. 293-1 at 11. However, this support came with a condition and an explicit threat: it would only be given if Original Class Plaintiffs (and Liberty Mutual) agreed to stand aside and accept this reverse auction settlement. Ex. T at 5.

By filing their October 13, 2011 opposition to Original Class Plaintiffs' motion (Dkt. 519, hereinafter "Opp. Mem."), Settlement Class Plaintiffs carried out their threat. Their objection and AIG's accompanying "Statement of Position" (Dkt. 511) should be seen for what they really are – an attempt to punish Original Class Plaintiffs and Liberty Mutual for objecting to the settlement.

This case is in an extremely unusual posture because these Settlement Class Plaintiffs and their counsel are not the same parties and counsel who actively litigated against the settling class action defendant *(*AIG). They took no role whatsoever in actually litigating the case on behalf of the Class, and, in fact, specifically *declined* when offered the opportunity to do so. Ex. D at ¶ 8. As a result, Original Class Plaintiffs and their counsel were the *only* parties and counsel

---

[1]     The exhibits attached to this brief are numbered starting at Exhibit V. Exhibits A to U, some of which are referred to herein, were attached to Original Class Plaintiffs' opening brief. Emphasis added throughout unless otherwise noted.

representing the Class for nearly two years of hotly contested litigation, involving scores of depositions, substantial document discovery, hearings, motion practice, and an extensive Court-supervised statistical sampling process that the Court expressly intended be "*one that can bear fruit in terms of giving meaningful information concerning potential damages.*" Ex. M. at 38-39.

Despite Settlement Class Plaintiffs' mischaracterization, Original Class Plaintiffs' motion is not a motion by a settlement objector seeking fees for making objections. On the contrary, Original Class Plaintiffs are not seeking reimbursement for amounts spent pursuing their objections (*i.e.*, for activities undertaken after January 13, 2011). Rather, their motion seeks reimbursement for *litigation* fees, costs and expenses, brought by the only parties who litigated on behalf of the Class during a period when all other Class members – *including these same Settlement Class Plaintiffs* – declined to do so. This fact alone makes the authority cited by Settlement Class Plaintiffs inapposite. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (denying objector fees because its objections did not substantially benefit class); *Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 513 (D. Del. 2003) (same).

Even Settlement Class Plaintiffs concede that reimbursement of fees and costs is appropriate where substantial benefits were conferred on the Class. Opp. Br. at 11; *see also Gottlieb v. Barry*, 43 F.3d 474, 985 (10th Cir. 1994) ("If [counsel] have indeed conferred a benefit on the class, as here, they should receive some compensation.") By being the only parties willing to litigate for the Class, it is axiomatic that Original Class Plaintiffs meet that test. There can be no dispute that Original Class Plaintiffs conferred substantial benefits on the Class, among them: (1) preservation of the Class's claims through a motion to dismiss filed by AIG; (2) development of extensive evidence that AIG's underreporting scheme was approved by the highest levels of AIG management, who knew that the company was defrauding NWCRP

- 2 -

members; (3) development of extensive evidence that AIG's scheme continued longer, involved other AIG business divisions and was more pervasive than was previously known; and (4) development and implementation of the only admissible means to fully measure the underreporting and damages caused by AIG's wrongdoing (*i.e.* a statistical sampling process), proving that underreporting in the two AIG divisions Leslie analyzed is triple what he assumed.

The Settlement Class Plaintiffs do not offer any evidence, nor do they even suggest, that Original Class Plaintiffs, Liberty Mutual or their counsel performed any particular litigation task that was unwarranted or did not reasonably need to be done to effectively litigate against AIG. Settlement Class Plaintiffs do not suggest that Original Class Plaintiffs and Liberty Mutual filed motions that did not need to be filed, obtained documents that should have gone unreviewed, or spent too much time on any particular activity. Instead, Settlement Class Plaintiffs implausibly theorize that AIG would have agreed to settle this private sector dispute in the absence of any legal means to compel private liability (following dismissal of the 2007 Action), or that the settlement would have been reached out of AIG's benevolence had Original Class Plaintiffs not preserved the Class's claims by bringing this case and zealously litigating it.

Settlement Class Plaintiffs suggest that Original Class Plaintiffs should not be reimbursed for the statistical sampling project because Leslie claims he was not aware of it. But AIG was well aware of sampling and how the results of a legally admissible quantification of its true underreporting would negatively impact the "agreed" underreporting figure it had reached with Leslie, and that is what matters. Magistrate Judge Schenkier also was keenly aware of the importance of sampling when he ordered that it be undertaken in November 2009, appointed Dr. Kadane, and later called sampling "*top priority*" in discovery. Exs. N at ID 8251; J; K at ¶ 3; L; V at 8; W at 10-11. Even NWCRP counsel recognized that sampling was the "*driving factor in*

- 3 -

*the litigation.*"  Ex. O.19.  Only Original Class Plaintiffs and Liberty Mutual stepped forward to undertake and fund the sampling process against AIG on behalf of the Class.

According to Settlement Class Counsel, Klein, the NWCRP Board has authorized payment of "*more than $60 million*" to fund the attorneys' fees and expenses incurred by Winston & Strawn (Travelers); Dykema (Hartford); and Walker Wilcox (ACE), the NWRCP's two outside law firms (LLBL and Schiff Hardin), various additional law firms retained to represent certain individual NWCRP Board members sued by AIG, and – as we discovered in Settlement Class Plaintiffs' recent fee petition – the fees and expenses of Settlement Class Plaintiffs' counsel (Goldberg Kohn), including those incurred *before* these parties intervened and the Court preliminary approved the proposed settlement.  Exs. X at 11; Y at 6.  These sums necessarily were paid by the Class members by virtue of their participation in the NWCRP. Among the activities included in this $60 million are:

- Amounts incurred to bring and prosecute the action originally filed by the NCCI as attorney-in-fact for the NWCRP (the 2007 Case) – an action so procedurally defective that it was dismissed for lack of standing, thus jeopardizing NWCRP members' claims on statute of limitations grounds had the Class Action not been filed by Original Class Plaintiffs; and

- Substantial legal fees and expenses incurred by the AURs and certain NWRCP Board members for *defending* claims brought by AIG (which AIG has either dismissed or now asserts it is releasing for free in the proposed settlement), despite the fact that AIG's claims alleged that the AURs also cheated Class members by underreporting their own WC premiums and that the NWRCP Board engaged in related misconduct.

It is troubling in the extreme that the Settlement Class Plaintiffs (who are NWRCP Board members) previously authorized direct payment by the NWRCP of over $60 million in fees and expenses for activities that have benefited only select Class members (mostly themselves), or no Class members at all, yet now object to reimbursing Original Class Plaintiffs and Liberty Mutual for sums two-thirds smaller spent actually *litigating* the Class's claims against AIG.

- 4 -

## ARGUMENT

### I.  THERE WOULD HAVE BEEN NO SETTLEMENT WITHOUT ORIGINAL CLASS PLAINTIFFS' LITIGATING THE CLASS ACTION.

Settlement Class Plaintiffs' assertion that this private sector lawsuit settled solely because of the Leslie-supervised "regulatory settlement" process – and that litigation activity in the Class Action had no effect – is implausible, bordering on absurd.  This argument is the equivalent of saying that, if a mediator assists in settling a class action, class counsel deserve no fees because the mediator caused the settlement.

Even Leslie admits that settlement talks withered and died when the NCCI's 2007 Action was dismissed in August 2009.  Ex. Z at ¶ 7; Ex. C.  Indeed, nobody disputes that AIG promptly withdrew its pending settlement offer upon dismissal of the 2007 Action.  *Id.*  During all subsequent settlement discussions (regardless of who participated in them) the negotiations centered on a possible settlement of *this* Class Action and Liberty Mutual's counterclaims against AIG in the 2007 Action.  It is fanciful to suggest that AIG (or any defendant) would have paid $450 million to settle a case that did not exist, was not being aggressively litigated or as to which limitations periods had likely run in whole or in part.

#### A.  Leslie's speculation regarding the litigation or AIG's motivations are irrelevant.

Examiner Leslie, a non-party, claims he is unfamiliar with events in the litigation and plainly is in no position to opine on what prompted AIG's settlement offer. Yet, in his latest declaration, Leslie curiously opines on why AIG offered $450 million to settle.  This opinion is nothing more than self-serving rank speculation, replete with inadmissible hearsay and entitled to no weight.[2]  *See, e.g., U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (one person's opinion on

---

[2]      *See* Original Class Plaintiffs' and Liberty Mutual's Motion to Strike the Third Supplemental Declaration of J. David Leslie, filed concurrently herewith.

another's intent is inadmissible and unhelpful), *mandate recalled on other grounds by* 957 F.2d 301 (7th Cir. 2002); *Klackzak v. Consol. Med. Trans. Inc.*, 96 C 6502, 2005 WL 1564981, at *5 (N.D. Ill. May 26, 2005) (excluding expert testimony regarding intent of parties because "abundant caselaw confirms the impropriety of such purported expert testimony").

Notably, no AIG witness has ever submitted a declaration stating that the existence and aggressive litigation of the Class Action was not instrumental in causing the $450 million settlement offer.  AIG's unsupported three-page "Statement of Position" criticizes "Liberty" and says that Leslie facilitated the settlement, but does not claim that AIG would have offered $450 million, or anything, in the absence of a legal action that could potentially compel liability.  Nor does AIG recant the admission in its July 29, 2010 settlement letter that the existence, aggressive litigation and the prospective certification of the Class Action increased AIG's litigation exposure, and hence its settlement offer:  *"there is no question that AIG's litigation exposure will be drastically reduced (to a level well below what AIG has already offered to settle the case) if class certification is denied."*  Ex. U at 3. [3]

### B.    Original Class Plaintiffs' litigation efforts were instrumental in causing the $450 million offer.

Settlement Class Plaintiffs argue that Original Class Plaintiffs should receive no credit for AIG's settlement offers in May 2009 ($147 million) and August 2009 ($375 million) and that, at most, the prosecution of the Class Action caused a $75 million increase in what AIG eventually agreed to pay.  But AIG's offers were made only after Original Class Plaintiffs filed the Class Action in April 2009, and AIG promptly withdrew its $375 million offer after the 2007 NCCI

---

[3]    AIG's "Statement of Position" should be disregarded in all events since it lacks standing.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 481 n. 7 (1980) (holding defendant only has standing to object to class counsel's fee request from a common fund if it has a colorable claim to a possible return of some of the settlement funds); *Been v. O.K. Indus., Inc.*, No. 02-285, 2011 WL 4478766, at *15 (E.D. Ok. Aug. 16, 2011) (defendant has no standing to object to attorneys' fees awarded out of common settlement fund).

- 6 -

Action case was dismissed, a signal that AIG viewed negotiations as back at square one, or, at the very least, that it would not return to the bargaining table without litigation pressure. Ex. C.

Since the Class Action was then the only case pending against AIG, it is hard not to credit it as the catalyst for the entire $450 million. It defies logic that AIG would offer $375 or $450 million (or any amount) if no case existed to compel liability, or if limitations periods had run on claims. In all events, even if Original Class Plaintiffs were responsible only for the $75 million increase, their efforts still support their requested fees and expenses representing approximately 20% of $75 million. *See* Alba Conte and Herbert Newberg, 4 NEWBERG ON CLASS ACTIONS § 14:6 (4th ed.) (average fee award around 1/3 of total settlement).

### C. Leslie and Settlement Class Plaintiffs concede AIG paid more than Leslie's methodology says AIG owed in order to settle claims that were preserved, brought and litigated by Original Class Plaintiffs.

In his declaration, Leslie says that he and AIG "agreed" during negotiations that, under his methodology, AIG had underreported by $2.1 billion, translating to damages to the Class (with interest) of approximately $366 million. Ex. AA at ¶ 26. Leslie characterizes the additional amount bringing the total to $450 million (approximately $84 million) as a settlement "inducement." *Id.* Klein (somewhat inconsistently) characterizes the amount over $366 million as a "*catchall*" to cover all legal theories other than breach of contract. Ex. BB at ¶ 26. Settlement Class Plaintiffs previously argued that this additional $84 million is a reasonable amount to cover AIG's exposure to litigation risks regarding the claims brought by Original Class Plaintiffs, including the possibility of a greater damages award, punitive damages and/or RICO damages. *Id.* While Original Class Plaintiffs disagree that the amount is sufficient, there is no question that Leslie's methodology results in approximately $84 million *less* than what AIG in fact paid to settle (assuming unrealistically that it paid 100 cents on the dollar for the claims Leslie supposedly evaluated).

- 7 -

In short, AIG paid at least $75 million and more plausibly most or all of $450 million to settle the very claims that were brought, preserved, and vigorously litigated by Original Class Plaintiffs and Liberty Mutual. This fact is further reinforced by AIG's July 29, 2010 offer letter, which makes clear that but for the existence and litigation of the Class Action, AIG's exposure would dramatically decrease because nobody else (including Settlement Class Plaintiffs) was "*interested in pursuing a class action against AIG*." Ex. U at 3.[4] There can be no doubt that if Original Class Plaintiffs' Motion for Class Certification (Dkt. 171) was denied or withdrawn, AIG's $450 million offer would have immediately disappeared. Settlement Class Plaintiffs and AIG admitted as much by immediately requesting (when Settlement Class Plaintiffs' moved to intervene) that the Court stay ruling on Original Class Plaintiffs' fully briefed Motion for Class Certification. Ex. DD at ¶ 10. This would not have been necessary had the settlement been based "solely" on the "regulatory pressure" brought by the Leslie process, rather than Original Class Plaintiffs' and Liberty Mutual's aggressive litigation and the procedural posture of this case (prior to intervention), as Settlement Class Plaintiffs now disingenuously and implausibly claim.

## II.    SETTLEMENT CLASS PLAINTIFFS' PROPOSED MAY 8, 2010 CUT-OFF FOR FEES IS UNREASONABLE AND UNJUSTIFIED.

Settlement Class Plaintiffs argue that Original Class Plaintiffs deserve no reimbursement for litigation fees and expenses after May 8, 2010, because Settlement Class Plaintiffs disagree with negotiating tactics used by Liberty Mutual on that date. Liberty Mutual's brief sets forth its explanation of the events of May 8, 2010, and we will not repeat that. Settlement Class Plaintiffs

---

[4]     It is also implausible that AIG ever would have agreed to settle with the regulators separately without first (or at least simultaneously) settling the Class Action because, as part of the regulatory settlement, AIG will be required to file revised, sworn "Page 14" statements with the NCCI which will have the legal effect of an admission that AIG underreported by the Leslie-generated $2.1 billion figure. Such an admission would put a floor under recovery in this case. AIG's regulatory settlement is accordingly expressly conditioned on settlement of *this* action. Ex. CC at § H.1.b.

- 8 -

cite no legal support for imposing such a penalty, nor do they explain why Original Class Plaintiffs should not have continued to litigate the case after May 8, how they could have done so in any event given multiple Court-imposed interim deadlines after May 8, or who (besides AIG) would have benefitted from such a decision. Indeed, Settlement Class Plaintiffs and NWCRP counsel previously complimented Original Class Plaintiffs' prosecution of the claim, including actions taken after May 8. Exs. T at 3; O at ¶ 28.

No one involved in litigating (or monitoring) this case could dispute that a great deal of key evidence was developed against AIG after May 8, 2010, which surely created enormous pressure on AIG to settle. In particular, the sampling evidence was obtained after that date, including the pilot sample of 19 files from AIG's Division 55 and AIG's judicially-compelled admission on July 2, 2010 that more than $28 million in underreporting took place in those 19 files alone. Ex. EE at ¶ 5-6. Many key depositions took place after May 8, including, for example, those of Wayland Mead, Joseph Cavolo, Mark Paffman, Bernard Aidnoff, and Joe Smetana. These produced powerful evidence that AIG engaged in intentional and egregious fraudulent conduct extending to divisions other than those described in the Joye memo (and considered by Leslie). Ex. R.1 at ¶¶ 26-28, 30-31, 34, 40-43, and 56.

## III. ORIGINAL CLASS PLAINTIFFS DID NOT OVERSTAFF THE CASE, NOR DID THEY INCUR UNREASONABLE FEES AND EXPENSES LITIGATING IT.

Settlement Class Plaintiffs assert conclusively that Original Class Plaintiffs "overworked" the case but fail to identify any task undertaken that was unreasonable or did not benefit the Class. Nor do they explain why any particular task should not be reimbursed. They argue instead that only the work of a single law firm should be reimbursed, asserting incorrectly that no other party in this case has hired more than one firm. In all events, the Court's role in awarding fees for litigating the case on behalf of the Class is to do its "best to award counsel the

- 9 -

market price for legal services." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). "The best evidence of whether attorney's fees are reasonable is whether a party has paid them." *Cintas Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008); *RK Co. v. See*, 622 F.3d 846, 854 (7th Cir. 2010) (same). All of the fees, costs and expenses sought have been fully paid. Exs. O at ¶ 7; R at ¶ 8; S at ¶ 10. Thus, the Court should not second-guess sophisticated legal consumers, Original Class Plaintiffs, who determined, while acting on behalf of the Class, that these fees, costs and expenses were reasonable. This is particularly so where Settlement Class Plaintiffs have not offered any specific arguments to the contrary, other than a generic complaint that two firms were used instead of one and an implausible argument that the prosecution of this case and its settlement were wholly unrelated events.

A. **There is no justification for limiting Original Class Plaintiffs' reimbursement to the work done by only one law firm.**

In arguing that Original Class Plaintiffs should only be reimbursed for the costs and fees incurred by one of the two law firms that represented them, Settlement Class Plaintiffs state that "*none of the other insurance companies involved in this case have retained more than one law firm to represent them in this action.*" Opp. Br. at 24. Not only is that statement patently false, its recklessness is astonishing given its intended purpose– *i.e.*, to accuse Original Class Plaintiffs of overstaffing the case by hiring two firms to litigate the Class Action.

First, as the Court well knows, AIG retained two firms – one Chicago firm (Novack & Macey) and one East Coast firm (Quinn Emanuel) – to litigate this case, just as Original Class Plaintiffs did by hiring Grippo & Elden (Chicago) and Nutter (Boston). But this fact alone does not fully demonstrate the gross inaccuracy of Settlement Class Plaintiffs' statement.

Indeed, only five months ago, these same parties (though their counsel) represented to the Court that "Settlement Class Plaintiffs have also… been vigorously, thoughtfully, and effectively

- 10 -

represented by *three* competent outside law firms." Ex. FF at 2 (emphasis in original).  These

three firms are Goldberg Kohn, and (by virtue of their representation of the NWCRP and its

Board) LLBL and Schiff Hardin, the latter two having deployed more than 20 lawyers between

them to bill substantial sums to this matter during the period after the NCCI's 2007 Action was

dismissed, when neither firm was litigating any of the Class's claims against AIG.  To that

number, Goldberg Kohn has utilized an additional six lawyers to push through a settlement

negotiated by others, raising the total to more than 26 lawyers among these three firms alone.  As

noted above, LLBL's, Schiff Hardin's and Golberg Kohn's fees and expenses were included in

the "*more than $60 million*" in payments previously authorized by the NWCRP Board.

On top of that, *each* of the three AUR-Settlement Class Plaintiffs (Travelers, Hartford

and Ace) has a fourth law firm representing it:  Winston & Strawn (for Travelers), Dykema (for

Hartford) and Walker Wilcox (for Ace).  It is clear from Goldberg Kohn's timesheets that these

firms were heavily involved in the intervention and settlement approval efforts and have been

advising Goldberg Kohn from the beginning.  R. 455-1.

Given the NWRCP Board's decision to authorize the NWRCP to directly pay over $60

million in fees and costs related to this action – a sum that includes substantial amounts to the six

firms last noted – it is the pinnacle of hypocrisy for Settlement Class Plaintiffs to object that

Original Class Plaintiffs hired two law firms (who billed less than a third of that amount) to

actually *litigate* the Class's claims.[5]

More fundamentally, it is irrelevant how many firms Original Class Plaintiffs hired.

Settlement Class Plaintiffs present no evidence or argument that Original Class Plaintiffs spent

---

[5]     Even more disturbing, the NWCRP Board's decision to directly fund certain of its members'
lawyers (Settlement Class Plaintiffs) to intervene in and settle a lawsuit against another member (AIG) in
contravention of the interests of still other members (*i.e.*, Original Class Plaintiffs and Liberty Mutual) is
precisely the type of conduct that the Court has already ruled constitutes a "*profound conflict of interest*."
2007 Action Dkt. 475 at 14-15.

1233651

too many hours or used too many lawyers to litigate the case. There is no reason why a certain number of lawyers working a certain number of hours on the case at one firm should be compensated, but the same number of lawyers working the same number of hours but split between two firms should not.

Original Class Plaintiffs' counsel have explained how the work was generally divided between Nutter and Grippo to avoid unnecessary duplication. Ex. R.1 at ¶¶ 2-3. Settlement Class Plaintiffs provide only three vague examples of alleged duplication between firms. First, Settlement Class Plaintiffs complain that both Nutter and Grippo were involved in preparing for the deposition of Taylor Atkins, one of AIG's most important witnesses. Grippo's bills show only 0.5 hours of paralegal time and 0.8 hours of attorney time to assist Nutter (who attended the deposition rather than Grippo) in gathering and reviewing documents related it. *See* Ex. O.1 at 14884-85 (entries 2768, 2780). This amounted to less than $500, hardly evidence of rampant duplication, and is evidence that Grippo avoided redoing work that Nutter had already done. Settlement Class Plaintiffs also vaguely argue that the two firms must have duplicated work because they were "spending time and conversing regarding review of related documents and preparation of overlapping witnesses" in January 2010 and "communicating regarding sampling strategies and damages analysis" in the spring of 2010. Opp. Br. at 14. It is impossible tell what tasks Settlement Class Plaintiffs assert are duplicative because they do not identify any. But it is obvious that the only way to avoid duplication is by communication and coordination between the two firms. No one suggests the amount of time spent on these tasks was excessive. Settlement Class Plaintiffs' general and unsupported assertions of duplication should be rejected.

**B.     Reimbursement is appropriate for time spent on the sampling project.**

Settlement Class Plaintiffs argue that work on the sampling project was wasteful because Leslie claims it did not influence him during the settlement negotiations. But what Leslie

thought is irrelevant. He was not representing AIG, the party writing the check. As noted, AIG tellingly submits no declaration claiming it was not motivated to settle by the specter of the Court-mandated, Court-approved and Court-supervised statistical sampling process, or the threat that sampling would expose Leslie's "agreed" $2.1 billion underreporting figure as insufficient by two-thirds. Settlement Class Plaintiffs present no credible evidence that sampling did not affect the settlement, in particular its timing. AIG (citing nothing) argues only that it disputes damages are what Original Class Plaintiffs assert they are, as if other defendants would not make a similar self-serving claim. The possibility that a jury would agree with Original Class Plaintiffs' sampling conclusions and resulting damages calculations is what caused AIG to settle.

Even NWCRP counsel itself contemporaneously characterized sampling as the "*driving factor*" in the litigation, and recognized its importance to settlement (as did the Court).[6] *See* Ex. O.19; Ex. N at 1108251; Ex. M at 38-39. Indeed, at the time of Dr. Kadane's adoption of the sampling plan NWCRP counsel called the event "*every plaintiff's dream scenario.*" Ex. O at ¶ 28.

Settlement Class Plaintiffs have apparently revised their lawyers' prior assessment and – as part of their effort to punish Original Class Plaintiffs for objecting to the settlement – now assert that the sampling evidence is not powerful. Even if true (which it is not), this is no reason to deny Original Class Plaintiffs reimbursement for developing an admissible methodology to quantify AIG's underreporting and resulting damages, the absence of which would have had grave consequences for the Class. Indeed, the Court *ordered* Original Class Plaintiffs (and AIG and the AURs) to engage in sampling for the express purpose of providing "*meaningful information concerning potential damages,*" and further ordered that no policy-level discovery of

---

[6]     Sampling caused not only AIG to want to settle, but also the AUR-Settlement Class Plaintiffs, who became notably more interested in settlement just as AIG's sampling of their files began and, according to AIG's allegations, revealed that similar underreporting may have occurred.

- 13 -

AIG would be permitted other than by sampling. Exs. M. at 38-39; K at ¶ 3. The Court also repeatedly stated that sampling was the top priority in discovery, and Dr. Kadane and the Court were heavily involved in supervising the process. Exs. V at 8; W at 10-11.

In all events, what do Settlement Class Plaintiffs know about sampling? None of them – or their lawyers – took any part in the analysis or hired experts to evaluate it. They relied entirely on Leslie's methodology, which is inadmissible and done as part of a regulatory settlement process pursuant to confidentiality agreements. To rely on those calculations in the litigation (rather than developing an admissible, sampling-based damages theory) would have involved huge risk and great expense for a vastly inferior product.

## IV. THE AMOUNTS AWARDED TO ORIGINAL CLASS PLAINTIFFS SHOULD NOT BE OFFSET BY GOLDBERG KOHN'S FEES.

Settlement Class Plaintiffs' argument that the amount awarded to Original Class Plaintiffs should be reduced by Goldberg's fees is that there would have been no need for Goldberg to incur *any* fees "but for the tactics" of Original Class Plaintiffs and Liberty Mutual. Opp. Br. at 14. This argument assumes that negotiating a settlement agreement and getting to final judgment would normally be done at zero cost to the Class. Obviously, fees and expenses were incurred and are always incurred to finalize the settlement, submit it for court approval, send notice to the Class, prepare for the final fairness hearing, and the like. Since Settlement Class Plaintiffs provide no breakdown for these items, this argument cannot even be considered.

In any event, as with their "no reimbursement after May 8" argument, there is no law supporting this "offset" argument. This is not surprising because it directly contradicts the Seventh Circuit directive that courts should encourage objections so that they may hear a wide range of opinions on a settlement. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002). In determining whether an objector deserves fees *for objecting*, it may make sense to

examine whether the objector has, through its objections, provided a net benefit to the class which justifies the fee requested. But that point is irrelevant here since Original Class Plaintiffs seek only sums incurred litigating against AIG, not for objecting to the settlement. Imposing a several million dollar penalty for disputing a settlement that Original Class Plaintiffs strongly believe is against the Class's interests is wholly unsupported in the case law and manifestly unjust. *See generally In re Agent Orange Prod. Liab. Litig*., 818 F.2d 226, 238-39 (2d Cir. 1987) (reversing district court for subtracting from amounts otherwise due to law firm for work in class action because of benefits its other clients received because to do so would result in class unfairly obtaining benefit of the firm's work at no cost).

## CONCLUSION

For the foregoing reasons and those set forth in their opening memorandum, Original Class Plaintiffs request reimbursement in the amount of $14,800,890.22 from any common fund that results from the Class Action.

Dated: November 17, 2011

Respectfully submitted,

**SAFECO INSURANCE COMPANY OF AMERICA** and **OHIO CASUALTY INSURANCE COMPANY**

By: /s/ Matthew O. Sitzer
One of Their Attorneys

Gary M. Elden
Gary M. Miller
Matthew O. Sitzer
Daniel M. Hinkle
GRIPPO & ELDEN, LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700
gelden@grippoelden.com
gmiller@grippoelden.com
msitzer@grippoelden.com
dhinkle@grippoelden.com

Michael A. Walsh (admitted *pro hac vice*)
Allison D. Burroughs (admitted *pro hac vice*)
NUTTER, McCLENNEN & FISH, LLP
155 Seaport Boulevard
Boston, MA 02110
(617) 439-2775
mwalsh@nutter.com
aburroughs@nutter.com

- 15 -

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing **ORIGINAL**

**CLASS PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR**

**REIMBURSEMENT OF ATTORNEYS' FEES, COSTS AND EXPENSES** was served upon

all counsel of record in this action via the U.S. District Court CM/ECF e-filing system on

November 17, 2011.


/s/  Matthew O. Sitzer
Matthew O. Sitzer

1233651